## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

Case No.: _____

MARK CASSIDY, on behalf of himself
and all others similarly situated,

          Plaintiff,                        **CLASS ACTION COMPLAINT**

v.                                    **JURY DEMAND**

VOYAGER DIGITAL LTD, and VOYAGER
DIGITAL LLC

          Defendants.

_____/

### CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Mark Cassidy files this class action complaint on behalf of himself, and all others similarly situated, against VOYAGER DIGITAL LTD ("Voyager") and VOYAGER DIGITAL LLC ("VDL") (Voyager and VDL shall together be referred to herein as "the Voyager Defendants").

### INTRODUCTION

1.     Voyager has quickly become one of the most utilized avenues for nascent investors to purchase cryptocurrency, and thus has already reaped hundreds of millions of dollars in revenue since 2019, which is increasing exponentially every week. The Voyager Defendants operate a multi-billion-dollar mobile application cryptocurrency investment service (the "Deceptive Voyager Platform") that places cryptocurrency trade orders on behalf of users like Plaintiff and Class Members. The Voyager Defendants specifically target young and inexperienced investors, who are certainly new to cryptocurrency trading and mainly utilize mobile apps (rather than any sophisticated software) for trading, through the use of youth-forward marketing, promises of interest payments on cryptocurrency holdings (if a minimum balance is met), and uniform representations that the Deceptive Voyager Platform is "100% Commission-Free," while also

*Mark Cassidy v. Voyager Digital Ltd., et al.*

assuring customers that they will receive the best possible price on cryptocurrency trades. As will be explained with extensive expert support, the Voyager Defendants' statements and representations are false, misleading and certainly violate numerous state and federal consumer statutes.

2.     The Deceptive Voyager Platform is based upon false pretenses, false representations, and is specifically designed to take advantage of investors that utilize mobile apps to make their investments, in an unfair, unsavory, and deceptive manner. Simply put, Plaintiffs will prove that the Deceptive Voyager Platform is a house of cards, built on false promises and factually impossible representations that were specifically designed to take advantage of the cryptocurrency craze to the direct detriment of any ordinary investor.

3.     The Voyager Defendants offer what they misleadingly claim to be "100% Commission-Free" cryptocurrency trading services, in order to unfairly obtain an edge over their competition, such as Coinbase, Gemini, Kraken, or Binance, who openly disclose the commissions and fees they charge on cryptocurrency trades. This tactic directly evolved from the alleged "no commission" alternatives offered by numerous brokerage houses I the 1980s.

4.     In reality and unbeknownst to the Voyager Defendants' unsuspecting and largely unsophisticated consumers (especially considering that cryptocurrency is an emerging and innovative market with differences from traditional stock exchanges not appreciated by the average retail consumer), the Voyager Defendants *never* disclose that they intentionally set the pricing on their Voyager Platform high enough that they do, in fact, collect exorbitant hidden commissions on every cryptocurrency trade.

5.     Capitalizing on their customers' naivete by using their proprietary systems to throw up smoke screens, including "Smart Order Routing," the "Voyager Pricing Engine," and the "Proprietary Fills Algorithm," numerous experts explain that the Voyager Defendants place their own financial interests at the forefront, and are able to collect on average what is likely to be *more* in hidden commissions than their competition collect from their disclosed commissions.

6.     The very public support from the Dallas Mavericks and their owner, Mark Cuban, including their recent massive investment in the Deceptive Voyager Platform, gives a great illustration of how the Voyager Defendants are targeting unsophisticated investors with false and misleading promises of reaping large profits in the cryptocurrency market.

*Mark Cassidy v. Voyager Digital Ltd., et al.*

7.      Mark Cuban recently spoke at a Dallas Mavericks press conference, conducted over the internet, where he strongly supported and touted the partnership between his company and the Voyager Defendants. Mr. Cuban proudly described how he would personally help significantly increase scope and presence of the Deceptive Voyager Platform for those with limited funds and experience:

> You know, there's a lot of hype, there's a lot of discussion, but most people don't understand the fundamentals behind it. We're going to try to bring that level of education to our fans and to our joint customers."
>
> To put it simply: there's untapped potential in the future of digital currencies and it's an attractive investment for novice investors who might only have $100 to start. That's where Voyager enters the picture.
>
> In other words, it's a way to earn high returns while also getting skin in the game and the Voyager platform makes the process easy and simplified for fans of all ages. The 60+ crypto assets allows you to build a diverse portfolio from a single account.
>
> You don't have to spend a lot of money in order to learn. It's not like the stock market where it's almost impossible, except on a few platforms, to spend $10 and get started. My now 12-year-old son got me in Dogecoin when it was less than a penny. I was like "let's do this" because it's a cheap way for him to learn how all of this works. While you have to put in a $100 to get the $100 bonus the next two days, if you don't have a hundred dollars and you just want to download the app and put in $5 and buy SHIBA INU (SHIB) and Dogecoin (DOGE), there's a lot of ways to inexpensively start.[1]

8.      Voyager's President and Chief Officer, Steve Ehrlich agreed with Mr. Cuban and added as follows:

> That's one of the advantages of Voyager. You can actually download the app and fund your account and trade in three minutes or less. We make it really simple. We have a very easy-to-use and integrative platform that allows you to get engaged in the crypto market very quickly. That's one of the values of Voyager. You'll be trading in three minutes or less.
>
> About 220 million people have crypto right now and we (anticipate) a billion in four years. So that shows you where we can actually go with crypto and crypto adoption. Now the comparison there is the internet. It took the internet eight years, for the same time frame, for the internet to grow that fast. So it's a great time to enter the space and learn more.[2]

---

[1] https://www.mavs.com/mavsvoyager/
[2] *Id.*

*Mark Cassidy v. Voyager Digital Ltd., et al.*

9.     The Voyager Defendants' representations and marketing materials regarding their "100% Commission-Free" Platform are false, deceptive, and are objectively very likely to deceive average consumers acting reasonably under the circumstances. Accordingly, the Voyager Defendants' conduct violates the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, *et seq*., ("NJCFA"), the Florida Deceptive and Unfair Trade Practices Act, §§ 501.201, *et seq.*, Florida Statutes ("FDUTPA"), and has unjustly enriched the Voyager Defendants to the detriment of the Plaintiff and the Class members.

10.     Plaintiff thus seeks damages and restitution on behalf of himself and the Class members, as well as declaratory and injunctive relief to put an end to the Voyager Defendants' unfair and deceptive marketing and sales practices.

## PARTIES

11.     Plaintiff is a citizen of the State of Florida residing in Broward County, Florida. He is a natural person over the age of 21 and is otherwise *sui juris*.

12.     Defendant Voyager is an entity existing and incorporated pursuant to the laws of British Columbia, Canada, is regulated by the Securities and Exchange Commission, and maintains a principal place of business in 33 Irving Place, 3rd Floor, New York, New York 10003. Defendant Voyager, for purposes of this action, is therefore a citizen of New York.

13.     Defendant VDL is an entity existing and incorporated pursuant to the laws of Delaware, with its principal place of business in Jersey City, New Jersey. Defendant VDL is therefore a citizen of Delaware and New Jersey.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because this is a class action for a sum exceeding $5,000,000.00, exclusive of interest and costs, and in which at least one class member is a citizen of a state different than the Voyager Defendants. Additionally, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) as Plaintiff, a Florida citizen, brings his individual claims against Delaware, New Jersey, or New York citizens, and given the nature of the claims and the declaratory and injunctive relief sought, the amount in controversy is greater than $75,000.00, exclusive of interest and costs.

*Mark Cassidy v. Voyager Digital Ltd., et al.*

15.     This Court has jurisdiction over the Voyager Defendants because they are foreign corporations authorized to conduct business in Florida, are doing business in Florida, and have registered with the State of Florida, or do sufficient business in Florida, have sufficient minimum contacts with Florida, or otherwise intentionally avail themselves of the Florida consumer market through the promotion, marketing, sale, and service of their Voyager Platform in Florida. This purposeful availment renders the exercise of jurisdiction by this Court over the Voyager Defendants and their affiliated or related entities permissible under traditional notions of fair play and substantial justice.

16.     Venue is proper in this District under 28 U.S.C. § 1391 because the Voyager Defendants maintain substantial operations in this District; thousands of Class Members either reside or did business with the Voyager Defendants in this District; the Voyager Defendants engaged in business in this District; a substantial part of the events or omissions giving rise to the claims at issue occurred in this District; and because the Voyager Defendants entered into transactions and received substantial profits from Class Members who reside in this District.

17.     All conditions precedent to the institution and maintenance of this action have been performed, excused, waived, or have otherwise occurred.

**FACTUAL ALLEGATIONS**

**A.  The Voyager Defendants and the Deceptive Voyager Platform**

18.     Voyager, through its Deceptive Voyager Platform, offers investors, developers and platform providers a fully functional suite of APIs and mobile apps to allow anyone who is legally able to do so the ability to trade, invest, earn and secure digital assets across multiple types of digital assets.[3] According to its creators, Voyager "is a publicly traded holding company whose subsidiaries operate a crypto-asset platform that provides retail and institutional investors with a turnkey solution to trade crypto assets. The Deceptive Voyager Platform provides its customers with competitive price execution through its smart order router and as well as a custody solution on a wide choice of popular crypto-assets. Voyager was founded by established Wall Street and

---

[3] *See* Voyager Digital Ltd. Management's Discussion and Analysis for the Three and Six Months Ended December 21, 2020, dated March 1, 2021, attached as **Exhibit A**.

5

*Mark Cassidy v. Voyager Digital Ltd., et al.*

Silicon Valley entrepreneurs who teamed to bring a better, more transparent, and cost-efficient alternative for trading crypto-assets to the marketplace."[4]

19.     VDL, one of Voyager's subsidiaries, acts as a "crypto broker," being a digital agent broker that facilitates users buying and selling of cryptocurrencies delivering deep pools of liquidity.[5] It also offers a single access point to research, manage, trade, and secure cryptocurrencies for novice and sophisticated investors.[6] Some of the services offered by VDL include:

    (a) users can open an account in three minutes or less. VDL utilizes third party service providers for know-your-client and anti-money-laundering checks to ensure fast and secure account openings;

    (b) users are able to trade between fiat and cryptocurrency on a wide variety of core and alternative cryptocurrencies;

    (c) execution of trade orders across a spectrum of exchanges to give Voyager the deepest pool of liquidity;

    (d) minimizing transaction costs by aggregating orders and routing the order flow through the optimal mix of exchanges, by utilizing VDL's patented smart router technology;

    (e) providing users with data in order for them to manage and track their crypto investments, including delivering news, social feeds and real-time alerts to keep users connected to the market, and providing portfolio tools to track performance, balances and transactions; and

    (f) storing crypto assets in a secure wallet and in a "cold" facility, with 24/7 security. (fiat currency is stored at custodial banks).[7]

20.     In November 2020, Voyager hired Natalie Jaeger as the Head of Digital Marketing, and promptly began "a more aggressive marketing strategy which included digital advertising, increased social marketing, and increased influencer marketing using crypto centric influencers

---

[4] *See* "Voyager Digital and Market Rebellion to Form Online Broker Platform for Equities, Options, and Futures Trading," dated May 5, 2021, attached as **Exhibit B**.
[5] *See* Ex. B.
[6] *Id.*
[7] *Id.*

*Mark Cassidy v. Voyager Digital Ltd., et al.*

and professional athletes."[8] Part of this aggressive marketing strategy, in addition to increased direct targeted marketing to consumers, has been to introduce an "interest rate hike campaign" known as "March Interest Mania," where Voyager increased the rates of interest it would pay to customers who hold certain minimum account balances for different cryptocurrencies.[9] Voyager also recently purchased a full season Oakland A's suite at the Oakland Coliseum for one Bitcoin, "becoming the first purchase of a ticket offering priced in cryptocurrency in MLB."[10]

21.     As a result of this increased marketing, Voyager has enjoyed explosive growth throughout the ongoing COVID-19 pandemic. In January 2021, Voyager closed on a private placement offering of 8,363,637 shares of common stock for gross proceeds of approximately $46.0 million.[11] In February 2021, Voyager closed on a private placement offering of 7,633,588 shares of common stock for gross proceeds of approximately $100.0 million.[12]

22.     Further, during the months of January, February, and March 2021, the Voyager Defendants onboarded 65,000, 70,000, and 95,000 new funded accounts with net deposits of $170M, $400M, and $650M, respectively:[13]

|  | March 2021 | February 2021 | January 2021 |
|---|---|---|---|
| Net Deposits | $650M | $400M | $170M |
| New Funded Accounts | 95,000 | 70,000 | 65,000 |
| New Verified Users | 395,000 | 190,000 | 250,000 |
| Principal Value traded | $2.5B | $1.6B | $840M |

As of March 31, 2021, Voyager's Assets Under Management exceeded $2.4 billion, with total funded accounts exceeding 270,000 and over 1 million total verified users on the Platform.[14]

---

[8] *Id.*

[9] *See* "Voyager Digital Announces March Interest Mania Rate Increases" dated March 10, 2021, attached as **Exhibit C**.

[10] *See* "Voyager Digital Purchases Oakland A's Bitcoin Suite," dated April 1, 2021, attached as **Exhibit D**.

[11] *See* Ex. B.

[12] *Id.*

[13] *See* "Voyager Digital Provides Business Update and March 2021 Metrics," dated April 6, 2021, attached as **Exhibit E**.

[14] *Id.*

*Mark Cassidy v. Voyager Digital Ltd., et al.*

23.     Moreover, during the month of April 2021 alone, the Voyager Defendants "onboarded new users at a record rate with over 130,000 new funded accounts added to the platform."[15]

24.     As a result of Voyager's exponential growth, as of March 2021, Voyager "had an overall cash and liquid investments position in excess of $200 million."[16] Unsurprisingly, Voyager maintains that 50% of their increased budget will go directly into marketing in order to recruit new customers.[17]

**B.     The Voyager Defendants' Uniform "100% Commission-Free" Misrepresentations**

25.     Included prominently throughout Voyager's uniform marketing representations to its customers is that the Voyager Platform offers trades that are "100% Commission-Free."

26.     These representations enable Voyager to obtain an edge over its competitors, including but not limited to Coinbase, Gemini, Kraken, and Binance, who openly display the applicable fees and commissions they charge on each trade.

27.     Voyager's "100% Commission-Free" representations, however, are false and are reasonably likely to mislead objective consumers acting reasonably under the circumstances. While Voyager does not openly display the commissions it charges on each cryptocurrency trade, Voyager utilizes various methods to secrete the exorbitant commissions it retains from every trade.

28.     For example, the "spread" (i.e., the difference between the "Bid Price" and "Ask Price" on a given cryptocurrency) is kept intentionally wide on all cryptocurrencies listed throughout the Voyager Platform. Voyager explains in its most recent Management's Discussion and Analysis that the spread is the main source of their revenue:[18]

> Fee revenue for the three and nine months ended March 31, 2021 was $53.7 million and $57.4, an increase of $53.5 and $57.1 compared to the same periods in 2020. The increase in the three months ended March 31, 2021 compared to the three months ended March 31, 2020 was primarily due to an increase of $5.0 billion in trade volumes, and an increase in average spread of 70.1 bps. The increase in the nine months ended March 31, 2021 compared to the nine months ended March 31,

---

[15] *See* "Voyager Digital Provides Business Update for April," dated May 3, 2021, attached as **Exhibit F**.

[16] *See* Transcript of Voyager Digital FY2Q 2021 Earnings Call dated March 1, 2021, attached as **Exhibit G**.

[17] *Id*.

[18] *See* Voyager Digital Ltd. Management's Discussion and Analysis for the Three and Nine Months Ended March 31, 2021, dated May 25, 2021, attached as **Exhibit H.**

*Mark Cassidy v. Voyager Digital Ltd., et al.*

2020 was primarily due to an increase of $5.5 billion in trade volumes, and an increase in average spread of 60.6 bps.

29.     Similarly, Founder and President, Steve Ehrlich, explains the importance of "spread revenue" to his investors at their latest earnings call:[19]

> With the growth of assets under management, we remind investors of our 2 main revenue sources, spread revenue and interest revenue. Estimated spread revenue is derived by the trading velocity of our assets while interest revenue was driven by the gross interest earned on the overall assets under management. Historically, the company has earned between 10 to 12% annualized revenue on assets under management.

> At this point, I would also like to remind investors of certain drivers of our business. As in agency brokerage business, market volatility can often act as our friend. Voyager executes trades and captures spread revenue in both up and down markets. One example of the powerful agency model happened on Tuesday, February 23rd when Bitcoin decreased from a high of $56,000 to $45,000. That day, Voyager experienced a record day for trading volume, revenue and net deposits. Investors were very active buying the dips across all of the coins Voyager offers.

30.     Although the Voyager Defendants will display a "Fair Market Price" for each cryptocurrency, which falls somewhere in the middle of the spread, the Voyager Defendants' systems will automatically execute market orders at the highest end of the spread, from which they pocket secret commissions. Moreover, once a user submits a market buy order, the "Estimated Price" for the trade displayed on the Voyager Platform automatically defaults to an amount higher than the quoted "Ask Price" at the top end of the spread, so that an order can execute at an amount that is "less" than the "Estimated Price," but still at the very top end of the spread. Similarly, for market sell orders, the trade will automatically default to an amount lower than the quoted "Bid Price" at the bottom end of the spread so that the order can execute at an amount that is "more" than the "Estimated Price," but still at the bottom end of the spread.

31.     To effectuate these unfair and deceptive business practices, the Voyager Defendants use proprietary systems they have developed, which they refer to as the "Smart Order Router," the "Voyager Pricing Engine," and the "Proprietary Fills Algorithm."[20]

32.     In describing the Smart Order Router, the Voyager Defendants maintain that the Voyager Platform "does not let clients post orders directly on the exchanges to which it connects

---

[19] *See* Ex. G.
[20] *See* "Passion for Product: Voyager Trading System," published Jan 23, 2020 at https://www.investvoyager.com/blog/passion-for-product-trading/ (last accessed May 12, 2021).

*Mark Cassidy v. Voyager Digital Ltd., et al.*

or with the market makers that provide liquidity, but instead its Smart Order Router accepts customer orders and fills them in the market for the customer using its proprietary order routing algorithm."[21] The Voyager Pricing Engine "calculates the fair market price while constantly analyzing the order books, executions, depth of liquidity, commissions and other proprietary factors across [Voyager's] liquidity sources and streams this price to its users."[22]

33.     To obscure this overarching scheme, Voyager utilizes vague and opaque representations that Voyager will only "share" in "price improvement" where they can fill a user's order at a price better than that which was quoted to the user (which is not in the bid/ask spread or fair market price, but rather in the jacked up estimated price that is only shown after the customer submits the market order).[23] "By example, if the user is quoted $10,040 and the router is able to fill at $10,030, Voyager may price improve the user's order to $10,035 (note: share of price improvement is variable and is determined by Voyager's proprietary fills algorithm)."[24]

34.     In reality, and unbeknownst to customers, the Voyager Defendants' "Smart Order Router," "Voyager Pricing Engine," and "Proprietary Fills Algorithm" are designed to be intentionally obscure and to provide Voyager with hidden commissions on every trade that in most cases exceed the disclosed fees and commissions charged by its competitors. Voyager unfairly gains an edge on its competition and overcharges customers by collecting these secret commissions to the detriment of its unknowing customers.

35.     In support of these allegations, Plaintiff attaches the preliminary expert reports of (a) Richard A. Sanders, the Co-Founder and Lead Investigator of CipherBlade, a blockchain forensics and cybercrime investigative firm which consults on some of the most renowned blockchain projects, as well as numerous law enforcement and regulatory investigations, and provides advisory services to cryptocurrency exchanges and other organizations;[25] and (b) Dr. Stephen Peter Castell, a Chartered IT Professional, independent consultant in computer and telecommunications systems and software development, and the Chairman of the United Kingdom

---

[21] *Id*.
[22] *Id*.
[23] *Id*.
[24] *Id*.
[25] *See* **Exhibit I**

*Mark Cassidy v. Voyager Digital Ltd., et al.*

company CASTELL Computer and Systems Telecommunications Limited, a professional firm of Management and Financial Consultants in Information Technology of over 40 years' standing.[26]

36.    Richard Sanders utilized a blockchain visualization tool called Chainalysis Reactor in forming the opinions set forth in his report. Mr. Sanders explains that Chainalysis Reactor provides a visualization of the same data that would be viewable on a block explorer, but unlike block explorer, Chainalysis Reactor has what is known as "attribution." Attribution is simply the labeling of wallet addresses.[27] "Chainalysis Reactor (as well as similar tools) will have a baseline amount of what is known as attribution: the labeling of wallet addresses. Addresses will be unknown/pseudonymous until Chainalysis updates/labels the addresses in their system. A combination of automated analysis and manual investigation is utilized to continually add attribution.[28]

37.    Mr. Sanders found through his analysis that Voyager had an alarmingly low number of addresses attributed, far below the expected industry standard. "While it is true that no services (not even the most voluminous exchanges, such as Coinbase or Binance) will ever have all addresses attributed, services that have a lower amount of addresses attributed oftentimes lack such attribution as a result of the entity not utilizing a compliance tool such as Chainalysis KYT (the compliance equivalent of Chainalysis Reactor), and/or not submitting address data to such providers. Voyager currently has 1 Bitcoin address attributed in Chainalysis Reactor, a figure far lower than industry standard.

38.    For example, Voyager competitor Celsius has 277,287 attributed addresses for Bitcoin in Chainalysis Reactor. A service with such aggressive marketing as Voyager, according to Sanders, should have more address attribution. Voyager's lack of attribution may at least partially have to do with how Voyager processes customer deposits and withdrawals, which is distinctly different (perhaps deliberately) from their competitors and obfuscates potential attribution efforts.[29] Further, attribution for Voyager wallet addresses for other blockchains was scarce and in some cases non-existent. While attribution for some more less-utilized assets (say, LTC or the ERC-20 tokens) may often have gaps, for attribution on widely-utilized assets (such

---

[26] *See* **Exhibit J**
[27] Sanders report at ¶ 18
[28] *Id.* at ¶ 20
[29] *Id.* at ¶ 22

*Mark Cassidy v. Voyager Digital Ltd., et al.*

as Ethereum) to be lacking immediately stands out. Sanders therefore performed manual attribution for Voyager addresses."[30]

39.     Mr. Sanders found through his analysis that Voyager lacks necessary transparency on their platform and programs, and that opacity materially affects a customer's ability to make an informed decision with their money. "Voyager is not transparent. As described in the preceding paragraph regarding the Voyager Interest Program, it is impossible for consumers to make an informed decision regarding whether to deposit funds to Voyager or not. Further, even if an individual opts out of the Voyager Interest Program, nothing evidences customer funds are not rehypothecated, rendering Voyager customers susceptible to the risk of this rehypothecation whether or not they have the risk appetite and/or desire to sign up for such activity."[31]

40.     According to Mr. Sanders, Voyager fails to communicate to its users exactly what extra fees apply to their transactions, how exactly transactions are being executed, and employs misleading advertising to lure in customers:

> Voyager is deliberately misleading, and often refuses to substantiate information that is essential for a consumer to make an informed decision. As one prominent example, Voyager strongly advertises "Commission-free" trading on their landing page, but no such fees are ever clearly outlined. In the absence of any specificity regarding "the marketplace," it is impossible for a consumer — or anyone for that matter — to determine which "marketplaces" (exchanges?) Voyager is determining to provide the "best execution." There would, indeed, presumably be a set price for a market order, which would be derived from an aggregate of the exchanges Voyager is sourcing liquidity from. In the simplest terms possible, ***it is entirely a black box as to what Voyager is doing with orders purportedly directed to their Smart Order Router***, where (which exchanges) the Voyager Pricing Engine "calculates the fair market price" from, and how the Proprietary Fills Algorithm functions — and in the absence of such information, as well as demonstrable discrepancies between what Voyager says should happen and what happens, these systems are either improperly configured, or to varying degrees may not even exist or exist as described by Voyager. Phrasing such as "evaluation of multiple factors" is, per my experience regarding *all* companies that were suspected of, and subsequently confirmed to be, misleading consumers, extremely concerning. ***The utilization of seemingly-technical jargon, and/or otherwise unspecified yet critical information, often result in tragedy for consumers***.[32] In the absence of any information whatsoever regarding how Voyager is processing customer orders, it is functionally impossible to verify that Voyager is even performing the steps described on their own FAQ. ***Voyager, in essence, is expecting the same degree of***

---

[30] *Id*. at ¶ 23

[31] *Id*. at ¶ 27

[32] https://www.makeuseof.com/the-rise-and-fall-of-bitconnect-an-internet-famous-ponzi-scheme/

*Mark Cassidy v. Voyager Digital Ltd., et al.*

*trust from users that Bitconnect expected from their users regarding a 'trading bot' that turned out to <u>never exist.</u>* Voyager is undoubtedly profiting off of customers utilizing the trade functionality of the Voyager platform, and is irrefutably *not* providing best execution. Voyager cannot both claim to provide best execution *and* be commission-free when it is easily evidenced that numerous other exchanges provide better rates.[33]

41.     Mr. Sanders further explains that Voyager's advertising claim that their platform provides the best execution of trades for users is plainly and demonstrably false:

> The exchange rates provided by Voyager are consistently worse than the rates provided by cryptocurrency exchanges -- regardless of whether the exchange is centralized or decentralized, US-based or not US-based, etc. For Voyager to suggest they are providing any form of 'best execution' across the marketplace is demonstrably false. What makes Voyager's representations even more egregious is that, in the course of my analysis, I had performed extensive cryptocurrency deposits and withdrawals in order to discover cryptocurrency wallet addresses that Voyager utilizes for customer funds. Customer assets are sent to/from either Binance or HTC Trading wallets. Comparing exchange rates on Voyager to those on Binance resulted in Binance having better exchange rates on *every* occasion. Said differently, the *one* exchange that it is possible to assess Voyager would be including across their marketplace comparison (and thus should reflect the same price in Voyager app) provided a better deal than Voyager.[34]

42.     Mr. Sanders also obtained comparison data from the Voyager Defendants' competitors, such as Celsius, which further demonstrates the Deceptive Voyager Platform's vast deviation in number of attributed addresses from the expected industry standard. Mr. Sanders explained that "[u]pon a search of Celsius, a core Voyager competitor, their addresses are well-attributed; note the requirement to scroll down to see the full depth of cryptocurrencies that Celsius wallets are attributed in. Upon a search for Voyager, **only four cryptocurrencies are attributed**, and of those, **the attribution is partial**."[35]

43.     This lack of attribution indicates, in Mr. Sanders' view, that Voyager demonstrates a possibility of noncompliance and lack of responsibly managed services on their platform

> While a service not being attributed in Chainalysis does not confirm the service is suspicious, it is generally typical for compliant and responsibly-managed services to have attribution in a tool like Chainalysis Reactor for several reasons: Companies will sometimes provide their wallet addresses to companies like Chainalysis in order to be helpful to law enforcement and/or decrease the overhead associated with

---

[33] *Id*. at ¶ 29 (emphasis in original and added)
[34] *Id*. at ¶ 30
[35] *Id*. at ¶ 34

*Mark Cassidy v. Voyager Digital Ltd., et al.*

false positives and inquiries that would otherwise stem from a lack of attributed wallet addresses.[36]

44.     This lack of compliance is further illustrated in Voyager's heavy utilization of non-U.S. based fund-receiving addresses which do not reflect the targeted customer demographic:

> While proportionality and focus at this time preclude me from providing a deeper review into Voyager's AML practices, observations regarding Voyager addresses (and the nature of the entities they send and receive cryptocurrencies from) while conducting my attribution work did prompt concerns. As just one example, Voyager's known Bitcoin address sends funds to exchanges that are not US-based or even preclude US residents from signing up (KuCoin, Binance, Byibit, and FTX would all be strong examples.) In essence, where Voyager customers withdraw funds to does not reflect what I'd expect a US-based company soliciting US-based users[37] to send funds to. In my experience, when I see sending exposure that does not reflect the targeted demographic, the company attributed to the wallet(s) has an (often intentional) porous approach to compliance; said differently, I find it very unlikely that the quantity of Source of Wealth inquiries Voyager sent to customers due to these observations (assets going to US-restricted exchanges) would match the statistics shown above.[38]

45.     Not only does Voyager fail to deliver on their advertising promise of "Better Pricing On Trades," **they charge their users the highest premium on trades across all competitors**. According to Mr. Sanders, "On all but one occasion (which was for a less liquid cryptocurrency, ZRX, in a small amount, on FTX), Voyager's prices were worse than whichever exchange they were compared to. Voyager does not offer better pricing on trades. In fact, the rates Voyager offers would result in a plainly worse deal, often to the tune of nearly or more than 1% higher than competitors, even on highly liquid pairs such as BTC/USD."[39] "Consequently, Voyager's representation of offering "Better Pricing on Trades" is, under the most generous of terms, deliberately misleading (it is *obvious* that would lead most people to conclude "across exchanges"), and I'd opine deliberately misleading in a way that is plainly to enrich themselves at the expense of that very misconception Voyager instills."[40]

46.     Upon further testing, Mr. Sanders also found it probable that Voyager is not basing their market quotes off exchanges:

---

[36] *Id*. at ¶ 35 (emphasis added)
[37] https://www.investvoyager.com/blog/where-is-voyager-available/
[38] *Id*. at ¶ 43
[39] *Id*. at ¶ 47
[40] *Id*. at ¶ 48

*Mark Cassidy v. Voyager Digital Ltd., et al.*

Baffled as to how Voyager may be generating the quotes for market buy/sell orders, I decided to run one more test on Voyager regarding USD/USDC. USDC is a cryptocurrency known as a stablecoin, which should be close to the value of the USD; however, these assets are never *entirely* 100%-pegged.[41] Consequently, if one goes onto a cryptocurrency exchange (with legitimate liquidity -- so Coinbase or Kraken would be good choices, whereas an exchange known for fake volume, which is also likely to have fake order books, such as HitBTC[42] might not be), and seeks to trade between a stablecoin and fiat, the exchange will not be an exact 1:1 match. Note that when entering tens or hundreds of millions of dollars into a USDC buy order on Kraken, the peg noticeably is lost, as it should be. Note that on Voyager it does not. *See*: Exhibit E – Infinite Stability.mp4 [accessible at https://youtu.be/zF5nHhLhpaM].[43] In the absence of any indication Voyager is sourcing funds from exchanges, as well as the alarming revelation that Voyager purports to effectively have infinite USDC stores at peg, I am thus left to conclude that it is possible, if not probable, Voyager is not basing their market quotes off exchanges. The explanation may simply be that Voyager sources liquidity from Binance at a markup."[44] "Notably, with Binance's known AML issues, even *if* Voyager were transparently providing Binance's rates on cryptocurrency trades (which they are not) to US users, Voyager is effectively a workaround for Binance being restricted to US residents *and* Voyager cannot know, with confidence, what their ultimate source of funds is. Such activity would be, from a value transfer/blockchain analysis standpoint, described as a workaround to US regulatory requirements and cryptocurrency exchange terms of use.[45]

47.     This probability is further bolstered by the questionability of Voyager's business activity with Binance. Mr. Sanders states:

I can evidence, and have evidenced, that Voyager sends funds to HTC Trading and Binance. What happens with those funds when sent to HTC Trading is a black box (until/unless records are provided), but what one *can* conclude is Voyager, or the company they own/act through, HTC Trading, has one or more Binance accounts. If Voyager were, in fact, being honest about providing the best rates to their users, it would only be sensible to include in the hypothetical set of exchanges they are getting these alleged best rates from: namely Binance. Said differently: **why does Voyager send customer funds to Binance where they presumably hold account(s) yet a Voyager customer will consistently get a better deal on Binance than is shown on Voyager?** As far as the blockchain is concerned, the

---

[41] https://invao.org/how-stable-are-stablecoins/
[42]     https://cointelegraph.com/news/bitwise-calls-out-to-sec-95-of-bitcoin-trade-volume-is-fake-real-market-is-or
[43] *Id*. at ¶ 50
[44] *Id*. at ¶ 51
[45] *Id*. at ¶ 53

*Mark Cassidy v. Voyager Digital Ltd., et al.*

*one* place I can *definitively* assess Voyager receiving liquidity from is Binance, yet Voyager's rates were *worse* than Binance every time.[46]

48.    Mr. Sanders lastly concludes, in line with what Plaintiff alleges:

Voyager has fraudulently conducted business by making false claims, utilizing misleading marketing, and obscuring the truth behind what Voyager does with customer's funds, and what fees users are charged. "Voyager's aggressive expansion in the late 2020/2021 bull market is, in my estimation, plainly targeting inexperienced cryptocurrency users/investors that would not have the experience to know better. New cryptocurrency users rely on active industry participants (companies such as Voyager, and "educators/influencers") to provide them with good-faith insight and not mislead them. Voyager's representations, namely those about commission-free and best price trading, would undoubtedly be understood to mean what they say they mean whether by a cryptocurrency novice or a deeply experienced expert."[47]

49.    Dr. Castell similarly conducted a careful preliminary analysis to demonstrate the potential scope of damages resulting from Voyager's overcharges. This analysis, "relying on Voyager's own reported figures," reflected that Voyager's conduct has likely resulted or will result in 1.08 billion dollars in damages to its users.[48]

50.    Dr. Castell agrees with Mr. Sanders in that Voyager does not actually execute trades at the "best market price" as they advertise. "In summary, it is my firm preliminary opinion that the Voyager App does not materially provide the user functionality as represented by Voyager Digital as regards achieving the 'best market price' for the user/trader."[49]

51.    The Voyager app was likely deliberately designed to not provide the actual functionality aspects represented to users. Dr. Castell states:

Furthermore, in my preliminary opinion the failure of the Voyager App to provide the represented functionality is likely to be centered principally within elements of the coding or programmed behavior of the "Smart Order Router," and/or the "Voyager Pricing Engine," and/or the "Proprietary Fills Algorithm", either acting alone, amongst themselves, or in conjunction with the Voyager Digital corporate software and systems with which these modules connect and inter-operate.[50]

In my preliminary view it is clear that the available technical evidence shows that the Voyager App does not materially provide the user functionality as represented

---

[46] *Id*. at ¶ 55
[47] *Id*. at ¶ 67
[48] Castell report at ¶ 43
[49] *Id*. at ¶ 45
[50] *Id*. at ¶ 46

*Mark Cassidy v. Voyager Digital Ltd., et al.*

by Voyager Digital as regards achieving the "best market price" or "fair market price" for the user/trader.[51]

52.     This obscurity leading to charging customers extra hidden fees is most likely known to Voyager at least at this time, or earlier. Dr. Castell explains,

> …whether through an unintentional failure, or deliberate act, in my view such overcharge provisionally appears to be a definite *software material defect*, and it seems highly unlikely to me that the Voyager Digital company's IT and corporate management did, and does, not know (and, if not, it should), what was and is happening as regards this software material defect and its overcharge/undisclosed commission financial consequences to the Voyager App user.[52]

53.     According to Dr. Castell, each time a user was overcharged on their purportedly "commission free" trades, that overcharge amounted to no less than 0.5% of the total value of that user's trade. "In my view this overcharge to the Voyager User may be characterized or thought of as essentially an undisclosed commission levied by Voyager Limited. The overcharge/ undisclosed commission varied somewhat per individual trade, between approximately 0.5% and 1% of the value of the trade, across all trades in the sample, i.e. the overcharge was never less than 0.5% of the value of the trade."[53]

54.     According to Dr. Castell, it is a fact that there is a definite material defect in the design of Voyager App's software, either deliberately or negligently:

> In the meantime, whether the overcharge is as a result, on the part of Voyager Digital's management, of a fault in Voyager Digital's software development management, i.e. the company's software design, build, testing, deployment and operational processes, or arises from a deliberate intent of the company to deceive and overcharge the users of its Voyager App, or some combination of both, in my view and experience, and dependent, as noted herein, on due inspection and examination of the software development, management and operational documentation to be disclosed by Voyager Digital, such overcharge provisionally appears to me to be a definite *software material defect*. I naturally defer to the court to make that finding legally in due course, and, if so, determine what restitution and compensation falls to be provided by Voyager Digital for the financial consequences of such a software material defect.[54]

55.     That said, Dr. Castell believes this material defect, which led to hundreds of millions of dollars in user overcharges, ***was not an accident, and was indeed deliberate in design***:

---

[51] *Id*. at ¶ 40
[52] *Id*. at ¶ 41
[53] *Id*. at ¶ 26
[54] *Id*. at ¶ 29(b)

However, and subject to the Discovery that will be necessary to analyze definitively whether what the Voyager Digital company's management is doing is intentional, in my preliminary view, since the overcharge/undisclosed commission appears to be present in every trade, it is highly likely that the Voyager App is deliberately conceived and designed by the company's management to function that way, or, equally, the company's management has grossly failed to discharge its requisite IT and corporate governance duties, and has failed to correct this software material defect, perhaps because it is to their company's benefit. It seems highly unlikely to me that the Voyager Digital company's IT and corporate management did, and does, not know (and, if not, it should), what was and is happening as regards this software material defect and its overcharge/undisclosed commission financial consequences to the Voyager App user.[55]

57.     Voyager has failed to meet acceptable professional and transactional standards in the market segment they belong to. Dr. Castell concludes, based on his experience, that:

> Based on the evident material failure of Voyager Digital to provide its promised Voyager App "best market price," and "100% Commission Free," user functionalities, whether those failures be through deliberate policy and systems design, or through faults in software construction and operation, I am of the preliminary opinion that the technical governance of Voyager Digital in the management, operation, integrity, representations and security of its Voyager App and of its other management and customer systems are likely not to meet, in whole or in part, accepted professional standards for, and/or custom and practice in, the consumer electronic financial services and/or online trading sectors, but cannot arrive at a final considered view prior to Defendants' discovery and disclosure.[56]

## PLAINTIFF-SPECIFIC ALLEGATIONS

57.     After being exposed to the Voyager Defendants' uniform misrepresentations that their Platform is "100% Commission-Free," Plaintiff registered for an account on the Voyager Platform on March 17, 2021.

58.     In reliance on the Voyager Defendants' foregoing misrepresentations and omissions, Plaintiff executed the following trades on the Voyager Platform:

| Date | Order | Cryptocurrency | Amount (USD) | Order ID |
|------|-------|----------------|--------------|----------|
| March 18, 2021 | Market Buy | +0.008588 BTC | $500.00 | ZSSEDN |
| March 18, 2021 | Market Buy | +0.11627 ETH | $300.00 | YJTZRN |
| March 18, 2021 | Market Buy | +0.000838 BTC | $50.00 | R9QFBS |
| March 18, 2021 | Market Sell | -0.16627 ETH | $301.06 | Q6G4VX |

---

[55] *Id.* at ¶ 29©
[56] *Id.* at ¶ 50

*Mark Cassidy v. Voyager Digital Ltd., et al.*

| March 18, 2021 | Market Buy | +0.005028 BTC | $301.06 | E13RAS |
|---|---|---|---|---|
| March 18, 2021 | Market Sell | -0.004455 BTC | $263.32 | HK8RCB |
| March 18, 2021 | Market Buy | +0.14357 ETH | $263.31 | 3VHERZ |
| March 31, 2021 | Market Sell | -0.14358 ETH | $263.88 | 5M8EVR |
| March 31, 2021 | Market Buy | +263.88 USDC | $263.88 | GGXZYW |
| April 3, 2021 | Market Sell | -100.00 USDC | $100.00 | 3VFR9Z |
| April 6, 2021 | Market Buy | +100.00 USDC | $100.00 | E07N9M |
| April 18, 2021 | Market Sell | -100.00 USDC | $100.00 | 5A1XVM |
| April 18, 2021 | Market Buy | +0.001788 BTC | $99.99 | EB7CF5 |
| April 25, 2021 | Market Buy | +0.003061 BTC | $150.00 | J57N9H |
| May 1, 2021 | Market Sell | -163.88 USDC | $163.88 | 32VX48 |
| May 1, 2021 | Market Buy | +0.05729 ETH | $163.87 | 3K6TA6 |
| May 4, 2021 | Market Buy | +55.3 ADA | $74.99 | BWY5H0 |
| May 4, 2021 | Market Sell | -1.60 USDC | $1.60 | G9HV8H |
| May 11, 2021 | Market Buy | +0.00248 ETH | $10.00 | DX65EW |
| May 11, 2021 | Limit Buy | +0.00250 ETH | $10.11 | 5J3F4Q |

59.     To illustrate the deceptive nature of the Platform and how the Voyager Defendants secretly charge exorbitant commissions on each trade for Plaintiff and all putative class members despite their misrepresentations that the Platform is "100% Commission-Free," Plaintiff includes the following screenshots of his May 11, 2021 Market Buy trade at Order ID Dx65EW.

*Mark Cassidy v. Voyager Digital Ltd., et al.*

60.     At 11:17am EST, the cryptocurrency Ethereum (ETH) was displayed on the Platform with a "Fair Market Price" of $3,997.83 a coin.



61.     On the "trade" page for Ethereum in the Platform at 11:17am EST, the "Bid Price" displayed at $3,969.44, and the "Ask Price" displayed at $4,025.44.



*Mark Cassidy v. Voyager Digital Ltd., et al.*

62.     At 11:17am EST, Plaintiff submitted a Market Buy order for $10.00 USD worth of Ethereum. On execution of the trade, however, the "Estimated Price" for Ethereum suddenly reflected at $4,027.36 a coin, higher than the maximum quoted "Ask Price" on the immediately preceding page. Plaintiff's order filled at $4,025.28 per coin, at the top end of the bid/ask spread.



63.     At no point during Plaintiff's relationship with the Voyager Defendants did the Voyager Defendants ever disclose, contrary to their representations that the Platform operates "100% Commission-Free," that their "Smart Order Routing," "Voyager Pricing Engine," and "Proprietary Fills algorithm" systems are intentionally designed to provide the Voyager Defendants with secret commissions built into the pricing of every trade.

## CLASS ACTION ALLEGATIONS

64.     As detailed below in the individual counts, Plaintiff brings this lawsuit on behalf of himself and all others similarly situated, pursuant to Rule 23(a), (b)(2), (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure.

### A.  <u>Class Definitions</u>

65.     Plaintiff seeks to represent the following Nationwide Class and Florida Class (collectively, "the Classes"):

> **(1)** <u>Nationwide Class:</u> All persons in the United States who, within the applicable limitations period, used the Voyager Defendants' trading platform to place cryptocurrency investment orders.

> **(2)** <u>Florida Subclass:</u> All persons in the state of Florida who, within the applicable limitations period, used the Voyager Defendants' trading platform to place cryptocurrency investment orders.

Excluded from the Classes are the Voyager Defendants and their officers, directors, affiliates, legal representatives, and employees, any governmental entities, any judge, justice, or judicial officer

presiding over this matter and the members of their immediate families and judicial staff. Plaintiff reserves the right to modify or amend the definition of the proposed Nationwide Class or Florida Subclass, or to include additional classes or subclasses, before or after the Court determines whether such certification is appropriate as discovery progresses.

### B. <u>Numerosity</u>

66.    The Classes are comprised of thousands, if not millions, of consumers nationwide and throughout the state of Florida who have executed trades on the Voyager Platform within the applicable limitations period. Indeed, during the month of April 2021 alone, the Voyager Defendants "onboarded new users at a record rate with over 130,000 new funded accounts added to the platform."[57] Further, during the months of January, February, and March 2021, the Voyager Defendants onboarded 65,000, 70,000, and 95,000 new funded accounts with net deposits of $170M, $400M, and $650M, respectively.[58] Membership in the Classes is thus so numerous that joinder of all members is impracticable. The precise number of members in the Nationwide Class and the Florida Subclass is currently unknown to Plaintiff, but is easily identifiable through the Voyager Defendants' corporate records.

### C. <u>Commonality/Predominance</u>

67.    This action involves common questions of law and fact, which predominate over any questions affecting individual class members. These common legal and factual questions include, but are not limited to, the following:

(a) whether the Voyager Defendants' description of their trading platform as being "100% commission free" is deceptive, unfair, false and misleading;

(b) whether the Voyager Defendants' representations are objectively likely to mislead reasonable consumers to believe that their trading platform operates as "100% commission free";

(c) whether the Voyager Defendants practices violate the NJCFA;

(d) whether the Voyager Defendants practices violate the FDUTPA;

(e) whether the Voyager Defendants have been unjustly enriched at the expense of Plaintiff and Class members as a result of their practices described above;

---

[57] *See* Ex. F.
[58] *See* Ex. E.

*Mark Cassidy v. Voyager Digital Ltd., et al.*

(f)  whether Plaintiff and Class members have sustained monetary loss and the proper measure of that loss;

(g)  whether Plaintiff and Class members are entitled to injunctive relief;

(h)  whether Plaintiff and Class members are entitled to declaratory relief; and

(i)  whether Plaintiff and Class members are entitled to consequential damages, punitive damages, statutory damages, disgorgement, and/or other legal or equitable appropriate remedies as a result of the Voyager Defendants' conduct.

**D.  <u>Typicality</u>**

68.    Plaintiff's claims are typical of the claims of the members of the Classes because all members were injured through the uniform misconduct described above, Plaintiff and all members were exposed to the Voyager Defendants' identical and uniform misrepresentations and omissions regarding the Voyager Platform being "100% commission free," and Plaintiff is advancing the same claims and legal theories on behalf of himself and all such members.

**E.  <u>Adequacy of Representation</u>**

69.    Plaintiff will fairly and adequately protect the interests of the members of the Classes. Plaintiff has retained counsel experienced in complex consumer class action litigation, and Plaintiff intends to prosecute this action vigorously. Plaintiff has no adverse or antagonistic interests to those of the Classes. Plaintiff anticipates no difficulty in the management of this litigation as a class action. To prosecute this case, Plaintiff has chosen the undersigned law firms, which have the financial and legal resources to meet the substantial costs and legal issues associated with this type of consumer class litigation.

**F.  <u>Requirements of Fed. R. Civ. P. 23(b)(3)</u>**

70.    The questions of law or fact common to Plaintiff's and each Classes member's claims predominate over any questions of law or fact affecting only individual members of the Classes. All claims by Plaintiff and the unnamed members of the Classes are based on the common course of conduct by the Voyager Defendants in making identical and uniform misrepresentations and omissions regarding the Voyager Platform being "100% commission free," while secretly charging exorbitant and secret commissions to Plaintiff and the unnamed members of the Classes for every trade made on the Voyager Platform.

71.    Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

*Mark Cassidy v. Voyager Digital Ltd., et al.*

72.     As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the Classes as is in the case at bar, common questions will be held to predominate over individual questions.

**G.   Superiority**

73.     A class action is superior to individual actions for both the Nationwide Class and the Florida Subclass, in part because of the non-exhaustive factors listed below:

(a) Joinder of all Class members would create extreme hardship and inconvenience for the affected customers as they reside nationwide and throughout the state;

(b) Individual claims by Class members are impracticable because the costs to pursue individual claims exceed the value of what any one Class member has at stake. As a result, individual Class members have no interest in prosecuting and controlling separate actions;

(c) There are no known individual Class members who are interested in individually controlling the prosecution of separate actions;

(d) The interests of justice will be well served by resolving the common disputes of potential Class members in one forum;

(e) Individual suits would not be cost effective or economically maintainable as individual actions; and

(f) The action is manageable as a class action.

**H.   Requirements of Fed. R. Civ. P. 23(b)(2)**

74.     The Voyager Defendants have acted and refused to act on grounds generally applicable to the classes by engaging in a common course of conduct of uniformly making identical and uniform misrepresentations and omissions regarding the Voyager Platform being "100% Commission-free," while secretly charging exorbitant and secret commissions to Plaintiff and the unnamed members of the Classes for every trade made on the Voyager Platform, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

**I.   Requirements of Fed. R. Civ. P. 23(c)(4)**

75.     As it is clear that the predominant issue regarding the Voyager Defendants' liability is whether they have violated the NJCFA, the FDUTPA, or been unjustly enriched in making identical and uniform misrepresentations and omissions regarding their trading platform being "100% commission free," while secretly charging exorbitant and secret commissions to Plaintiff

*Mark Cassidy v. Voyager Digital Ltd., et al.*

and the unnamed members of the Classes for every trade made on the Voyager Platform, utilizing Rule 23(c)(4) to certify either or both of the Classes for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

### J.   <u>Nature of Notice to the Proposed Classes.</u>

76.     The names and addresses of all Class Members are contained in the business records maintained by the Voyager Defendants and are readily available to the Voyager Defendants. The Class Members are readily and objectively identifiable. Plaintiff contemplates that notice will be provided to Class Members by e-mail, mail, and published notice.

### <u>COUNT I</u>

### VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT
### (on behalf of Plaintiff and Members of the Nationwide Class)

77.     Plaintiff re-alleges and incorporates paragraphs 1–76 above as if fully set forth herein and further alleges as follows.

78.     The New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, *et seq*., prohibits the "use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise and misrepresentation . . . in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby." N.J.S.A 56:8-2.

79.     The Voyager Defendants have engaged in, and continue to engage in, unconscionable commercial practices, deceptive acts, and misrepresentations in the conduct of its trade and/or commerce in the State of New Jersey, as described more fully hereinabove.

80.     The Voyager Defendants' statements regarding the Voyager Platform being "100% Commission-Free" were false and misleading because the Voyager Defendants in fact did charge Plaintiff and Class members undisclosed commissions on cryptocurrency trades made on the Voyager Platform.

81.     The NJCFA further provides that "[a]ny person who suffers an ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under the [NJCFA] may bring an action or assert a counterclaim therefore in any court of competent jurisdiction. N.J.S.A. 56:8-19.

82.     Plaintiff and the Class are "person(s)" as that term is defined in N.J.S.A.56:8-1(d).

*Mark Cassidy v. Voyager Digital Ltd., et al.*

83.     Plaintiff and the Class have suffered an ascertainable loss of moneys or property as a direct and proximate result of the Voyager Defendants' unconscionable practices.

84.     Plaintiff and the Class have a private right of action against the Voyager Defendants and it entitles them to recover, in addition to their actual damages, a threefold award of the damages sustained by any person, interest, an award of reasonable attorney's fees, filing fees and reasonable costs of suit. N.J.S.A 56:8-19.

85.     Plaintiff and the Class have suffered, and will continue to suffer, irreparable harm if the Voyager Defendants continue to engage in such deceptive, unfair, and unreasonable practices.

<u>COUNT II</u>
**For Violations of the Florida Deceptive and Unfair Trade Practices Act,**
**§ 501.201, Florida Statutes, *et seq.***
**(On behalf of Plaintiff and Members of the Florida Subclass)**

86.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1–76 as if fully set forth herein.

87.     This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, section 501.201, Fla. Stat., *et seq.* ("FDUTPA"). The stated purpose of the FDUTPA is to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202(2), Fla. Stat.

88.     Plaintiff and Class members are consumers as defined by section 501.203, Fla. Stat. The Voyager Defendants are engaged in trade or commerce within the meaning of the FDUTPA.

89.     Florida Statute section 501.204(1) declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

90.     The Voyager Defendants' unfair and deceptive practices as described herein are objectively likely to mislead – and have misled – consumers acting reasonably in the circumstances.

91.     The Voyager Defendants have violated the FDUTPA by engaging in the unfair and deceptive practices as described herein, which offend public policies and are immoral, unethical, unscrupulous and injurious to consumers.

92.     Plaintiff and consumers in the Class have been aggrieved by The Voyager Defendants' unfair and deceptive practices and acts of false advertising by paying the Voyager Defendants undisclosed commissions on cryptocurrency trades on the Voyager Platform, having parted with money under false pretenses.

93.     The harm suffered by Plaintiffs and consumers in the Class was directly and proximately caused by the deceptive and unfair practices of the Voyager Defendants, as more fully described herein.

94.     Pursuant to sections 501.211(2) and 501.2105, Fla. Stat., Plaintiff and consumers in the Class make claims for actual damages, attorneys' fees and costs.

95.     The Voyager Defendants still utilize many of the deceptive acts and practices described above and is still secretly retaining money from every cryptocurrency trade made on the Voyager Platform. Plaintiff and the other members of the Class have suffered and will continue to suffer irreparable harm if the Voyager Defendants continue to engage in such deceptive, unfair, and unreasonable practices. Section 501.211(1) entitles Plaintiff and the Class to obtain both declaratory or injunctive relief to put an end to the Voyager Defendants' unfair and deceptive scheme.

## COUNT III

### Unjust Enrichment
### (Alleged alternatively, on behalf of Plaintiff and Members of the Nationwide Class)

96.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1–76 as if fully set forth herein.

97.     The Voyager Defendants charged and collected Plaintiff and Class members undisclosed commissions in connection with cryptocurrency trades Plaintiff and Class members made on the Voyager Platform. The Voyager Defendants' collection of these undisclosed commissions contrary to their "100% Commission-Free" representations allowed the Voyager Defendants to enrich itself to the detriment of Plaintiff and Class members.

98.     Plaintiff and Class members conferred upon the Voyager Defendants non-gratuitous payments of undisclosed commissions on cryptocurrency trades made on the Voyager Platform. The Voyager Defendants appreciated, accepted and/or retained, in whole or in part, the non-gratuitous benefits conferred by Plaintiff and Class members.

99.     The Voyager Defendants profited from their unlawful collection and retention of undisclosed commissions it charged at the expense of Plaintiff and Class members, under

*Mark Cassidy v. Voyager Digital Ltd., et al.*

circumstances in which it would be unjust for the Voyager Defendants to be permitted to retain the benefit. Under common law principles of unjust enrichment, the Voyager Defendants should not be permitted to retain the benefits of this unjust enrichment, as they were obtained through deceptive representations and omissions, as more fully described above.

100.    Because the Voyager Defendants' retention of the non-gratuitous benefits conferred by Plaintiff and Class members is unjust and inequitable, Plaintiff and Class members suffered damages as a result of the Voyager Defendants' unjust enrichment, and are entitled to, and hereby seek disgorgement and restitution of the Voyager Defendants' wrongful profits, revenue, and benefits in a manner established by the Court.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for a judgment on behalf of himself and the Classes:

   a.   Certifying the Classes as requested herein;

   b.   Awarding actual, direct and compensatory damages;

   c.   Awarding restitution and disgorgement of revenues if warranted;

   d.   Awarding declaratory relief as permitted by law or equity, including declaring the Voyager Defendants' practices as set forth herein to be unlawful;

   e.   Awarding injunctive relief as permitted by law or equity, including enjoining the Voyager Defendants from continuing those unlawful practices as set forth herein, and directing the Voyager Defendants to identify, with Court supervision, victims of their conduct and pay them all money they are required to pay;

   f.   Awarding statutory and multiple damages, as appropriate;

   g.   Awarding attorneys' fees and costs; and

   **h.**   Providing such further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial as to all claims so triable.

*Mark Cassidy v. Voyager Digital Ltd., et al.*

Dated: December 24, 2021                    Respectfully submitted,

                                      By: *s/ Adam M. Moskowitz*
                                      Adam M. Moskowitz
                                      Florida Bar No. 984280
                                      adam@moskowitz-law.com
                                      Joseph M. Kaye
                                      Florida Bar No. 117520
                                      joseph@moskowitz-law.com
                                      **THE MOSKOWITZ LAW FIRM, PLLC**
                                      2 Alhambra Plaza
                                      Suite 601
                                      Coral Gables, FL 33134
                                      Telephone: (305) 740-1423
                                      *Co-Counsel for Plaintiff and the Class*

                                      By: */s/Stuart Z. Grossman*
                                      Stuart Z. Grossman
                                      Florida Bar No. 156113
                                      szg@grossmanroth.com
                                      Rachel W. Furst
                                      Florida Bar No. 45155
                                      rwf@grossmanroth.com
                                      GROSSMAN ROTH YAFFA COHEN, P.A.
                                      2525 Ponce de Leon Blvd Ste 1150
                                      Coral Gables, FL 33134
                                      Office: 305-442-8666

                                      *Co-Counsel for Plaintiff and the Class*