**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**Case No.: 21-24441-CIV-ALTONAGA/Torres**

MARK CASSIDY, on behalf of himself
and all others similarly situated,

               Plaintiff,                      **CLASS ACTION COMPLAINT**

v.                                     **JURY DEMAND**

VOYAGER DIGITAL LTD, and VOYAGER
DIGITAL LLC

               Defendants.

_____/

**AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

      Plaintiff Mark Cassidy files this class action complaint on behalf of himself, and all others similarly situated, against VOYAGER DIGITAL LTD. ("Voyager") and VOYAGER DIGITAL LLC ("VDL") (Voyager and VDL shall at times together be referred to as "the Voyager Defendants").

*Mark Cassidy v. Voyager Digital Ltd., et al.*
*Case No.: 21-24441-CIV-ALTONAGA/Torres*
*First Amended Complaint*

## INTRODUCTION

1.       The Crypto Currency market is expected to reach US over $ 32 Trillion by 2027, exhibiting a compound annual growth rate (CAGR) of 58.4% during 2022–2027.[1] Accordingly, there is fierce competition within the crypto currency market to obtain as many customers and capital as quickly as possible. One of the largest, and most well attended crypto investor conferences, is the Bitcoin 2022 Miami that was held just weeks ago here in Miami. Voyager was not only a Main Sponsor for the Event, but also sent a large contingent to speak and participate, including Voyager's CEO, Steven Ehrlich and Chief Marketing Officer, Pam Kramer.

2.       Voyager has been very successful in quickly growing into the crypto currency market. As Voyager's CEO Steve Ehrlich proudly announced on Voyager's investor earnings call on February 15, 2022: "As volume and funded accounts grew, so did our assets om platform, increasing from $4.4 billion in the September quarter to $5.9 billion at the end of the December quarter with approximately $1 billion in net new deposits, making up the majority of the $1.4 billion increase."[2]

3.       Mr. Ehrlich's unorthodox cryptocurrency growth strategy was simple: (1) making his company, Voyager, open to the public and for sale on the Toronto and OTC public stock exchanges, so that his company (unlike almost all other cryptocurrency competitors) would appear to the public to be "regulated," and so those that might be hesitant to buy cryptocurrency directly, could be sucked into the market by simply buying Voyager stock,[3] and (2) deceptively designing and marketing Voyager's Platform, which is operated by VDL, a company that has the same CEO, CFO, COO and General Counsel, in order to "put a lot of energy into pushing people down the funnel and incentivize them,"[4] to attract the most investors.

---

[1] https://www.imarcgroup.com/cryptocurrency-market (last accessed April 28, 2022).

[2] Transcript of Voyager Digital FY2Q 2022 Earnings Call dated February 15, 2022, attached as **Exhibit A**.

[3] "Voyager is extremely excited by the new symbol as it reflects our global brand", said Stephen Ehrlich, CEO of Voyager. "The Stock symbol change makes it clear to all of our customers and investors that they can purchase Voyager stock through U.S. Brokers and is the next step in our growth."
https://www.businesswire.com/news/home/20190325005091/en/Voyager-Changes-OTC-Pink-Symbol-to-VYGVF (last accessed April 28, 2022) (last accessed April 28, 2022)

[4] *See* Transcript of Voyager Digital FY2Q 2021 Earnings Call dated March 1, 2021, attached as **Exhibit B.**

*Mark Cassidy v. Voyager Digital Ltd., et al.*
*Case No.: 21-24441-CIV-ALTONAGA/Torres*
*First Amended Complaint*

4.     Voyager's CEO Steve Ehrlich proudly touts that "[w]e're already self-regulating ourselves when it comes to bringing products to retail investors." [5] "Ehrlich adds that there is a limited number of cryptocurrency companies abiding by this extra set of rules as a publicly traded company."[6]

5.     The original Complaint filed in this action, specifically detailed with Expert Reports, how Voyager's practices were deceptive, illegal and were the sale of unregistered securities.

6.     ***After this Complaint*** was filed, the following important actions took place:

(a) the United States Securities and Exchange Commission (SEC) began an enforcement review focused on whether Voyager's Earn Program Accounts ("EPAs") constitute unregistered securities;

(b) seven state Attorney Generals (New Jersey, Alabama, Kentucky, Oklahoma, Texas, Vermont and Washington) took specific action finding that Voyager was violating their state laws, including issuing "cease and desist" letters to Voyager, finding that the EPAs, like the one Plaintiff Mark Cassidy was offered and sold by Voyager, was an unregistered security, prohibiting the crypto-asset broker-dealer from selling any more unregistered securities (finding that Voyager used these EPAs to raise millions of dollars in revenue worldwide as of March 1, 2022 (thousands of these EPAs were Florida-based);

(c) On March 29, 2002, the State of New Jersey Bureau of Securities entered a Cease and Desist Order against Voyager, finding that the Earn Program is not exempt from registration under the law, and instead that it must be registered—and as a result, Voyager's stock price tanked by 25% in a day and is down over 80% for the year;[7]

(d) On February 14, 2022, crypto trader Block-Fi entered into a $50 million dollar settlement with the state regulators and $50 million dollar settlement with the

---

[5]     https://www.msn.com/en-us/money/news/sec-regulations-and-the-cryptocurrency-market-voyager-digital-grayscale-bitcoin-executives-weigh-in/ar-AANZDZc (last accessed April 28, 2022)

[6] *Id.*

[7]     https://seekingalpha.com/article/4498956-voyager-digital-plunged-25-percent-heres-why (last accessed April 28, 2022); https://seekingalpha.com/article/4503716-voyager-digital-buy-dip-during-crypto-crash (last accessed April 28, 2022)

*Mark Cassidy v. Voyager Digital Ltd., et al.*
*Case No.: 21-24441-CIV-ALTONAGA/Torres*
*First Amended Complaint*

SEC and agreed to stop selling its interest-bearing cryptocurrency accounts until they were registered with state and federal securities regulators;

(e) In September 2021, the New Jersey Bureau issued a Summary Cease and Desist Order against Celsius Network LLC, whose unlawful unregistered securities had raised at least $14 billion nationwide;[8] and,

(f) the largest cypto exchange, COINBASE, dropped all plans to offer the same lending rewards program after the SEC threated to sue them.[9]

7.      Voyager's CEO, Steve Ehrlich, told his investors, and the public, on his last investor call, that Voyager is now determining what to do in regards to all of these state and federal investigations: "… that's a conversation between myself, out internal GC, our advisors. And we have a very, very deep team, and we're evaluating all that at this point in time."[10]

## **FACTUAL BACKGROUND**

8.      Voyager describes itself as "a fast-growing, publicly traded cryptocurrency platform in the United States founded in 2018 to bring choice, transparency, and cost efficiency to the marketplace."[11] Voyager was first listed on the Toronto Venture Exchange (TSX.V) under the symbol VYGR.V in February of 2019.[12] In September 2019, Voyager Digital Ltd was listed on the Canadian Stock Exchange (CSE) under the symbol VYGR.CN. In 2021, Voyager announced its approval to trade on the Toronto Stock Exchange (TSX) under the new ticker symbol VOYG and de-list from the CSE.

9.      Voyager stock is also available Over-the-Counter (OTC) through many US brokerages and can be purchased in the state of Florida and throughout the United States via the symbol VYGVF. Voyager has quickly become one of the most utilized avenues for nascent

---

[8]      https://www.njoag.gov/new-jersey-bureau-of-securities-orders-cryptocurrency-company-voyager-digital-to-stop-offering-and-selling-interest-bearing-accounts/ (last accessed April 28, 2022)
[9]      https://www.coindesk.com/policy/2022/01/26/sec-scrutinizing-crypto-firms-over-interest-paying-services-report/ (last accessed April 28, 2022)
[10] Ex. A.
[11] https://www.investvoyager.com/investorrelations/overview/ (last accessed April 28, 2022)
[12] *See* https://www.investvoyager.com/blog/why-voyager-is-a-public-company/ (last accessed April 28, 2022)

investors to purchase cryptocurrency, and thus has already reaped hundreds of millions of dollars in revenue since 2019, which is increasing exponentially every week.

10.      Voyager's founder and CEO, Stephen Ehrlich, who is also the CEO of nearly every other Voyager wholly-owned subsidiary, including VDL, explains that Voyager "made the decision to go public early in our company history. This was an unconventional choice for a crypto-company in 2019 but proved beneficial for our customers and our platform."[13] Ehrlich goes on to explain:

> Here are three reasons why Voyager and our customers benefit from a public structure.
>
> **1) Transparency**
>
> We believe that our users deserve transparency when it comes to their finances.
>
> As a public company, we are held to the highest standards. We are legally required to disclose both quarterly and annual reports as well as conduct public filings for mergers, acquisitions, insider trading, securities transactions by company insiders, and ownership changes. We also have an obligation to act in the best interest of our shareholders and drive value to their investments. Furthermore, our shareholders have a voice in our future, and a vested interest in our success.
>
> **2) Bridging the gap between traditional finance and crypto**
>
> A public structure enables us to create opportunities for investors who want exposure to the crypto markets by investing in companies like Voyager through stock offerings.
>
> Equities traders have the opportunity to invest in the crypto industry by buying shares of Voyager, even if they do not directly invest in crypto. We believe that this type of exposure will help more people become comfortable with the crypto market and ultimately increase widespread adoption.
>
> **3) Opportunity for growth**
>
> We decided to go public early in our growth trajectory, which gave Voyager an alternate avenue for company growth while also empowering everyday equities traders the opportunity to back an emerging crypto company.

---

[13] *Id.*

*Mark Cassidy v. Voyager Digital Ltd., et al.*
*Case No.: 21-24441-CIV-ALTONAGA/Torres*
*First Amended Complaint*

By going public, we keep our doors open to all who see the potential for growth at
Voyager and the crypto economy.

11.     What Ehrlich does not disclose in his blog, however, is that he intentionally
structured Voyager to siphon as much profit off American consumers as possible while
simultaneously preventing them from ever being able to effectively vindicate their rights when
Voyager wrongs them, as Plaintiff is attempting to do here on behalf of himself and all others
similarly situated. As Voyager explains in its Annual Information Form for Fiscal Year 2021:[14]

> [Voyager] is a corporation formed under the laws of British Columbia, Canada;
> however its principal place of business is in the United States. Most of [Voyager's]
> directors and officers, [Voyager's] auditors, and the majority of [Voyager's] assets,
> are located in the United States.

> It may be difficult for customers in the United States to effect service of process
> within the United States upon those directors who are not residents of the United
> States or to enforce against them judgments of the United States courts based upon
> civil liability under the United States federal securities laws or the securities laws
> of any state within the United States. There is doubt as to the enforceability in
> Canada against [Voyager] or against any of its non-United States directors, in
> original actions or in actions for enforcement of judgments of United States courts
> of liabilities based solely upon the United States federal securities laws or securities
> laws of any state within the United States.

12.     Voyager's disdain for being held accountable for its actions by the legal system and
its penchant for gamesmanship continue throughout this litigation. Initially, Plaintiff's counsel
were contacted approximately one year ago by numerous aggrieved consumers who had serious
concerns about Voyager's business practices. Essentially, these consumers and experts concluded
that Voyager was conducting an inherently rigged game, fueled by specific misrepresentations and
lies.

13.     Counsel spent the following months focusing on two main projects:

   a.   investigating and researching, along with some of the top cryptocurrency experts
        in the United States and Europe, to not only prepare allegations regarding
        Voyager's unlawful actions, but to generate preliminary expert reports with
        supporting evidence as to these allegations and a set plan for managing discovery
        of the disputed issues to confirm the allegations, and

---

[14] *See* Ex. I

b.   researching and concluding that there was no enforceable arbitration clause and/or class action waiver executed by Plaintiff Mark Cassidy that precluded him from filing this action before this Court.[15]

14.   When Plaintiff first filed his 29-page complaint, along with over two hundred pages of exhibits, including two comprehensive preliminary Expert Reports, however, Voyager's then Chief Communications Officer, Michael Legg (since this Complaint was filed and his deposition was specifically noticed, Voyager "immediately" took him off of the Voyager Website and he was given a different position), within barely an hour after receiving a copy of the pleading, wrote on behalf of Voyager to the press that "This action is absolutely spurious and without any merit whatsoever. We look forward to dealing with this matter through the appropriate legal channels." Legg Tr. 38:19–39:20.

15.   As a result of some initial, nefarious conduct by Voyager, Plaintiff was required to file a Motion for Order to Show Cause and noticed Voyager Digital LLC for deposition on three topics. *See* ECF No. 25. Voyager Digital LLC refused to produce any deponent and instead filed a Motion to Stay, [ECF No. 29], along with Defendants' Motion to Compel Arbitration and to Dismiss this case [ECF No. 28]. Defendants included in their Motion to Compel Arbitration, for the first time, arguments that, as a factual matter were beyond the four corners of Plaintiff's complaint, such as that the Court does not have personal jurisdiction over Defendant Voyager Digital LTD.

16.   While Defendants had exclusive access to all materials relevant to the Court's determination of whether Plaintiff and either Defendant entered into an enforceable arbitration agreement, they selectively produced some cherry-picked information in their Motion and asked this Court to refuse to allow Plaintiff to take even limited discovery necessary to uncover all of the relevant facts to test Defendants' assertions. For instance, Defendants claimed that Plaintiff is specifically bound by a January 2021 User Agreement with VDL to arbitrate all claims, but then confusingly attaches four additional revised versions and claim that "notice was sent to customers" regarding one of the revisions, two days after the revision was implemented, though asserts that

---

[15] At this early pleading stage of the litigation, the Court initially will only need to find that Plaintiff has standing to assert his claims and is not bound by an arbitration clause, and not whether all, or even any, other class members may be bound by such revised agreements.

they are all materially the same [ECF No. 28, 10–11; ECF No. 28-1 ¶¶ 14–21]. Defendants stipulate that Voyager is not a party or signatory to VDL's User Agreement but maintain that Voyager should still be entitled to enforce its arbitration provision against Plaintiff, assuming any such agreement with VDL was formed [ECF No. 28 at 16–21]. Defendants also claimed that Voyager is "a foreign holding company with no operations or employees," and that VDL "operates" the Voyager Platform. *Id*. 8; [ECF No. 28-1 ¶ 5].

17.     This Court, through careful analysis, saw through the Defendants' ruse, calling their arguments "nonsense," and afforded Plaintiff the opportunity to take limited discovery before filing this amended complaint. [ECF No. 36]. In conducting its analysis, the Court noted, among other things, that the evidence Plaintiff attached to his original complaint showed that In Voyager Ltd.'s March 2021 earnings call, one of its representatives stated, "We're at 49 states today. We offer our services in 49 states. It's only New York that we're not —we don't offer this service." *Id.* (citing Compl., Ex. G, March 3, 2021 Earnings Call [ECF No. 1-8] 17; *see id.* 2 ("[W]elcome to Voyager Digital Limited earnings call." (alteration added)). The Court noted that "[i]t is possible that the representative meant to reference Voyager Digital, LLC, when he used 'we,' but this ambiguity only accentuates the need for jurisdictional discovery." *Id*.

18.     Discovery, however, only further reinforced that Voyager does, in fact, conduct business throughout the United States, including Florida. In response to the question, "[w]as Voyager doing business in 49 states except for the State of New York when you were there?" Voyager's former Chief Communications Officer, Michael Legg, testified "Here is my answer to this. We do business in New York. We don't have customers in New York. **We do business in every state**. We do business internationally, okay." Legg Tr. 26:5–21 (emphasis added).

19.     Why did Defendants fight so vociferously against submitting to even limited discovery? Because they did not want to afford Plaintiff the opportunity to reveal the illusory nature of the VDL User Agreement, or that their claims that Voyager is merely a holding company with no operations or employees were false.

20.     The corporate representative for VDL confirmed in deposition testimony that VDL's regular practice is that it not only unilaterally "makes continuous revisions" to the User Agreement, but it also undertakes a conscious effort to ensure that its customers are not notified of the changes—VDL does not even have *a phone number* to contact customer support—so that

customers can actually decide whether they agree to them before VDL attempts to bind them, as was the case with Plaintiff:

> Q. I'm asking you do you know why, when Voyager makes continuous revisions to the User Agreement -- and you're aware of that, right? Every couple –
>
> A. Yeah.
>
> Q. -- months or years there's changes to this agreement?
>
> . . .
>
> THE WITNESS: Yes.
>
> Q. Okay. Why -- for those subsequent changes that are made why doesn't Voyager just follow the same easy process of having this "click this button," and if you click it, then you could go back, type in the user ID, and you can see, simply, if they clicked it and read it or even received it. Why don't you do that?
>
> A. I don't know.
>
> Q. Have you ever asked anybody?
>
> A. No.
>
> Q. Do you know of any reason, sitting here today as the director of operations that's in charge of the Voyager Platform User Agreement, why Voyager can't do this same process for subsequent amendments?
>
> . . .
>
> THE WITNESS: No.

LLC Tr. (**Exhibit C**) 48:11–49:9

> THE WITNESS: In reviewing the -- the terms he agreed to it's discussed that as the -- that they may change and that they're where they're available and that he can go look at them and make sure that he's still in agreement with them.
>
> Q. But how would he know that those changes have been made?
>
> . . .
>
> THE WITNESS: That would be his responsibility.

LLC Tr. 53:20–54:6

> Q. Okay. And just so I'm perfectly clear, regardless of whether Voyager lets Mr. Cassidy know that there's been an amendment, it's Mr. Cassidy's responsibility on his own to go find out and monitor the site to make sure there's no changes made?
>
> . . .

THE WITNESS: Yes. The user, after they've agreed to it, is -- that is part of what they are agreeing to.

LLC Tr. 56:16–24

Q. Okay. So Pam [Kramer, Voyager's Chief Marketing Officer] writes "Also, based on the specific updates, do you think this warrants an email to customers? This summary is very helpful in that regard. So what we just looked at in the email, the form email, that was sent out that you testified about dated April 16th [sic], that didn't provide a summary to any of the customers. It just said your user agreement has been updated, correct?

A. Yes.

Q. Do you know why the internal summary that Voyager was aware of isn't provided to the customers of Voyager?

. . .

THE WITNESS: No.

Q. Okay. As the corporate rep today with the person with the most knowledge about the unifor- -- the User Agreements, including any revisions thereto, have you ever spoke to anybody about providing your customers with a summary of the changes?

A. No.

. . .

Q. I mean, wouldn't you think that would be helpful if somebody wanted to know?

A. I suppose it could be helpful for some people.

LLC Tr. 75:4–76:16

Q. [Plaintiff] says under oath he reviewed your declaration in support of the motion and he said "I did not receive the April 18th email notifying of the April 16th update to the Customer Agreement," that you had testified went out to this mass mailing of 1.2 million.

My question is very simple. Do you have any shred of evidence, anything, to indicate that he is wrong and that he did receive that email, not that the mass marketing email went out, but that he, in fact, received it?

. . .

THE WITNESS: I -- I personally do not, no.

. . .

Q. Okay. Number 9, he says "I did not receive any email, notifications, or any other form of actual notice of any other versions of the Customer Agreement referenced in Shannon Casey's declaration."

You have no evidence, standing here today, that he did, in fact, receive any of those other notices, correct?

A. What other notices?

Q. Any other notices.

A. I'm just not sure what you're referring to.

Q. Mr. Cassidy says: I didn't receive any emails, any notifications, or any other form of actual notice of any other versions of the Customer Agreement referred to in Shannon Casey's declaration.

You talked about six different modifications that were done over time. Mr. Cassidy under oath is saying I never received any of those.

Do you, sitting here today, have any evidence to show that Mr. Cassidy received any of these other updates or emails?

A. No. We only sent the update on the April 18th email.

LLC Tr. 94:7–96:25

Q.  Okay.  Paragraph 10 says after he – Users apparently can't contact Defendants by phone regarding the questions of their account. Is that correct?  Is there a number that I can call and say, hey, I'm having a problem logging in to my account, can you help me, Voyager LLC?

A.  That's correct, there's -- we do not have phone support.

LLC Tr. 99:4–11

21.     Discovery further revealed deficiencies in the January 2021 version of the User Agreement. Janice Barrillueax, Voyager's Chief Administrative Officer, in reviewing the January 2021 version of the User Agreement, advised that "I just think that we need to be aware that things [sic] grossly outdated" and that customers "need to be put in their little corner." VOYAGER_001890. Later, David Brosgol, Voyager's General Counsel, agreed with Janice and stated that, rather than simply revise the January 2021 User Agreement in effect when Plaintiff created his Voyager account, "it seems that it might be best to do a significant overhaul." VOYAGER_001894.

22.     Further, discovery revealed that, prior to July 26, 2021, not only did VDL *never* submit any version of its arbitration provision to the AAA for review, but when it finally did, the AAA determined that the requirements that "the arbitration will occur in New Jersey and will be conducted confidentially by a single, neutral arbitrator" constituted "a material or substantial

deviation from the Consumer Rules and/or Protocol" and requested that VDL waive those requirements for all future consumer arbitrations under the User Agreement.[16]

23.     Under these circumstances, especially where VDL fully retains the unfettered right to unilaterally modify the User Agreement at will without providing advance notice to its customers, applicable law holds that no agreement has been formed. Thus, not only was Plaintiff not bound by any amendments to the VDL User Agreement, he did not enter into any agreement to arbitrate (or delegate issues of arbitrability) with VDL.

24.     Discovery also revealed that Defendants' sworn statement that Voyager Digital LTD has "no operations or employees" and "does not . . . market the Voyager Platform," [ECF No. 28-1 ¶ 5], was a false statement. For instance, Voyager explained during its Q2 2022 earnings call that "[b]y the end of calendar 2021, we had 250 employees, 3.2 million verified users and 1.074 million funded accounts with over $5.9 billion of assets on the platform. This level of growth makes Voyager one of the fastest-growing cryptocurrency platforms in the industry and one of the largest in the United States. Based on data obtained from one of our investment banking partners, Voyager was third on the list of fastest-growing public companies listed on any U.S. exchange including the OTC markets, based on revenue growth in calendar 2021 with $416 million of revenue, up from just $6.6 million for the calendar year 2020."[17]

25.     Moreover, Voyager markets and offers for sale unregistered securities in the form of cryptocurrency interest-earning accounts. Since Voyager first introduced these unregistered securities to consumers in Florida and throughout the United States in November 2019, it has referred to them by various names, including the "Voyager Interest Program" or the "Voyager Earn Program Account" (collectively, the "EPA"). As Voyager LTD's former Chief Communications Officer, Michael Legg, explained in his deposition taken in this case, "[t]here's always been a program in place to earn yield. How the terminology has been around it has evolved." Legg 43:24–44:1.

---

[16] *See* VOYAGER_001951–52.

[17] Ex. A. Moreover, Legg confirmed in his testimony that (1) every press release was cleared by Stephen Ehrlich as CEO of Voyager Digital Ltd.; and (2) every statement made during the earnings calls was "100 percent accurate at that time." Legg Tr. excerpts (**Exhibit D**), 15:2–12; 17:14–18:2

*Mark Cassidy v. Voyager Digital Ltd., et al.*
*Case No.: 21-24441-CIV-ALTONAGA/Torres*
*First Amended Complaint*

26.     As explained below, the reasoning for that change in terminology has been to avoid the reality—that the EPAs are, in fact, securities that must be registered with the SEC and state analogs.

27.     Voyager never registered the EPAs with the United States Securities and Exchange Commission ("SEC") or with the Florida Office of Financial Regulation (the "OFR").

28.     Not only that, but Voyager has spent tens of millions of dollars from capital raises to fund marketing efforts throughout the United States, including in the state of Florida, to market, offer and sell EPAs through various internet and social media campaigns across state lines to consumers, including Plaintiff. The results have been for Voyager to earn, in turn, tens of millions of dollars in revenue from the EPA investments.

29.     Plaintiff's original complaint, including the extensive preliminary expert report of Rich Sanders of CipherBlade, went into great detail regarding the inherent risks and issues with the fact that Voyager was offering for sale the EPAs without the necessary registration with federal and state regulatory entities or the oversight that follows that registered status.[18]

30.     After Plaintiff filed the original complaint, in February 2022, the SEC charged Voyager's competitor, BlockFi, with failing to register the offers and sales of its retail crypto lending product—a nearly identical offering to Voyager's EPA, called the BlockFi Interest Account.[19] BlockFi settled those claims with the SEC and paid $100 million in fines and agreed to cease its unregistered offers and sales of the BlockFi Interest Accounts, to bring its business within the provisions of the Investment Company Act, and to register under the Securities Act of 1933 the offer and sale of a new lending product.[20]

31.     Shortly after the BlockFi settlement was announced, Stephen Ehrlich, CEO and co-founder of Voyager, explained during the Q2 2022 earnings call for Voyager Digital Ltd, that:[21]

> Lastly, we want to address the recent news about the SEC order in the matter of BlockFi lending LLC. We recognize that this is a significant development in the industry and will provide a potential regulatory path for market participants. We

---

[18] Attached as **Exhibit E** is a supplemental report from Mr. Sanders, which goes into further detail regarding how the EPAs function, how they generate revenue, and whether Voyager properly represents their risk ("Sanders Supp.").
[19] https://www.sec.gov/news/press-release/2022-26 (last accessed April 28, 2022).
[20] *Id.*
[21] Ex. A.

also understand that some may view Voyager's rewards program to be similar to BlockFi interest accounts. While we understand the temptation to bucket them together, we think there are important differences between Voyager's program and BlockFi's that we think have legal significance.

That said, we are in ongoing discussions with regulators about the rewards program, and it is, of course, possible that regulators may have a different view. Under the circumstances, we think it's important to confirm that Voyager has received requests and subpoenas from the SEC and certain states in connection with the rewards program as part of nonpublic fact-finding inquiries. Of course, we believe that Voyager accounts that earn rewards comply with existing U.S. law and look forward to demonstrating that as necessary. We think it is normal and appropriate for financial service firms, especially in the crypto industry with these evolving regulatory frameworks to receive inquiries from regulators and law enforcement. When Voyager received such requests, our policy is to cooperate fully, but we limit public discussion as these matters are always evolving and as a public company, Voyager is subject to important rules regarding disclosures about its business.

32.     Two weeks after Voyager made these statements to its investors, on March 30, 2022, Voyager issued a press release revealing that it was served with orders from various state securities divisions, including New Jersey and Alabama, ordering Voyager to cease and desist its offer and sale of the EPAs as they constitute unregistered securities.[22] As Voyager admits, "The Voyager Earn Program is the only Voyager product subject to the Orders. No other products and services offered by the Company are noted in the Orders."[23]

33.     As Stephen Ehrlich, CEO and co-founder of Voyager, also explained, "I want to emphasize to our shareholders and customers that only one of our products is noted in the Orders. Voyager has always recognized that the US regulatory framework must evolve, and in some cases completely transform, to address the needs of the rapidly expanding crypto sector. Historically, Voyager has advocated for thoughtful regulation, which is a natural progression for this asset class. We believe tailored regulation will spur increased confidence and adoption of crypto assets. Nonetheless, Voyager continues to pursue its strategy to innovate and grow the business and position the Company as a leader in the crypto asset market."[24] As explained more fully, below,

---

[22] A copy of the New Jersey Cease and Desist Order is attached as **Exhibit F**.
[23]   https://www.investvoyager.com/pressreleases/voyager-provides-update-on-state-orders   (last accessed April 28, 2022)
[24] *Id.*

Voyager's offering and selling the EPAs, which are unregistered securities, violates federal and state securities laws.

34.     VDL, on the other hand, operates the multi-billion-dollar mobile application cryptocurrency investment service (the "Deceptive Voyager Platform"), owned by Voyager, that places cryptocurrency trade orders on behalf of users like Plaintiff and Class Members. Specifically targeted to young and inexperienced investors, who are certainly new to cryptocurrency trading and mainly utilize mobile apps (rather than any sophisticated software) for trading, through the use of youth-forward marketing are uniform representations that the Deceptive Voyager Platform is "100% Commission-Free," while also assuring customers that they will receive the best possible price on cryptocurrency trades. As will be explained with extensive expert support, these statements and representations are false, misleading and certainly violate numerous state and federal consumer statutes.

35.     The Deceptive Voyager Platform is based upon false pretenses, false representations, and is specifically designed to take advantage of investors that utilize mobile apps to make their investments, in an unfair, unsavory, and deceptive manner. Simply put, Plaintiffs will prove that the Deceptive Voyager Platform is a house of cards, built on false promises and factually impossible representations that were specifically designed to take advantage of the cryptocurrency craze to the direct detriment of any ordinary investor.

36.     VDL offers what it misleadingly claims to be "100% Commission-Free" cryptocurrency trading services, in order to unfairly obtain an edge over their competition, such as Coinbase, Gemini, Kraken, or Binance, who openly disclose the commissions and fees they charge on cryptocurrency trades. This tactic directly evolved from the alleged "no commission" alternatives offered by numerous brokerage houses in the 1980s.

37.     In reality and unbeknownst to unsuspecting and largely unsophisticated consumers (especially considering that cryptocurrency is an emerging and innovative market with differences from traditional stock exchanges not appreciated by the average retail consumer), VDL *never* discloses that they intentionally set the pricing on the Voyager Platform high enough that they do, in fact, collect exorbitant hidden commissions on every cryptocurrency trade.

38.     Capitalizing on their customers' naivete by using their proprietary systems to throw up smoke screens, including "Smart Order Routing," the "Voyager Pricing Engine," and the

"Proprietary Fills Algorithm," numerous experts explain that VDL places their own financial interests at the forefront, and are able to collect on average what is likely to be *more* in hidden commissions than their competition collect from their disclosed commissions.

39.     The very public support from the Dallas Mavericks and their owner, Mark Cuban, including their recent massive investment in the Deceptive Voyager Platform, gives a great illustration of how this marketing is targeting unsophisticated investors with false and misleading promises of reaping large profits in the cryptocurrency market.

40.     Mark Cuban recently spoke at a Dallas Mavericks press conference, conducted over the internet, where he strongly supported and touted the partnership between his company and Voyager. Mr. Cuban proudly described how he would personally help significantly increase scope and presence of the Deceptive Voyager Platform for those with limited funds and experience:

> You know, there's a lot of hype, there's a lot of discussion, but most people don't understand the fundamentals behind it. We're going to try to bring that level of education to our fans and to our joint customers."
>
> To put it simply: there's untapped potential in the future of digital currencies and it's an attractive investment for novice investors who might only have $100 to start. That's where Voyager enters the picture.
>
> In other words, it's a way to earn high returns while also getting skin in the game and the Voyager platform makes the process easy and simplified for fans of all ages. The 60+ crypto assets allows you to build a diverse portfolio from a single account.
>
> You don't have to spend a lot of money in order to learn. It's not like the stock market where it's almost impossible, except on a few platforms, to spend $10 and get started. My now 12-year-old son got me in Dogecoin when it was less than a penny. I was like "let's do this" because it's a cheap way for him to learn how all of this works. While you have to put in a $100 to get the $100 bonus the next two days, if you don't have a hundred dollars and you just want to download the app and put in $5 and buy SHIBA INU (SHIB) and Dogecoin (DOGE), there's a lot of ways to inexpensively start.[25]

41.     Voyager's President and Chief Officer, Steve Ehrlich agreed with Mr. Cuban and added as follows:

> That's one of the advantages of Voyager. You can actually download the app and fund your account and trade in three minutes or less. We make it really simple. We have a very easy-to-use and integrative platform that allows you to get engaged in

---

[25] https://www.mavs.com/mavsvoyager/ (last accessed April 28, 2022)

the crypto market very quickly. That's one of the values of Voyager. You'll be trading in three minutes or less.

About 220 million people have crypto right now and we (anticipate) a billion in four years. So that shows you where we can actually go with crypto and crypto adoption. Now the comparison there is the internet. It took the internet eight years, for the same time frame, for the internet to grow that fast. So it's a great time to enter the space and learn more. [26]

42.     VDL's representations and marketing materials regarding the "100% Commission-Free" Voyager Platform are false, deceptive, and are objectively very likely to deceive average consumers acting reasonably under the circumstances. Accordingly, VDL's conduct violates the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, *et seq.*, ("NJCFA") and the Florida Deceptive and Unfair Trade Practices Act, §§ 501.201, *et seq.*, Florida Statutes ("FDUTPA").

43.     Plaintiff thus seeks damages and restitution on behalf of himself and the Class members, as well as declaratory and injunctive relief to put an end to VDL's unfair and deceptive marketing and sales practices.

## PARTIES

44.     Plaintiff is a citizen of the State of Florida residing in Broward County, Florida. He is a natural person over the age of 21 and is otherwise *sui juris*.

45.     Defendant Voyager is an entity existing and incorporated pursuant to the laws of British Columbia, Canada, is regulated by the Securities and Exchange Commission, and maintains a principal place of business in 33 Irving Place, 3rd Floor, New York, New York 10003. Defendant Voyager, for purposes of this action, is therefore a citizen of New York.

46.     Defendant VDL is an entity existing and incorporated pursuant to the laws of Delaware, with its principal place of business in Jersey City, New Jersey. Defendant VDL is therefore a citizen of Delaware and New Jersey.

## JURISDICTION AND VENUE

47.     This Court has subject matter jurisdiction over claims under the Securities Act pursuant to 15 U.S.C. § 78aa and §1331, and supplemental jurisdiction over the entire action under 28 U.S.C. § 1367. Further, this Court has subject matter jurisdiction over this action pursuant to

---

[26] *Id.*

28 U.S.C. § 1332(d)(2)(A) because this is a class action for a sum exceeding $5,000,000.00, exclusive of interest and costs, and in which at least one class member is a citizen of a state different than the Voyager Defendants. Additionally, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) as Plaintiff, a Florida citizen, brings his individual claims against Delaware, New Jersey, or New York citizens, and given the nature of the claims and the declaratory and injunctive relief sought, the amount in controversy is greater than $75,000.00, exclusive of interest and costs.

48.     This Court has jurisdiction over Voyager because it is a foreign corporation authorized to conduct business in Florida, is doing business in Florida, has registered with the State of Florida, or does sufficient business in Florida, has sufficient minimum contacts with Florida, or otherwise intentionally avails itself of the Florida consumer market through the promotion, marketing, and sale of its EPAs in Florida, to Plaintiff and all those similarly situated, which constitutes committing a tortious act within the state of Florida.

49.     For example, Voyager sells its stock OTC throughout the United States, including specifically in the state of Florida to Florida residents. As another example. in November 2020, Voyager hired Natalie Jaeger as the Head of Digital Marketing, and promptly began "a more aggressive marketing strategy which included digital advertising, increased social marketing, and increased influencer marketing using crypto centric influencers and professional athletes."[27] Part of this aggressive marketing strategy, in addition to increased direct targeted marketing to consumers, has been to introduce an "interest rate hike campaign" known as "March Interest Mania," where Voyager increased the rates of interest it would pay to customers to whom it had offered and sold EPAs.[28]

50.     As a result of this increased marketing, Voyager enjoyed explosive growth throughout the ongoing COVID-19 pandemic. In January 2021, Voyager closed on a private placement offering of 8,363,637 shares of common stock for gross proceeds of approximately $46.0 million.[29] In February 2021, Voyager closed on a private placement offering of 7,633,588

---

[27] *Id.*

[28] *See* "Voyager Digital Announces March Interest Mania Rate Increases" dated March 10, 2021, attached as **Exhibit G**.

[29] *See* Voyager Digital LTD' Management's Discussion and Analysis for the Three and Six Months Ended December 31, 2020 (**Exhibit H**), 8.

shares of common stock for gross proceeds of approximately $100.0 million.[30] Unsurprisingly, Voyager allocated 50% of this increased budget towards marketing EPAs so it could "get that market share that we're grabbing from everybody else right now and keeping accelerating the land grab."[31]

51.     In addition to marketing and offering the EPAs for sale to U.S. consumers, including those in Florida, Voyager Digital LTD received revenue from lending and staking activities as a result of receiving investments in the EPAs from consumers like Plaintiff and similarly situated Florida residents. For fiscal year 2021, Voyager generated approximately $21 million in fees on crypto assets loaned.[32] As Voyager's CFO, Evan Psaropoulos, explained in Voyager's latest earnings call, Voyager earned during Q2 of fiscal year 2022 "approximately $57 million in lending and staking activities."[33]

52.     This purposeful availment renders the exercise of jurisdiction by this Court over Voyager permissible under traditional notions of fair play and substantial justice.

53.     Further, and alternatively, jurisdiction over Voyager is proper in that Voyager and VDL (1) have common stock ownership; (2) have common business departments; (3) file consolidated financial statements and tax returns; (4) do not keep separate their daily operations; and (5) share at least the following Executive Officers in common, who have the following overlapping duties and responsibilities across Voyager and its subsidiaries, including VDL:

| Name, province or state and country of residence | Tenure with the Company | Principal occupation |
|---|---|---|
| **Stephen Ehrlich** Connecticut, USA | CEO & Director | Chief Executive Officer of Voyager and its US subsidiaries. |
| **Evan Psaropoulos** New York, USA | Chief Financial Officer | Chief Financial Officer of Voyager and certain subsidiaries. Mr. Psaropoulos leads the finance, accounting and treasury functions for Voyager. |
| **Gerard Hanshe** New York, USA | Chief Operating Officer | Chief Operating Officer of Voyager and its US subsidiaries. Mr. Hanshe is responsible |

---

[30] *Id.*
[31] *See* Ex B.
[32] *see* Annual Information Form dated October 27, 2021, attached as **Exhibit I**.
[33] Ex. A.

*Mark Cassidy v. Voyager Digital Ltd., et al.*
*Case No.: 21-24441-CIV-ALTONAGA/Torres*
*First Amended Complaint*

| | | |
|---|---|---|
| | | for overseeing the customer experience, the business process and strategy, and treasury and trading operations teams, and works closely on coordinating their work with the product, engineering, data analysis, finance and marketing teams. |
| **Lewis Bateman** Ontario, Canada | Chief International Officer | Chief International Officer of Voyager and its US subsidiaries. Mr. Bateman is the executive leader for Voyager's Canadian, European and Cayman based subsidiaries, and heads all the Voyager strategic corporate acquisitions and international expansion. |
| **Daniel Constantino** Pennsylvania, USA | Chief Information Security Officer | Chief Information Security Officer of Voyager and its US subsidiaries. Mr. Costantino leads all technical and administrative cybersecurity programs for Voyager. |
| **David Brosgol** New York, USA | General Counsel | General Counsel and Secretary of Voyager and General Counsel of its US subsidiaries. Mr. Brosgol is responsible for the legal and compliance functions of Voyager. |
| **Pam Kramer** California, USA | Chief Marketing Officer | Chief Marketing Officer of Voyager and its US subsidiaries. Ms. Kramer oversees the brand, advertising, marketing, social media, customer insights and more. |
| **Rakesh Gidwani** New Jersey, USA | Chief Technology Officer | Chief Technology Officer at Voyager and its US subsidiaries. Rakesh leads the evolution of the Platform and systems as Voyager continues its plans for international expansion. |

54.    For example, discovery has demonstrated that for the calendar year 2021 alone, Voyager received nearly $29 million in trading revenue from VDL—which is separate from Voyager's interest revenue from the EPAs. Further, Voyager allocated funds from its approximately $200 million in capital raises to finance VDL's marketing of the Voyager Platform, Moreover, discovery has uncovered evidence that Voyager finances VDL's operations, provides compensation to VDL's employees in the form of, among other things, various stock options and

other monetary compensation and incentives, and treats VDL's property as its own, such has when both utilize the investvoyager website for marketing and selling their various products and communicating with Voyager's investors. For these alternative reasons, too, then, jurisdiction over Voyager is proper.

55.     This Court has jurisdiction over VDL because it is a foreign corporation authorized to conduct business in Florida, is doing business in Florida, has registered with the State of Florida, or does sufficient business in Florida, has sufficient minimum contacts with Florida, or otherwise intentionally avails itself of the Florida consumer market through the promotion, marketing, and sale of the Voyager Platform in Florida. This purposeful availment renders the exercise of jurisdiction by this Court over VDL permissible under traditional notions of fair play and substantial justice. Notably, Defendants have not contested and have instead admitted that this Court has personal jurisdiction over VDL throughout this litigation.

56.     Venue is proper in this District under 28 U.S.C. § 1391 because the Voyager Defendants each maintain substantial operations in this District; thousands of Class Members either reside or did business with the Voyager Defendants in this District; the Voyager Defendants engaged in business in this District; a substantial part of the events or omissions giving rise to the claims at issue occurred in this District; and because the Voyager Defendants entered into transactions and received substantial profits from Class Members who reside in this District. Venue is further proper pursuant to 15 U.S.C. § 78aa.

57.     All conditions precedent to the institution and maintenance of this action have been performed, excused, waived, or have otherwise occurred.

## FACTUAL ALLEGATIONS

**A. Voyager's Offer and Sale of EPAs Extensively in the State of Florida and Throughout the United States**

58.     On October 23, 2019, Voyager began offering EPAs for sale to consumers throughout the United States, including the state of Florida. Voyager initially launched the EPAs for customers holding Bitcoin, but thereafter extended them periodically to include dozens of other crypto assets, including USDC and Ethereum through end of fiscal year 2021.

59.     According to Voyager's Annual Information Form filed with Canadian regulators, "Rewards earned on crypto assets are variable, and reward rates are determined by Voyager at its sole discretion."[34]

60.     For fiscal year 2021, Voyager generated approximately $21 million in fees on crypto assets loaned.[35] Voyager earned during Q2 of fiscal year 2022 "approximately $57 million in lending and staking activities."[36] To generate this revenue, Voyager independently negotiates with institutional borrowers the terms of each unsecured institutional loan agreement, and selects which and how much of its crypto assets are available for such lending activity. In the event of bankruptcy or insolvency of an institutional borrower under a loan, Voyager bears the credit risk of lending crypto assets under the loan.[37]

61.     Voyager maintains that it does not support, custody, intermediate, or facilitate any transaction or activities with respect to any product that constitutes a "security," and, therefore, believes that it is not required to be registered in *any capacity* under applicable United States securities laws.[38] Voyager's conclusion is apparently drawn from its position that although the SEC had previously communicated to industry participants that it will apply existing securities laws, including the *Howey* Test, a four-part test developed by the U.S. Supreme Court to determine whether a particular "investment contract" is a security, to digital assets, the *Howey* Test is almost 75 years old, was not designed with digital assets in mind, and its application is fact-based.[39]

62.     At the same time, Voyager acknowledges that "it is possible that the SEC could come to a different conclusion" than Voyager, which "could result in [Voyager] being required to become registered, removing certain digital assets from its platform, or being required to cease certain of its operations."[40]

63.     As Plaintiff's expert, Rich Sanders, explains in his supplemental report Voyager's Earn program is functionally nearly entirely identical to similar programs offered by firms such as

---

[34] *see* Ex. I.

[35] *see* Ex. I.

[36] *see* Ex. A.

[37] *see* Ex. I.

[38] *see* Ex. I.

[39] *see* Ex. I.

[40] *see* Ex. I.

Celsius and BlockFi.[41] The differences between these companies and their respective programs are extremely minimal; as some examples, differences come down to phrasing (use of words like "interest" versus "rewards"), how frequently rewards are paid out (daily, weekly, or monthly, most commonly) or specific cryptocurrencies that are offered as part of the program.[42]

64.     Just like BlockFi settled with regulators, as explained above, Celsius, another Voyager competitor with a nearly identical "earn" program, quickly followed suit by revising their "earn" program by introducing "Celsius' Custody Solution," which only allows accredited U.S. investors to earn rewards on their crypto asset holdings.[43] To-date, Sanders explains, Voyager has not taken any similar actions, noting that "it is possible that Voyager instead opts to (continue to) benefit from the influx of users from BlockFi and Celsius, opting to take this action at a future date – whether voluntarily or by being compelled to do so." [44]

65.     In further describing the risks that stem from Voyager's offering and sale of the EPAs as unregistered securities, Sanders goes on to explain: [45]

> There have been extensive releases, statements, and actions from government agencies related to cryptocurrency in recent history. Secretary Yellen's remarks on digital assets leave no room for mystery. The *first* priority includes consumer protection; this is not accidental. The fifth priority states equitable access to *safe* and affordable financial services. To state the obvious, it is the opposite of safe to invest a significant portion of your net worth (let alone your life's savings) into activity such as DeFi staking. To invest a significant portion of someone else's net worth into activity such as DeFi staking, while painting a picture of far different asset use, adds a layer of dishonesty on top of risk.
>
> Customers of firms like BlockFi and Voyager are led to believe that their assets are being utilized largely by reputable institutions, not that their assets are being day-traded on platforms like Binance or utilized for extremely high-risk DeFi activity. In simpler terms, the risk and reward of loaning Ethereum to a reputable and audited western institution, as opposed to rehypothecation of that Ethereum into DeFi yield farming, are on entirely different ends of the spectrum. The risk associated with this reality transcends not just risk for the misled customers of firms

---

[41] Sanders Supp. ¶ 4
[42] *Id.*
[43] Sanders Supp. ¶ 6 (citing https://blog.celsius.network/important-celsius-update-to-our-us-clients-6df471420cc7) (last accessed April 28, 2022).
[44] Sanders Supp. ¶ 6
[45] Sanders Supp. ¶¶ 9–10.

like Voyager and BlockFi that stand to lose significant portions of their net worth, but would be something I would categorize as an item of national security interest: an increased likelihood of a hack means an increased likelihood of siphoning of hundreds of millions or even billions of dollars' worth of value out of the western economy and into the hands of, for example, North Korea.[46] While true a western institution using loaned Bitcoin for arbitrage trading could be hacked, this is generally a less likely threat than the risk of a DeFi hack. In short, companies like Voyager and BlockFi misrepresent the risk of utilizing their interest/earn programs since they misrepresent what customer assets are used for, disregarding and concealing risk, for the sake of making a risky quick buck.

66.    Under federal securities laws as construed by the United States Supreme Court in its decision *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) and by the SEC, an investment contract is a form of security under United States securities laws when (1) the purchaser makes an investment of money or exchanges another item of value (2) in a common enterprise (3) with the reasonable expectation of profits to be derived from the efforts of others. Voyager's EPAs offered and sold to Plaintiff and similarly situated consumers were a "security" as defined by the United States securities laws and as interpreted by the Supreme Court, the federal courts, and the SEC.

67.    The Securities Act and the Exchange Act were designed to "eliminate serious abuses in a largely unregulated securities market." *United Housing Found., Inc. v. Forman*, 421 U.S. 837, 849 (1975). They are focused, among other things, "on the capital market of the enterprise system: the sale of securities to raise capital for profit-making purposes . . . and the need for regulation to prevent fraud and to protect the interest of investors. *Id.* Under Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act, a security includes any "note." *See* 15 U.S.C. §§ 77b & 78c. A note is presumed to be a security unless it falls into certain judicially-created categories of financial instruments that are not securities, or if the note in question bears a "family resemblance" to notes in those categories based on a four-part test. *See Reves v. Ernst & Young*, 494 U.S. 56, 64–66 (1990), and its progeny. Applying the *Reves* four-part analysis, the EPAs were notes and thus securities. First, Voyager offered and sold EPAs to obtain crypto assets for the general use of its business, namely to run its lending and investment activities to pay interest to EPA investors, and purchasers bought EPAs to receive interest on the loaned crypto assets.

---

[46]    https://techcrunch.com/2022/04/15/us-officials-link-north-korean-lazarus-hackers-to-625m-axie-infinity-crypto-theft/ (last accessed April 28, 2022)

Second, EPAs were offered and sold to a broad segment of the general public. Third, Voyager promoted EPAs as an investment, specifically as a way to earn a consistent return on crypto assets. Fourth, no alternative regulatory scheme or other risk reducing factors exist with respect to EPAs.

68.     Under Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act, a security includes "an investment contract." *See* 15 U.S.C. §§ 77b, 78c. Based on the facts and circumstances set forth herein, the EPAs were securities because they were notes under *Reves v. Ernst & Young*, 494 U.S. 56, 64–66 (1990) and its progeny, and also because Voyager offered and sold the EPAs as investment contracts, under *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946) and its progeny, including the cases discussed by the SEC in its Report of Investigation Pursuant To Section 21(a) Of The Securities Exchange Act of 1934: The DAO.[47] Voyager promised EPA investors a variable interest rate, determined by Voyager on a periodic basis, in exchange for crypto assets loaned by the investors, who could demand that Voyager return their loaned assets at any time. Voyager thus borrowed the crypto assets in exchange for a promise to repay with interest. Investors in the EPAs had a reasonable expectation of obtaining a future profit from Voyager's efforts in managing the EPAs based on Voyager's statements about how it would generate the yield to pay EPA investors interest. Investors also had a reasonable expectation that Voyager would use the invested crypto assets in Voyager's lending and principal investing activity, and that investors would share profits in the form of interest payments resulting from Voyager's efforts. Further, as Rich Sanders demonstrates in his Preliminary Report, once an investor purchases a EPA from Voyager and invests assets into it, Voyager customer assets are consolidated into accounts operated by a common enterprise.[48] "Blockchains don't lie, and the tracing of Voyager customer deposits to common enterprise accounts is very clear." [49] Voyager offered and sold the EPAs to the general public to obtain crypto assets for the general use of its business, namely to run its lending and investment activities to pay interest to EPA investors, and promoted the EPAs as an investment. Voyager offered and sold securities without a registration statement filed or in effect with the Commission and without qualifying for an exemption from

---

[47] https://www.sec.gov/litigation/investreport/34-81207.pdf (last accessed April 28, 2022)
[48] Sanders Supp. ¶ 11.
[49] *Id*.

registration; as a result, Voyager violated Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act").

**B.   The Deceptive Voyager Platform**

69.      The Deceptive Voyager Platform offers investors, developers and platform providers a fully functional suite of APIs and mobile apps to allow anyone who is legally able to do so the ability to trade, invest, earn and secure digital assets across multiple types of digital assets.[50] According to its creators, "The Voyager Platform provides its customers with competitive price execution through its smart order router and as well as a custody solution on a wide choice of popular crypto-assets. Voyager was founded by established Wall Street and Silicon Valley entrepreneurs who teamed to bring a better, more transparent, and cost-efficient alternative for trading crypto-assets to the marketplace."[51]

70.      VDL, one of Voyager's subsidiaries, acts as a "crypto broker," being a digital agent broker that facilitates users buying and selling of cryptocurrencies delivering deep pools of liquidity.[52] It also offers a single access point to research, manage, trade, and secure cryptocurrencies for novice and sophisticated investors.[53] Some of the services offered by VDL include:

> (a) users can open an account in three minutes or less. VDL utilizes third party service providers for know-your-client and anti-money-laundering checks to ensure fast and secure account openings;
>
> (b) users are able to trade between fiat and cryptocurrency on a wide variety of core and alternative cryptocurrencies;
>
> (c) execution of trade orders across a spectrum of exchanges to give Voyager the deepest pool of liquidity;
>
> (d) minimizing transaction costs by aggregating orders and routing the order flow through the optimal mix of exchanges, by utilizing VDL's patented smart router technology;

---

[50] *See* Ex. H.
[51] *See* "Voyager Digital and Market Rebellion to Form Online Broker Platform for Equities, Options, and Futures Trading," dated May 5, 2021, attached as **Exhibit J**.
[52] *See* Ex. H.
[53] *Id.*

(e) providing users with data in order for them to manage and track their crypto investments, including delivering news, social feeds and real-time alerts to keep users connected to the market, and providing portfolio tools to track performance, balances and transactions; and

(f) storing crypto assets in a secure wallet and in a "cold" facility, with 24/7 security. (fiat currency is stored at custodial banks).[54]

71.     Further, during the months of January, February, and March 2021, 65,000, 70,000, and 95,000 new funded accounts were onboarded onto the Voyager Platform with net deposits of $170M, $400M, and $650M, respectively:[55]

|  | March 2021 | February 2021 | January 2021 |
|---|---|---|---|
| Net Deposits | $650M | $400M | $170M |
| New Funded Accounts | 95,000 | 70,000 | 65,000 |
| New Verified Users | 395,000 | 190,000 | 250,000 |
| Principal Value traded | $2.5B | $1.6B | $840M |

As of March 31, 2021, Voyager's Assets Under Management exceeded $2.4 billion, with total funded accounts exceeding 270,000 and over 1 million total verified users on the Platform.[56]

72.     Moreover, during the month of April 2021 alone, new users were onboarded "at a record rate with over 130,000 new funded accounts added to the platform."[57]

**C.  VDL's Uniform "100% Commission-Free" Misrepresentations**

73.     Included prominently throughout VDL's uniform marketing representations to its customers is that the Voyager Platform offers trades that are "100% Commission-Free."

---

[54] *Id.*

[55] *See* "Voyager Digital Provides Business Update and March 2021 Metrics," dated April 6, 2021, attached as **Exhibit K**.

[56] *Id.*

[57] *See* "Voyager Digital Provides Business Update for April," dated May 3, 2021, attached as **Exhibit L**.

74.     These representations enable VDL to obtain an edge over its competitors, including but not limited to Coinbase, Gemini, Kraken, and Binance, who openly display the applicable fees and commissions they charge on each trade.

75.     These "100% Commission-Free" representations, however, are false and are reasonably likely to mislead objective consumers acting reasonably under the circumstances. While VDL does not openly display the commissions it charges on each cryptocurrency trade, it utilizes various methods to secrete the exorbitant commissions it retains from every trade.

76.     For example, the "spread" (i.e., the difference between the "Bid Price" and "Ask Price" on a given cryptocurrency) is kept intentionally wide on all cryptocurrencies listed throughout the Voyager Platform. Voyager explains in its most recent Management's Discussion and Analysis that the spread is a main source of revenue:[58]

> Fee revenue for the three and nine months ended March 31, 2021 was $53.7 million and $57.4, an increase of $53.5 and $57.1 compared to the same periods in 2020. The increase in the three months ended March 31, 2021 compared to the three months ended March 31, 2020 was primarily due to an increase of $5.0 billion in trade volumes, and an increase in average spread of 70.1 bps. The increase in the nine months ended March 31, 2021 compared to the nine months ended March 31, 2020 was primarily due to an increase of $5.5 billion in trade volumes, and an increase in average spread of 60.6 bps.

77.     Similarly, Founder and President, Steve Ehrlich, explains the importance of "spread revenue" to his investors at the earnings call for Voyager's Second Quarter for Fiscal Year 2021:[59]

> With the growth of assets under management, we remind investors of our 2 main revenue sources, spread revenue and interest revenue. Estimated spread revenue is derived by the trading velocity of our assets while interest revenue was driven by the gross interest earned on the overall assets under management. Historically, the company has earned between 10 to 12% annualized revenue on assets under management.

> At this point, I would also like to remind investors of certain drivers of our business. As in agency brokerage business, market volatility can often act as our friend. Voyager executes trades and captures spread revenue in both up and down markets. One example of the powerful agency model happened on Tuesday, February 23rd when Bitcoin decreased from a high of $56,000 to $45,000. That day, Voyager

---

[58] *See* Voyager Digital Ltd. Management's Discussion and Analysis for the Three and Nine Months Ended March 31, 2021, dated May 25, 2021, attached as **Exhibit M.**
[59] *See* Ex. B.

experienced a record day for trading volume, revenue and net deposits. Investors were very active buying the dips across all of the coins Voyager offers.

78.     Although the Voyager Platform will display a "Fair Market Price" for each cryptocurrency, which falls somewhere in the middle of the spread, the Voyager Platform's systems will automatically execute market orders at the highest end of the spread, from which they pocket secret commissions. Moreover, once a user submits a market buy order, the "Estimated Price" for the trade displayed on the Voyager Platform automatically defaults to an amount higher than the quoted "Ask Price" at the top end of the spread, so that an order can execute at an amount that is "less" than the "Estimated Price," but still at the very top end of the spread. Similarly, for market sell orders, the trade will automatically default to an amount lower than the quoted "Bid Price" at the bottom end of the spread so that the order can execute at an amount that is "more" than the "Estimated Price," but still at the bottom end of the spread.

79.     To effectuate these unfair and deceptive business practices, VDL claims to use proprietary systems, which they refer to as the "Smart Order Router," the "Voyager Pricing Engine," and the "Proprietary Fills Algorithm."[60]

80.     In describing the Smart Order Router, VDL maintains that the Voyager Platform "does not let clients post orders directly on the exchanges to which it connects or with the market makers that provide liquidity, but instead its Smart Order Router accepts customer orders and fills them in the market for the customer using its proprietary order routing algorithm."[61] The Voyager Pricing Engine "calculates the fair market price while constantly analyzing the order books, executions, depth of liquidity, commissions and other proprietary factors across our liquidity sources and streams this price to its users."[62]

81.     To obscure this overarching scheme, VDL utilizes vague and opaque representations that VDL will only "share" in "price improvement" where they can fill a user's order at a price better than that which was quoted to the user (which is not in the bid/ask spread or fair market price, but rather in the jacked up estimated price that is only shown after the customer

---

[60] *See* "Passion for Product: Voyager Trading System," published Jan 23, 2020 at https://www.investvoyager.com/blog/passion-for-product-trading/ (last accessed April 28, 2022)
[61] *Id.*
[62] *Id.*

submits the market order).[63] "By example, if the user is quoted $10,040 and the router is able to fill at $10,030, Voyager may price improve the user's order to $10,035 (note: share of price improvement is variable and is determined by Voyager's proprietary fills algorithm)."[64]

82.     In reality, and unbeknownst to customers, the "Smart Order Router," "Voyager Pricing Engine," and "Proprietary Fills Algorithm" are designed to be intentionally obscure and to provide VDL with hidden commissions on every trade that in most cases exceed the disclosed fees and commissions charged by its competitors. VDL unfairly gains an edge on its competition and overcharges customers by collecting these secret commissions to the detriment of its unknowing customers.

83.     In support of these allegations, Plaintiff attaches the preliminary expert reports of (a) Richard A. Sanders, the Co-Founder and Lead Investigator of CipherBlade, a blockchain forensics and cybercrime investigative firm which consults on some of the most renowned blockchain projects, as well as numerous law enforcement and regulatory investigations, and provides advisory services to cryptocurrency exchanges and other organizations;[65] and (b) Dr. Stephen Peter Castell, a Chartered IT Professional, independent consultant in computer and telecommunications systems and software development, and the Chairman of the United Kingdom company CASTELL Computer and Systems Telecommunications Limited, a professional firm of Management and Financial Consultants in Information Technology of over 40 years' standing.[66]

84.     Richard Sanders utilized a blockchain visualization tool called Chainalysis Reactor in forming the opinions set forth in his report. Mr. Sanders explains that Chainalysis Reactor provides a visualization of the same data that would be viewable on a block explorer, but unlike block explorer, Chainalysis Reactor has what is known as "attribution." Attribution is simply the labeling of wallet addresses.[67] "Chainalysis Reactor (as well as similar tools) will have a baseline amount of what is known as attribution: the labeling of wallet addresses. Addresses will be unknown/pseudonymous until Chainalysis updates/labels the addresses in their system. A

---

[63] *Id.*
[64] *Id.*
[65] *See* **Exhibit N**
[66] *See* **Exhibit O**
[67] Sanders report at ¶ 18

combination of automated analysis and manual investigation is utilized to continually add attribution.[68]

85.    Mr. Sanders found through his analysis that Voyager had an alarmingly low number of addresses attributed, far below the expected industry standard. "While it is true that no services (not even the most voluminous exchanges, such as Coinbase or Binance) will ever have all addresses attributed, services that have a lower amount of addresses attributed oftentimes lack such attribution as a result of the entity not utilizing a compliance tool such as Chainalysis KYT (the compliance equivalent of Chainalysis Reactor), and/or not submitting address data to such providers. VDL currently has 1 Bitcoin address attributed in Chainalysis Reactor, a figure far lower than industry standard.

86.    For example, Voyager competitor Celsius has 277,287 attributed addresses for Bitcoin in Chainalysis Reactor. A service with such aggressive marketing as VDL, according to Sanders, should have more address attribution. VDL's lack of attribution may at least partially have to do with how VDL processes customer deposits and withdrawals, which is distinctly different (perhaps deliberately) from their competitors and obfuscates potential attribution efforts.[69] Further, attribution for VDL wallet addresses for other blockchains was scarce and in some cases non-existent. While attribution for some more less-utilized assets (say, LTC or the ERC-20 tokens) may often have gaps, for attribution on widely-utilized assets (such as Ethereum) to be lacking immediately stands out. Sanders therefore performed manual attribution for VDL addresses."[70]

87.    Mr. Sanders found through his analysis that VDL lacks necessary transparency on their platform and programs, and that opacity materially affects a customer's ability to make an informed decision with their money. "Voyager is not transparent. As described in the preceding paragraph regarding the Voyager Interest Program, it is impossible for consumers to make an informed decision regarding whether to deposit funds to Voyager or not. Further, even if an individual opts out of the Voyager Interest Program, nothing evidences customer funds are not

---

[68] *Id*. at ¶ 20
[69] *Id.* at ¶ 22
[70] *Id*. at ¶ 23

rehypothecated, rendering Voyager customers susceptible to the risk of this rehypothecation whether or not they have the risk appetite and/or desire to sign up for such activity."[71]

88.     According to Mr. Sanders, VDL fails to communicate to its users exactly what extra fees apply to their transactions, how exactly transactions are being executed, and employs misleading advertising to lure in customers:

> Voyager is deliberately misleading, and often refuses to substantiate information that is essential for a consumer to make an informed decision. As one prominent example, Voyager strongly advertises "Commission-free" trading on their landing page, but no such fees are ever clearly outlined. In the absence of any specificity regarding "the marketplace," it is impossible for a consumer — or anyone for that matter — to determine which "marketplaces" (exchanges?) Voyager is determining to provide the "best execution." There would, indeed, presumably be a set price for a market order, which would be derived from an aggregate of the exchanges Voyager is sourcing liquidity from. In the simplest terms possible, ***it is entirely a black box as to what Voyager is doing with orders purportedly directed to their Smart Order Router***, where (which exchanges) the Voyager Pricing Engine "calculates the fair market price" from, and how the Proprietary Fills Algorithm functions — and in the absence of such information, as well as demonstrable discrepancies between what Voyager says should happen and what happens, these systems are either improperly configured, or to varying degrees may not even exist or exist as described by Voyager. Phrasing such as "evaluation of multiple factors" is, per my experience regarding *all* companies that were suspected of, and subsequently confirmed to be, misleading consumers, extremely concerning. ***The utilization of seemingly-technical jargon, and/or otherwise unspecified yet critical information, often result in tragedy for consumers***.[72] In the absence of any information whatsoever regarding how Voyager is processing customer orders, it is functionally impossible to verify that Voyager is even performing the steps described on their own FAQ. ***Voyager, in essence, is expecting the same degree of trust from users that Bitconnect expected from their users regarding a 'trading bot' that turned out to <u>never exist</u>***. Voyager is undoubtedly profiting off of customers utilizing the trade functionality of the Voyager platform, and is irrefutably *not* providing best execution. Voyager cannot both claim to provide best execution *and* be commission-free when it is easily evidenced that numerous other exchanges provide better rates.[73]

89.     Mr. Sanders further explains that VDL's advertising claim that their platform provides the best execution of trades for users is plainly and demonstrably false:

---

[71] *Id*. at ¶ 27
[72] https://www.makeuseof.com/the-rise-and-fall-of-bitconnect-an-internet-famous-ponzi-scheme/ (last accessed April 28, 2022)
[73] *Id*. at ¶ 29 (emphasis in original and added)

The exchange rates provided by Voyager are consistently worse than the rates provided by cryptocurrency exchanges -- regardless of whether the exchange is centralized or decentralized, US-based or not US-based, etc. For Voyager to suggest they are providing any form of 'best execution' across the marketplace is demonstrably false. What makes Voyager's representations even more egregious is that, in the course of my analysis, I had performed extensive cryptocurrency deposits and withdrawals in order to discover cryptocurrency wallet addresses that Voyager utilizes for customer funds. Customer assets are sent to/from either Binance or HTC Trading wallets. Comparing exchange rates on Voyager to those on Binance resulted in Binance having better exchange rates on *every* occasion. Said differently, the *one* exchange that it is possible to assess Voyager would be including across their marketplace comparison (and thus should reflect the same price in Voyager app) provided a better deal than Voyager.[74]

90.     Mr. Sanders also obtained comparison data from VDL's competitors, such as Celsius, which further demonstrates the Deceptive Voyager Platform's vast deviation in number of attributed addresses from the expected industry standard. Mr. Sanders explained that "[u]pon a search of Celsius, a core Voyager competitor, their addresses are well-attributed; note the requirement to scroll down to see the full depth of cryptocurrencies that Celsius wallets are attributed in. Upon a search for Voyager, **only four cryptocurrencies are attributed**, and of those, **the attribution is partial**."[75]

91.     This lack of attribution indicates, in Mr. Sanders' view, that VDL demonstrates a possibility of noncompliance and lack of responsibly managed services on their platform

While a service not being attributed in Chainalysis does not confirm the service is suspicious, it is generally typical for compliant and responsibly-managed services to have attribution in a tool like Chainalysis Reactor for several reasons: Companies will sometimes provide their wallet addresses to companies like Chainalysis in order to be helpful to law enforcement and/or decrease the overhead associated with false positives and inquiries that would otherwise stem from a lack of attributed wallet addresses.[76]

92.     This lack of compliance is further illustrated in Voyager's heavy utilization of non-U.S. based fund-receiving addresses which do not reflect the targeted customer demographic:

While proportionality and focus at this time preclude me from providing a deeper review into Voyager's AML practices, observations regarding Voyager addresses (and the nature of the entities they send and receive cryptocurrencies from) while

---

[74] *Id*. at ¶ 30
[75] *Id*. at ¶ 34
[76] *Id*. at ¶ 35 (emphasis added)

conducting my attribution work did prompt concerns. As just one example, Voyager's known Bitcoin address sends funds to exchanges that are not US-based or even preclude US residents from signing up (KuCoin, Binance, Byibit, and FTX would all be strong examples.) In essence, where Voyager customers withdraw funds to does not reflect what I'd expect a US-based company soliciting US-based users[77] to send funds to. In my experience, when I see sending exposure that does not reflect the targeted demographic, the company attributed to the wallet(s) has an (often intentional) porous approach to compliance; said differently, I find it very unlikely that the quantity of Source of Wealth inquiries Voyager sent to customers due to these observations (assets going to US-restricted exchanges) would match the statistics shown above.[78]

93.     Not only does VDL fail to deliver on their advertising promise of "Better Pricing On Trades," **they charge their users the highest premium on trades across all competitors**. According to Mr. Sanders, "On all but one occasion (which was for a less liquid cryptocurrency, ZRX, in a small amount, on FTX), Voyager's prices were worse than whichever exchange they were compared to. Voyager does not offer better pricing on trades. In fact, the rates Voyager offers would result in a plainly worse deal, often to the tune of nearly or more than 1% higher than competitors, even on highly liquid pairs such as BTC/USD."[79] "Consequently, VDL's representation of offering "Better Pricing on Trades" is, under the most generous of terms, deliberately misleading (it is *obvious* that would lead most people to conclude "across exchanges"), and I'd opine deliberately misleading in a way that is plainly to enrich themselves at the expense of that very misconception Voyager instills."[80]

94.     Upon further testing, Mr. Sanders also found it probable that VDL is not basing their market quotes off exchanges:

> Baffled as to how Voyager may be generating the quotes for market buy/sell orders, I decided to run one more test on Voyager regarding USD/USDC. USDC is a cryptocurrency known as a stablecoin, which should be close to the value of the USD; however, these assets are never *entirely* 100%-pegged.[81] Consequently, if one goes onto a cryptocurrency exchange (with legitimate liquidity -- so Coinbase or Kraken would be good choices, whereas an exchange known for fake volume,

---

[77]   https://www.investvoyager.com/blog/where-is-voyager-available/ (last accessed April 28, 2022)

[78] *Id*. at ¶ 43

[79] *Id*. at ¶ 47

[80] *Id*. at ¶ 48

[81] https://invao.org/how-stable-are-stablecoins/

which is also likely to have fake order books, such as HitBTC[82] might not be), and seeks to trade between a stablecoin and fiat, the exchange will not be an exact 1:1 match. Note that when entering tens or hundreds of millions of dollars into a USDC buy order on Kraken, the peg noticeably is lost, as it should be. Note that on Voyager it does not. *See*: Exhibit E – Infinite Stability.mp4 [accessible at https://youtu.be/zF5nHhLhpaM].[83] In the absence of any indication Voyager is sourcing funds from exchanges, as well as the alarming revelation that Voyager purports to effectively have infinite USDC stores at peg, I am thus left to conclude that it is possible, if not probable, Voyager is not basing their market quotes off exchanges. The explanation may simply be that Voyager sources liquidity from Binance at a markup."[84] "Notably, with Binance's known AML issues, even *if* Voyager were transparently providing Binance's rates on cryptocurrency trades (which they are not) to US users, Voyager is effectively a workaround for Binance being restricted to US residents *and* Voyager cannot know, with confidence, what their ultimate source of funds is. Such activity would be, from a value transfer/blockchain analysis standpoint, described as a workaround to US regulatory requirements and cryptocurrency exchange terms of use.[85]

95.     This probability is further bolstered by the questionability of VDL's business activity with Binance. Mr. Sanders states:

I can evidence, and have evidenced, that Voyager sends funds to HTC Trading[86] and Binance. What happens with those funds when sent to HTC Trading is a black box (until/unless records are provided), but what one *can* conclude is Voyager, or the company they own/act through, HTC Trading, has one or more Binance accounts. If Voyager were, in fact, being honest about providing the best rates to their users, it would only be sensible to include in the hypothetical set of exchanges they are getting these alleged best rates from: namely Binance. Said differently: **why does Voyager send customer funds to Binance where they presumably hold account(s) yet a Voyager customer will consistently get a better deal on Binance than when shopping on Voyager?** As far as the blockchain is concerned, the *one* place I can *definitively* assess Voyager receiving liquidity from is Binance, yet Voyager's rates were *worse* than Binance every time.[87]

---

[82]     https://cointelegraph.com/news/bitwise-calls-out-to-sec-95-of-bitcoin-trade-volume-is-fake-real-market-is-or (last accessed April 28, 2022)

[83] *Id*. at ¶ 50

[84] *Id*. at ¶ 51

[85] *Id*. at ¶ 53

[86] Notably, when asked at deposition about Voyager's wholly-owned subsidiary, HTC Trading, Inc., even when shown Sanders' analysis and chart from Chainalysis indicating that VDL is routing trades through HTC Trading, Voyager's corporate representative claimed that HTC Trading holds no accounts and conducts no operations. *See* LTD Tr. excerpts (**Exhibit P**), 37:7–38:15, 44:3–45:19.

[87] *Id*. at ¶ 55

*Mark Cassidy v. Voyager Digital Ltd., et al.*
*Case No.: 21-24441-CIV-ALTONAGA/Torres*
*First Amended Complaint*

96.     Mr. Sanders lastly concludes, in line with what Plaintiff alleges:

Voyager has fraudulently conducted business by making false claims, utilizing misleading marketing, and obscuring the truth behind what Voyager does with customer's funds, and what fees users are charged. "Voyager's aggressive expansion in the late 2020/2021 bull market is, in my estimation, plainly targeting inexperienced cryptocurrency users/investors that would not have the experience to know better. New cryptocurrency users rely on active industry participants (companies such as Voyager, and "educators/influencers") to provide them with good-faith insight and not mislead them. Voyager's representations, namely those about commission-free and best price trading, would undoubtedly be understood to mean what they say they mean whether by a cryptocurrency novice or a deeply experienced expert."[88]

97.     Dr. Castell similarly conducted a careful preliminary analysis to demonstrate the potential scope of damages resulting from VDL's overcharges. This analysis, "relying on Voyager's own reported figures," reflected that VDL's conduct has likely resulted or will result in over **1.08 billion dollars** in damages to its users.[89]

98.     Dr. Castell agrees with Mr. Sanders in that VDL does not actually execute trades at the "best market price" as they advertise. "In summary, it is my firm preliminary opinion that the Voyager App does not materially provide the user functionality as represented by Voyager Digital as regards achieving the 'best market price' for the user/trader."[90]

99.     The Voyager app was likely deliberately designed to not provide the actual functionality aspects represented to users. Dr. Castell states:

Furthermore, in my preliminary opinion the failure of the Voyager App to provide the represented functionality is likely to be centered principally within elements of the coding or programmed behavior of the "Smart Order Router," and/or the "Voyager Pricing Engine," and/or the "Proprietary Fills Algorithm", either acting alone, amongst themselves, or in conjunction with the Voyager Digital corporate software and systems with which these modules connect and inter-operate.[91]

In my preliminary view it is clear that the available technical evidence shows that the Voyager App does not materially provide the user functionality as represented by Voyager Digital as regards achieving the "best market price" or "fair market price" for the user/trader.[92]

---

[88] *Id*. at ¶ 67
[89] Castell report at ¶ 43
[90] *Id*. at ¶ 45
[91] *Id*. at ¶ 46
[92] *Id*. at ¶ 40

100.    This obscurity leading to charging customers extra hidden fees is most likely known to VDL at least at this time, or earlier. Dr. Castell explains,

> …whether through an unintentional failure, or deliberate act, in my view such overcharge provisionally appears to be a definite *software material defect*, and it seems highly unlikely to me that the Voyager Digital company's IT and corporate management did, and does, not know (and, if not, it should), what was and is happening as regards this software material defect and its overcharge/undisclosed commission financial consequences to the Voyager App user.[93]

101.    According to Dr. Castell, each time a user was overcharged on their purportedly "commission free" trades, that overcharge amounted to no less than 0.5% of the total value of that user's trade. "In my view this overcharge to the Voyager User may be characterized or thought of as essentially an undisclosed commission levied by Voyager Limited. The overcharge/ undisclosed commission varied somewhat per individual trade, between approximately 0.5% and 1% of the value of the trade, across all trades in the sample, i.e. the overcharge was never less than 0.5% of the value of the trade."[94]

102.    According to Dr. Castell, it is a fact that there is a definite material defect in the design of the Voyager Platform software, either deliberately or negligently:

> In the meantime, whether the overcharge is as a result, on the part of Voyager Digital's management, of a fault in Voyager Digital's software development management, i.e. the company's software design, build, testing, deployment and operational processes, or arises from a deliberate intent of the company to deceive and overcharge the users of its Voyager App, or some combination of both, in my view and experience, and dependent, as noted herein, on due inspection and examination of the software development, management and operational documentation to be disclosed by Voyager Digital, such overcharge provisionally appears to me to be a definite *software material defect*. I naturally defer to the court to make that finding legally in due course, and, if so, determine what restitution and compensation falls to be provided by Voyager Digital for the financial consequences of such a software material defect.[95]

103.    That said, Dr. Castell believes this material defect, which led to hundreds of millions of dollars in user overcharges, ***was not an accident, and was indeed deliberate in design***:

> However, and subject to the Discovery that will be necessary to analyze definitively whether what the Voyager Digital company's management is doing is intentional,

---

[93] *Id*. at ¶ 41
[94] *Id*. at ¶ 26
[95] *Id*. at ¶ 29(b)

in my preliminary view, since the overcharge/undisclosed commission appears to be present in every trade, it is highly likely that the Voyager App is deliberately conceived and designed by the company's management to function that way, or, equally, the company's management has grossly failed to discharge its requisite IT and corporate governance duties, and has failed to correct this software material defect, perhaps because it is to their company's benefit. It seems highly unlikely to me that the Voyager Digital company's IT and corporate management did, and does, not know (and, if not, it should), what was and is happening as regards this software material defect and its overcharge/undisclosed commission financial consequences to the Voyager App user.[96]

104.     VDL has failed to meet acceptable professional and transactional standards in the market segment they belong to. Dr. Castell concludes, based on his experience, that:

Based on the evident material failure of Voyager Digital to provide its promised Voyager App "best market price," and "100% Commission Free," user functionalities, whether those failures be through deliberate policy and systems design, or through faults in software construction and operation, I am of the preliminary opinion that the technical governance of Voyager Digital in the management, operation, integrity, representations and security of its Voyager App and of its other management and customer systems are likely not to meet, in whole or in part, accepted professional standards for, and/or custom and practice in, the consumer electronic financial services and/or online trading sectors, but cannot arrive at a final considered view prior to Defendants' discovery and disclosure.[97]

**PLAINTIFF-SPECIFIC ALLEGATIONS**

105.     Plaintiff purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings.

106.     In exchange for receiving Plaintiff's crypto assets for use in its clandestine lending activities, Plaintiff was paid the following interest payments, as revealed from Voyager's business records:

| TRANSACTIO NUMBER | SYMBOL | TYPE | DATE | QUANTITY | NET | PRICE |
|---|---|---|---|---|---|---|
| 01FC0C0YT1ZX NAYYZG61TC28 WG | BTC | INTEREST | 2021-08-01 08:06:59.6 48 +0000 | 7.42E-05 | 3.098 3844 09 | 41745.95 |
| 01F9GM2K4E5C NCTPK6Q4P4B52 5 | BTC | INTEREST | 2021-07-01 08:48:27.2 78 +0000 | 8.03E-05 | 2.690 6442 66 | 33524.1 |

---

[96] *Id*. at ¶ 29(c)
[97] *Id*. at ¶ 50

*Mark Cassidy v. Voyager Digital Ltd., et al.*
*Case No.: 21-24441-CIV-ALTONAGA/Torres*
*First Amended Complaint*

| 01F73D8TSKKF0 6QAW20XT56NJ 5 | BTC | INTEREST | 2021-06-01 09:08:00.4 36 +0000 | 7.98E-05 | 2.948 9553 25 | 36940.44 |
|---|---|---|---|---|---|---|
| 01F4MFHB79ZV MTGBKJKHJ64F K9 | USDC | INTEREST | 2021-05-01 17:27:36.4 26 +0000 | 1.6041 | 1.604 1 | 1 |
| 01F4KQDDQXS M1XF5ZBYEV68 8W4 | BTC | INTEREST | 2021-05-01 10:26:02.1 10 +0000 | 6.07E-05 | 3.515 0164 92 | 57946.2 |

107.    Moreover, after being exposed to VDL's uniform misrepresentations that the Voyager Platform is "100% Commission-Free," Plaintiff registered for an account on the Voyager Platform on March 17, 2021. Further, in reliance on VDL's foregoing misrepresentations and omissions, Plaintiff executed the following trades on the Voyager Platform:

| Date | Order | Cryptocurrency | Amount (USD) | Order ID |
|---|---|---|---|---|
| March 18, 2021 | Market Buy | +0.008588 BTC | $500.00 | ZSSEDN |
| March 18, 2021 | Market Buy | +0.11627 ETH | $300.00 | YJTZRN |
| March 18, 2021 | Market Buy | +0.000838 BTC | $50.00 | R9QFBS |
| March 18, 2021 | Market Sell | -0.16627 ETH | $301.06 | Q6G4VX |
| March 18, 2021 | Market Buy | +0.005028 BTC | $301.06 | E13RAS |
| March 18, 2021 | Market Sell | -0.004455 BTC | $263.32 | HK8RCB |
| March 18, 2021 | Market Buy | +0.14357 ETH | $263.31 | 3VHERZ |
| March 31, 2021 | Market Sell | -0.14358 ETH | $263.88 | 5M8EVR |
| March 31, 2021 | Market Buy | +263.88 USDC | $263.88 | GGXZYW |
| April 3, 2021 | Market Sell | -100.00 USDC | $100.00 | 3VFR9Z |
| April 6, 2021 | Market Buy | +100.00 USDC | $100.00 | E07N9M |
| April 18, 2021 | Market Sell | -100.00 USDC | $100.00 | 5A1XVM |
| April 18, 2021 | Market Buy | +0.001788 BTC | $99.99 | EB7CF5 |
| April 25, 2021 | Market Buy | +0.003061 BTC | $150.00 | J57N9H |
| May 1, 2021 | Market Sell | -163.88 USDC | $163.88 | 32VX48 |
| May 1, 2021 | Market Buy | +0.05729 ETH | $163.87 | 3K6TA6 |
| May 4, 2021 | Market Buy | +55.3 ADA | $74.99 | BWY5H0 |

*Mark Cassidy v. Voyager Digital Ltd., et al.*
*Case No.: 21-24441-CIV-ALTONAGA/Torres*
*First Amended Complaint*

| May 4, 2021 | Market Sell | -1.60 USDC | $1.60 | G9HV8H |
|---|---|---|---|---|
| May 11, 2021 | Market Buy | +0.00248 ETH | $10.00 | DX65EW |
| May 11, 2021 | Limit Buy | +0.00250 ETH | $10.11 | 5J3F4Q |
| May 20, 2021 | Market Sell | -55.3 ADA | $95.30 | FJGHVA |
| July 31, 2021 | Market Buy | +0.00229645 BTC | $96.79 | 2HVC4R |
| August 17, 2021 | Market Sell | -0.06227 ETH | $197.01 | M7JWCA |
| August 17, 2021 | Market Sell | -0.017862 BTC | $821.30 | 2N96YH |

108.    To illustrate the deceptive nature of the Platform and how VDL secretly charges exorbitant commissions on each trade for Plaintiff and all putative class members despite their misrepresentations that the Platform is "100% Commission-Free," Plaintiff includes the following screenshots of his May 11, 2021 Market Buy trade at Order ID Dx65EW.

109.    At 11:17am EST, the cryptocurrency Ethereum (ETH) was displayed on the Platform with a "Fair Market Price" of $3,997.83 a coin.



*Mark Cassidy v. Voyager Digital Ltd., et al.*
*Case No.: 21-24441-CIV-ALTONAGA/Torres*
*First Amended Complaint*

110.    On the "trade" page for Ethereum in the Platform at 11:17am EST, the "Bid Price" displayed at $3,969.44, and the "Ask Price" displayed at $4,025.44.



111.    At 11:17am EST, Plaintiff submitted a Market Buy order for $10.00 USD worth of Ethereum. On execution of the trade, however, the "Estimated Price" for Ethereum suddenly reflected at $4,027.36 a coin, higher than the maximum quoted "Ask Price" on the immediately preceding page. Plaintiff's order filled at $4,025.28 per coin, at the top end of the bid/ask spread.



112.    At no point during Plaintiff's relationship with VDL did VDL ever disclose, contrary to its representations that the Platform operates "100% Commission-Free," that the "Smart Order Routing," "Voyager Pricing Engine," and "Proprietary Fills algorithm" systems are intentionally designed to provide VDL with secret commissions built into the pricing of every trade.

## CLASS ACTION ALLEGATIONS

113.    As detailed below in the individual counts, Plaintiff brings this lawsuit on behalf of himself and all others similarly situated, pursuant to Rule 23(a), (b)(2), (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure.

### A.    Class Definitions

114.    Plaintiff seeks to represent the following Nationwide Classes and Florida Subclasses (collectively, "the Classes"):

> **(1) Nationwide Voyager Class:** All persons or entities in the United States who, within the applicable limitations period, purchased or enrolled in a EPA.

> **(2) Florida Voyager Subclass:** All persons or entities in the state of Florida who, within the applicable limitations period, purchased or enrolled in a EPA.

> **(3) Nationwide VDL Class:** All persons in the United States who, within the applicable limitations period, used the Voyager Platform to place cryptocurrency investment orders.

> **(4) Florida VDL Subclass:** All persons in the state of Florida who, within the applicable limitations period, used the Voyager Platform to place cryptocurrency investment orders.

Excluded from the Classes are the Voyager Defendants and their officers, directors, affiliates, legal representatives, and employees, any governmental entities, any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff. Plaintiff reserves the right to modify or amend the definition of the proposed Nationwide Class or Florida Subclass, or to include additional classes or subclasses, before or after the Court determines whether such certification is appropriate as discovery progresses.

### B.    Numerosity

115.    The Classes are comprised of thousands, if not millions, of consumers nationwide and throughout the state of Florida to whom Voyager offered and/or sold EPAs. Moreover, thousands, if not millions, of consumers nationwide and throughout the state of Florida have executed trades on the Voyager Platform within the applicable limitations period. Membership in

the Classes is thus so numerous that joinder of all members is impracticable. The precise number of class members is currently unknown to Plaintiff, but is easily identifiable through the Voyager Defendants' corporate records.

### C.  Commonality/Predominance

116.    This action involves common questions of law and fact, which predominate over any questions affecting individual class members. These common legal and factual questions include, but are not limited to, the following:

As to Voyager:

   (a)  whether the EPAs were unregistered securities under federal and Florida law;

   (b)  whether Voyager's offerings and sales of EPAs violate the provisions of the Securities Act and Florida law; and

   (c)  the type and measure of damages suffered by Plaintiff and the Class.

As to VDL:

   (a)  whether VDL's description of the Voyager Platform as being "100% commission free" is deceptive, unfair, false and misleading;

   (b)  whether VDL's representations are objectively likely to mislead reasonable consumers to believe that their trading platform operates as "100% commission free";

   (c)  whether VDL's practices violate the NJCFA;

   (d)  whether VDL's practices violate the FDUTPA;

   (e)  whether Plaintiff and Class members have sustained monetary loss and the proper measure of that loss;

   (f)  whether Plaintiff and Class members are entitled to injunctive relief;

   (g)  whether Plaintiff and Class members are entitled to declaratory relief; and

   (h)  whether Plaintiff and Class members are entitled to consequential damages, punitive damages, statutory damages, disgorgement, and/or other legal or equitable appropriate remedies as a result of VDL's conduct.

### D.  Typicality

117.    Plaintiff's claims are typical of the claims of the members of the Classes because all members were injured through the uniform misconduct described above, namely that Plaintiff

and all class members were offered and/or sold EPAs by Voyager, or that Plaintiff and all members were exposed to VDL's identical and uniform misrepresentations and omissions regarding the Voyager Platform being "100% commission free," and Plaintiff is advancing the same claims and legal theories on behalf of himself and all such members. Further, there are no defenses available to either Voyager or VDL that are unique to Plaintiff.

### E.  **Adequacy of Representation**

118.    Plaintiff will fairly and adequately protect the interests of the members of the Classes. Plaintiff has retained counsel experienced in complex consumer class action litigation, and Plaintiff intends to prosecute this action vigorously. Plaintiff has no adverse or antagonistic interests to those of the Classes. Plaintiff anticipates no difficulty in the management of this litigation as a class action. To prosecute this case, Plaintiff has chosen the undersigned law firms, which have the financial and legal resources to meet the substantial costs and legal issues associated with this type of consumer class litigation.

### F.  **Requirements of Fed. R. Civ. P. 23(b)(3)**

119.    The questions of law or fact common to Plaintiff's and each Classes member's claims predominate over any questions of law or fact affecting only individual members of the Classes. All claims by Plaintiff and the unnamed members of the Classes are based on the common course of conduct (1) by Voyager in marketing, offering, and/or selling the EPAs, which are unregistered securities, or (2) by VDL in making identical and uniform misrepresentations and omissions regarding the Voyager Platform being "100% commission free," while secretly charging exorbitant and secret commissions to Plaintiff and the unnamed members of the Classes for every trade made on the Voyager Platform.

120.    Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

121.    As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the Classes as is in the case at bar, common questions will be held to predominate over individual questions.

### G.  **Superiority**

122.    A class action is superior to individual actions for the proposed Classes, in part because of the non-exhaustive factors listed below:

*Mark Cassidy v. Voyager Digital Ltd., et al.*
*Case No.: 21-24441-CIV-ALTONAGA/Torres*
*First Amended Complaint*

(a) Joinder of all Class members would create extreme hardship and inconvenience for the affected customers as they reside nationwide and throughout the state;

(b) Individual claims by Class members are impracticable because the costs to pursue individual claims exceed the value of what any one Class member has at stake. As a result, individual Class members have no interest in prosecuting and controlling separate actions;

(c) There are no known individual Class members who are interested in individually controlling the prosecution of separate actions;

(d) The interests of justice will be well served by resolving the common disputes of potential Class members in one forum;

(e) Individual suits would not be cost effective or economically maintainable as individual actions; and

(f) The action is manageable as a class action.

**H.   Requirements of Fed. R. Civ. P. 23(b)(2)**

123.     Voyager has acted and refused to act on grounds generally applicable to the classes by engaging in a common course of conduct of offering and/or selling the EPAs, which are unregistered securities, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

124.     VDL has acted and refused to act on grounds generally applicable to the classes by engaging in a common course of conduct of uniformly making identical and uniform misrepresentations and omissions regarding the Voyager Platform being "100% Commission-free," while secretly charging exorbitant and secret commissions to Plaintiff and the unnamed members of the Classes for every trade made on the Voyager Platform, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

**I.   Requirements of Fed. R. Civ. P. 23(c)(4)**

125.     As it is clear that the predominant issue regarding Voyager's liability is whether the EPAs it has offered and/or sold are unregistered securities, utilizing Rule 23(c)(4) to certify either or both of the Classes against Voyager for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

45

126.    As it is clear that the predominant issue regarding VDL's liability is whether it has violated the NJCFA or the FDUTPA in making identical and uniform misrepresentations and omissions regarding their trading platform being "100% commission free," while secretly charging exorbitant and secret commissions to Plaintiff and the unnamed members of the Classes for every trade made on the Voyager Platform, utilizing Rule 23(c)(4) to certify either or both of the Classes against VDL for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

### J.    Nature of Notice to the Proposed Classes.

127.    The names and addresses of all Class Members are contained in the business records maintained by the Voyager Defendants and are readily available to the Voyager Defendants. The Class Members are readily and objectively identifiable. Plaintiff contemplates that notice will be provided to Class Members by e-mail, mail, and published notice.

### COUNT ONE

### Offer and Sale of Unregistered Securities

### in Violation of Section 5 of the Securities Act, 15 U.S.C. §§ 77e(a)

### (on behalf of Plaintiff and Members of the Nationwide Class against Voyager)

128.    Plaintiff re-alleges and incorporates paragraphs 1–19, 24–33, 44–45, 47–54, 56–68, 105–106, 113–123, 125, 127 above as if fully set forth herein and further alleges as follows.

129.    Plaintiff brings this claim individually and on behalf of the members of the Nationwide Class against Voyager.

130.    Section 5 of the Securities Act, 15 U.S.C. §§ 77e(a), states:

Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—

(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or

(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

131.   The Voyager Earn Program Account ("EPA") is a security within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1) because it is a "note" and an "investment contract."

132.   The EPAs were not registered with the SEC.

133.   Voyager sold and offered to sell the unregistered EPAs to Plaintiff and Nationwide Class members, in violation of 15 U.S.C. §§ 77e(a).

134.   Plaintiff and members of the Nationwide Class suffered damages as a result of their purchase of the unregistered EPAs securities through Defendants' website and/or application.

135.   As a result of Voyager's unregistered sale of the EPAs securities, Voyager is liable to Plaintiff and the members of the Nationwide Class. 15 U.S.C. § 77l(a).

WHEREFORE, Plaintiff, on behalf of himself and the Nationwide Class members, demands judgment for rescission and/or compensatory damages, in addition to prejudgment interest, reasonable attorneys' fees, costs, post-judgment interest, and any and all further relief deemed just, equitable, and proper.

## COUNT TWO

### Offer and Sale of Unregistered Securities
### in Violation of Florida Statute Section 517.07,
### The Florida Securities and Investor Protection Act
### (on behalf of Plaintiff and Members of the Florida Sub-Class against Voyager)

136.   Plaintiff re-alleges and incorporates paragraphs 1–19, 24–33, 44–45, 47–54, 56–68, 105–106, 113–123, 125, 127 above as if fully set forth herein and further alleges as follows.

137.   Plaintiff brings this claim individually and on behalf of the members of the Florida Sub-Class against Voyager.

138.   Section 517.07(1), Fla. Stat., provides that it is unlawful and a violation for any person to sell or offer to sell a security within the State of Florida unless the security is exempt under Fla. Stat. § 517.051, is sold in a transaction exempt under Fla. Stat. § 517.061, is a federally covered security, or is registered pursuant to Ch. 517, Fla. Stat.

139.   The Voyager Earn Program Account is a security pursuant to Fla. Stat. § 517.021(22)(a).

*Mark Cassidy v. Voyager Digital Ltd., et al.*
*Case No.: 21-24441-CIV-ALTONAGA/Torres*
*First Amended Complaint*

140.    The EPAs sold and offered for sale to Plaintiffs and members of the Florida Sub-Class were not:

a.    exempt from registration under Fla. Stat. § 517.051;

b.    a federal covered security;

c.    registered with the Office of Financial Regulations (OFR); or

d.    sold in a transaction exempt under Fla. Stat. § 517.061.

141.    Through its actions described above, Voyager sold and offered to sell the unregistered EPAs to Plaintiff and the members of the Class.

142.    As a result of Voyager's sale and offer to sell the EPAs, Voyager violated Fla. Stat. § 517.07.

WHEREFORE, Plaintiff, on behalf of himself and the Florida Sub-Class members, demands judgment for rescission and/or damages pursuant to Fla. Stat. § 517.211, together with prejudgment interest, reasonable attorneys' fees, costs, post-judgment interest, and any and all further relief deemed just, equitable, and proper.

## COUNT THREE

### VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT
### (<u>Against VDL</u> on behalf of Plaintiff and Members of the Nationwide Class)

143.    Plaintiff re-alleges and incorporates paragraphs 1–3, 10–23, 34–44, 46–47, 55–57, 69–104, 107–112, 113–122, 124, and 126–127 above as if fully set forth herein and further alleges as follows.

144.    The New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, *et seq*., prohibits the "use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise and misrepresentation . . . in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby." N.J.S.A 56:8-2.

145.    VDL has engaged in, and continues to engage in, unconscionable commercial practices, deceptive acts, and misrepresentations in the conduct of its trade and/or commerce in the State of New Jersey, as described more fully hereinabove.

146.    VDL's statements regarding the Voyager Platform being "100% Commission-Free" were false and misleading because VDL in fact did charge Plaintiff and Class members undisclosed commissions on cryptocurrency trades made on the Voyager Platform.

147.    The NJCFA further provides that "[a]ny person who suffers an ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under the [NJCFA] may bring an action or assert a counterclaim therefore in any court of competent jurisdiction. N.J.S.A. 56:8-19.

148.    Plaintiff and the Class are "person(s)" as that term is defined in N.J.S.A.56:8-1(d).

149.    Plaintiff and the Class have suffered an ascertainable loss of moneys or property as a direct and proximate result of VDL's unconscionable practices.

150.    Plaintiff and the Class have a private right of action against VDL and it entitles them to recover, in addition to their actual damages, a threefold award of the damages sustained by any person, interest, an award of reasonable attorney's fees, filing fees and reasonable costs of suit. N.J.S.A 56:8-19.

151.    Plaintiff and the Class have suffered, and will continue to suffer, irreparable harm if VDL continues to engage in such deceptive, unfair, and unreasonable practices.

## COUNT FOUR
**For Violations of the Florida Deceptive and Unfair Trade Practices Act,**
**§ 501.201, Florida Statutes, *et seq.***
**(Against VDL on behalf of Plaintiff and Members of the Florida Subclass)**

152.    Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1–3, 10–23, 34–44, 46–47, 55–57, 69–104, 107–112, 113–122, 124, and 126–127 as if fully set forth herein.

153.    This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, section 501.201, Fla. Stat., *et seq*. ("FDUTPA"). The stated purpose of the FDUTPA is to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202(2), Fla. Stat.

*Mark Cassidy v. Voyager Digital Ltd., et al.*
*Case No.: 21-24441-CIV-ALTONAGA/Torres*
*First Amended Complaint*

154.    Plaintiff and Class members are consumers as defined by section 501.203, Fla. Stat. VDL is engaged in trade or commerce within the meaning of the FDUTPA.

155.    Florida Statute section 501.204(1) declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

156.    VDL's unfair and deceptive practices as described herein are objectively likely to mislead – and have misled – consumers acting reasonably in the circumstances.

157.    VDL has violated the FDUTPA by engaging in the unfair and deceptive practices as described herein, which offend public policies and are immoral, unethical, unscrupulous and injurious to consumers.

158.    Plaintiff and consumers in the Class have been aggrieved by VDL's unfair and deceptive practices and acts of false advertising by paying VDL undisclosed commissions on cryptocurrency trades on the Voyager Platform, having parted with money under false pretenses.

159.    The harm suffered by Plaintiffs and consumers in the Class was directly and proximately caused by the deceptive and unfair practices of VDL, as more fully described herein.

160.    Pursuant to sections 501.211(2) and 501.2105, Fla. Stat., Plaintiff and consumers in the Class make claims for actual damages, attorneys' fees and costs.

161.    VDL still utilizes many of the deceptive acts and practices described above and is still secretly retaining money from every cryptocurrency trade made on the Voyager Platform. Plaintiff and the other members of the Class have suffered and will continue to suffer irreparable harm if VDL continues to engage in such deceptive, unfair, and unreasonable practices. Section 501.211(1) entitles Plaintiff and the Class to obtain both declaratory or injunctive relief to put an end to VDL's unfair and deceptive scheme.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for a judgment on behalf of himself and the Classes:

    a.  Certifying the Classes as requested herein;

    b.  Awarding actual, direct and compensatory damages;

    c.  Awarding restitution and disgorgement of revenues if warranted;

    d.  Awarding declaratory relief as permitted by law or equity, including declaring the Voyager Defendants' practices as set forth herein to be unlawful;

    e.  Awarding injunctive relief as permitted by law or equity, including enjoining the Voyager Defendants from continuing those unlawful practices as set forth herein, and directing the Voyager Defendants to identify, with Court supervision, victims of their conduct and pay them all money they are required to pay;

    f.  Awarding statutory and multiple damages, as appropriate;

    g.  Awarding attorneys' fees and costs; and

    h.  Providing such further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial as to all claims so triable.

*Mark Cassidy v. Voyager Digital Ltd., et al.*
*Case No.: 21-24441-CIV-ALTONAGA/Torres*
*First Amended Complaint*

Dated: April 28, 2022

Respectfully submitted,

By: */s/ Adam Moskowitz*
Adam M. Moskowitz
Florida Bar No. 984280
adam@moskowitz-law.com
Joseph M. Kaye
Florida Bar No. 117520
joseph@moskowitz-law.com
Barbara C. Lewis
barbara@moskowitz-law.com
Florida Bar No. 118114
**THE MOSKOWITZ LAW FIRM, PLLC**
2 Alhambra Plaza, Suite 601
Coral Gables, FL 33134
Telephone: (305) 740-1423

By: */s/  Stuart Z. Grossman*
Stuart Z. Grossman
Florida Bar No. 156113
szg@grossmanroth.com
Rachel W. Furst
Florida Bar No. 45155
rwf@grossmanroth.com
Ryan J. Yaffa
Florida Bar No. 1026131
rjy@grossmanroth.com
**GROSSMAN ROTH YAFFA COHEN, P.A.**
2525 Ponce de Leon Blvd Ste 1150
Coral Gables, FL 33134
Office: 305-442-8666

*Co-Counsel for Plaintiff and the Class*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the forgoing was filed on April 28, 2022, with the Court via CM/ECF system, which will send notification of such filing to all attorneys of record.

By: */s/ Adam M. Moskowitz*
ADAM M. MOSKOWITZ
Florida Bar No. 984280