### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA

### CASE NO.: 21-24441-CIV-ALTONAGA/Torres

MARK CASSIDY, on behalf of himself
and others similarly situated,

     Plaintiff,

v.

VOYAGER DIGITAL LTD, and
VOYAGER DIGITAL LLC

     Defendants.

_____/

### PLAINTIFF'S MOTION TO CERTIFY A LIABILITY ISSUE ONLY CLASS AGAINST DEFENDANT VOYAGER DIGITAL LTD., PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 23(a), 23(b)(3), and 23(c)(4)

Plaintiff in this class action asserts state and federal claims against Defendant, Voyager Digital LTD ("Voyager") for the offer and sale of unregistered securities, in the form of the Voyager Earn Program Account, which has recently been the subject of great scrutiny by numerous state and regulatory entities.[1]

Since Voyager first introduced these unregistered securities to tens of thousands of consumers in Florida, and throughout the United States in October 2019, it has referred to them by various names, including the "Voyager Interest Program" or the "Voyager Earn Program Account" (collectively, the "EPA"). There is no dispute that Voyager never registered the EPAs with the United States Securities and Exchange Commission ("SEC") or with the Florida Office of Financial Regulation (the "OFR"). As Voyager LTD's former Chief Communications Officer, Michael Legg, explained in his recent deposition taken in this case, "[t]here's always been a

---

[1] Plaintiff also asserts two (2) claims against Voyager's subsidiary Voyager Digital LLC, for deceptive trade practices, under the FDUTPA and NJCFA. [ECF No. 46] ("Compl."), counts 3 and 4. Plaintiff is not moving at this time for certification of those state claims, or against that Defendant. Plaintiff has served some brief discovery on Voyager Digital LLC (which is <u>not</u> necessary to decide this Motion), and his counsel has also been retained by numerous other class members that reside across the country and have invested hundreds of thousands of dollars into the EPAs.

program in place to earn yield. How the terminology has been around it has evolved." Legg 43:24–44:1. One main reason for that constant change in terminology has been to avoid the reality that the EPAs are, in fact, securities that must be registered with the SEC and state regulatory authorities.

The reason for this drastic decision (by selling unregistered securities) was fueled solely by Voyager's extreme greed. If these extremely attractive EPAs (offering cryptocurrency assts as returns on investments, instead of free magazines and blenders) were not registered, Voyager decided to spend tens of millions in dollars to market these EPAs to every consumer in the country, they would not have to be "accredited investors" (as Voyager's competitors that comply with the law are restricted), but instead they targeted college students, sport fans and many lower income households, with admittedly very limited experience with the crypto market. That is the main reason the SEC and many state attorneys general are now preaching for the need for more regulation in the crypto market. But as explained below, this case is much simpler, yet more sinister, Voyager made the decision to knowingly violate these federal and state regulation laws, and (as Plaintiff will further investigate), may have used their inside and outside counsel to aid and abet in these serious violations.

Voyager went to *such* great lengths in blindly avoiding any adverse information (so they could possibly later argue that they did not "knowingly" violate the law or that their counsel did not aid and abet in any violations, which may certainly implicate the crime/fraud exception), Voyager shockingly represented to its shareholders that, although it has access to counsel competent to analyze the EPAs in the context of U.S. securities laws to determine whether the EPAs should be registered, Voyager "**will generally *not* seek to obtain such a legal opinion**."[2]

Voyager was very happy to keep itself—and its shareholders and customers—willfully ignorant of these crucial legal issues because, as it boastfully explained during its Q2 2022 earnings

---

[2] Compl., Ex. I at 20. It is simply absurd for any publicly traded company that deals with billions of dollars in customer investments in a new market, not to rely upon their fine counsel to know the answers to these basic legal questions. Plaintiff has already asked Voyager for all responsive documents involving discussions with inside and outside counsel about whether these Voyager EPAs needed to first be registered with the state and federal securities. Under certainly factual scenarios, the crime/fraud exception may be applicable, but more discovery is certainly necessary to reach those arguments.

call, *its risky practices have allowed it to enjoy exponential growth.*[3] "By the end of calendar 2021, we had 250 employees, 3.2 million verified users and 1.074 million funded accounts with over $5.9 billion of assets on the platform. This level of growth makes Voyager one of the fastest-growing cryptocurrency platforms in the industry and one of the largest in the United States. Based on data obtained from one of our investment banking partners, Voyager was third on the list of fastest-growing public companies listed on any U.S. exchange including the OTC markets, based on revenue growth in calendar 2021 with $416 million of revenue, up from just $6.6 million for the calendar year 2020."[4]

But others have not been happy to turn a blind eye towards these practices. After Plaintiff filed the original complaint, in February 2022, the SEC charged Voyager's competitor, BlockFi, with failing to register the offers and sales of its retail crypto lending product—a nearly identical offering to Voyager's EPA, called the BlockFi Interest Account.[5] BlockFi settled those claims with the SEC and paid $100 million in fines and agreed to cease its unregistered offers and sales of the BlockFi Interest Accounts, to bring its business within the provisions of the Investment Company Act, and to register under the Securities Act of 1933 the offer and sale of a new lending product.[6]

Shortly after the BlockFi settlement was announced, Stephen Ehrlich, CEO and co-founder of Voyager, explained during the Q2 2022 earnings call for Voyager Digital Ltd, that:[7]

Lastly, we want to address the recent news about the SEC order in the matter

---

[3] Plaintiff's original complaint, including the extensive preliminary Expert Report of Rich Sanders of CipherBlade, went into great detail regarding the inherent risks and issues with the fact that Voyager was offering for sale the EPAs **without the necessary registration with federal and state regulatory entities** or the oversight that follows that registered status. Attached to the Complaint as Exhibit E is a supplemental report from Mr. Sanders, in support of this Motion for Class Certification (as to the sale of unregistered securities), which goes into further detail regarding how the EPAs function, how they generate revenue, and whether Voyager properly represents their risk ("Sanders Supp.").

[4] Compl., Ex. A. Moreover, Voyager's former Chief Communications Officer, Michael Legg, (who was quickly taken off the Voyager website, only after we noticed him for deposition) confirmed in his testimony that (1) every press release was cleared by Stephen Ehrlich as CEO of Voyager Digital Ltd.; and (2) every statement made during the Voyager earnings calls was "100 percent accurate at that time." Legg Tr. excerpts (Compl., Ex. D), 15:2–12; 17:14–18:2

[5] https://www.sec.gov/news/press-release/2022-26 (last accessed May 4, 2022).

[6] *Id.*

[7] Compl., Ex. A.

of BlockFi lending LLC. We recognize that this is a significant development in the industry and will provide a potential regulatory path for market participants. We also understand that some may view Voyager's rewards program to be similar to BlockFi interest accounts. While we understand the temptation to bucket them together, we think there are important differences between Voyager's program and BlockFi's that we think have legal significance.

That said, we are in ongoing discussions with regulators about the rewards program, and it is, of course, possible that regulators may have a different view. Under the circumstances, we think it's important to confirm that Voyager has received requests and subpoenas from the SEC and certain states in connection with the rewards program as part of nonpublic fact-finding inquiries. Of course, we believe that Voyager accounts that earn rewards comply with existing U.S. law and look forward to demonstrating that as necessary. We think it is normal and appropriate for financial service firms, especially in the crypto industry with these evolving regulatory frameworks to receive inquiries from regulators and law enforcement. When Voyager received such requests, our policy is to cooperate fully, but we limit public discussion as these matters are always evolving and as a public company, Voyager is subject to important rules regarding disclosures about its business.

Two weeks after Voyager made these statements to its investors, on March 30, 2022, Voyager issued a press release revealing that it was served with orders from various state securities divisions, including New Jersey and Alabama, ordering Voyager to cease and desist its offer and sale of the EPAs as they constitute unregistered securities.[8] As Voyager admits, "The Voyager Earn Program is the only Voyager product subject to the Orders. No other products and services offered by the Company are noted in the Orders."[9]

As Stephen Ehrlich, CEO and co-founder of Voyager, also explained, "I want to emphasize to our shareholders and customers that only one of our products is noted in the Orders. Voyager has always recognized that the US regulatory framework must evolve, and in some cases completely transform, to address the needs of the rapidly expanding crypto sector. Historically, Voyager has advocated for thoughtful regulation, which is a natural progression for this asset class. We believe tailored regulation will spur increased confidence and adoption of crypto assets.

---

[8] *See* Compl., Ex. F for a copy of the New Jersey Cease and Desist Order.
[9] https://www.investvoyager.com/pressreleases/voyager-provides-update-on-state-orders   (last accessed May 4, 2022)

Nonetheless, Voyager continues to pursue its strategy to innovate and grow the business and position the Company as a leader in the crypto asset market."[10]

As explained more fully, below, the question of whether Voyager's offering and selling the EPAs, which are unregistered securities, violates federal and state securities laws, is a common and predominant issue that is capable of swift resolution by this Court on a classwide basis, which determination would materially advance this litigation for Plaintiff and the potentially millions of affected consumers around the nation. Therefore, Plaintiff moves for certification of an issue class for these expedited proceedings.

### A. Voyager's Offer and Sale of EPAs Extensively in the State of Florida and Throughout the United States.

On October 23, 2019, Voyager began offering EPAs for sale to consumers throughout the United States, including the state of Florida. Compl. ¶ 58; *id.* at Ex. I, 12. Voyager initially launched the EPAs for customers holding Bitcoin, but thereafter extended them periodically to include dozens of other crypto assets, including USDC and Ethereum through end of fiscal year 2021. Compl. ¶ 58; *id.* at Ex. I, 12.

According to Voyager's Annual Information Form filed with Canadian regulators, "Rewards earned on crypto assets are variable, and reward rates are determined by Voyager at its sole discretion." Compl. ¶ 59; *id.* at Ex. I.

For fiscal year 2021, Voyager generated approximately $21 million in fees on crypto assets loaned. Compl. ¶ 60; *id.* at Ex. I. Voyager earned during Q2 of fiscal year 2022 "approximately $57 million in lending and staking activities." Compl. ¶ 60; *id.* at Ex. A. To generate this revenue, Voyager independently negotiates with institutional borrowers the terms of each unsecured institutional loan agreement, and selects which and how much of its crypto assets are available for such lending activity. Compl. ¶ 60. In the event of bankruptcy or insolvency of an institutional borrower under a loan, Voyager bears the credit risk of lending crypto assets under the loan. Compl. ¶ 60; *id.* at Ex. I.

Voyager maintains that it does not support, custody, intermediate, or facilitate any transaction or activities with respect to any product that constitutes a "security," and, therefore, believes that it is not required to be registered in *any capacity* under applicable United States securities laws. Compl. ¶ 61; *id.* at Ex. I. Voyager's conclusion is apparently drawn from its

---

[10] *Id.*

position that although the SEC had previously communicated to industry participants that it will apply existing securities laws, including the *Howey* Test, a four-part test developed by the U.S. Supreme Court to determine whether a particular "investment contract" is a security, to digital assets, the *Howey* Test is almost 75 years old, was not designed with digital assets in mind, and its application is fact-based. Compl. ¶ 61; *id*. at Ex. I.

At the same time, Voyager acknowledges that "it is possible that the SEC could come to a different conclusion" than Voyager, which "could result in [Voyager] being required to become registered, removing certain digital assets from its platform, or being required to cease certain of its operations." Compl. ¶ 62; *id*. at Ex. I.

As Plaintiff's expert, Rich Sanders, explains in his Expert Supplemental Report, Voyager's Earn program is functionally ***nearly entirely identical*** to similar programs offered by firms such as Celsius and BlockFi. Compl. ¶ 63; *id*. at Sanders Supp. ¶ 4. The differences between these companies and their respective programs are extremely minimal; as some examples, differences come down to phrasing (use of words like "interest" versus "rewards"), how frequently rewards are paid out (daily, weekly, or monthly, most commonly) or specific cryptocurrencies that are offered as part of the program. Compl. ¶ 63; *id*. at Sanders Supp. ¶ 4.

Just like BlockFi settled with regulators, as explained above, Celsius, another Voyager competitor with a nearly identical "earn" program, quickly followed suit by revising their "earn" program by introducing "Celsius' Custody Solution," which only allows accredited U.S. investors to earn rewards on their crypto asset holdings. Compl. ¶ 64; *id*. at Sanders Supp. ¶ 6 (citing https://blog.celsius.network/important-celsius-update-to-our-us-clients-6df471420cc7) (last accessed May 4, 2022). To-date, Sanders explains, Voyager has not taken any similar actions, noting that "it is possible that Voyager instead opts to (continue to) benefit from the influx of users from BlockFi and Celsius, opting to take this action at a future date – whether voluntarily or by being compelled to do so." Compl. ¶ 64; *id*. at Sanders Supp. ¶ 6.

In further describing the risks that stem from Voyager's offering and sale of the EPAs as unregistered securities, Sanders goes on to explain:

> There have been extensive releases, statements, and actions from government agencies related to cryptocurrency in recent history. Secretary Yellen's remarks on digital assets leave no room for mystery. The *first* priority includes consumer protection; this is not accidental. The fifth priority states equitable access to *safe* and affordable financial services. To state the obvious, it is the opposite of safe to

invest a significant portion of your net worth (let alone your life's savings) into activity such as DeFi staking. To invest a significant portion of someone else's net worth into activity such as DeFi staking, while painting a picture of far different asset use, adds a layer of dishonesty on top of risk.

Customers of firms like BlockFi and Voyager are led to believe that their assets are being utilized largely by reputable institutions, not that their assets are being day-traded on platforms like Binance or utilized for extremely high-risk DeFi activity. In simpler terms, the risk and reward of loaning Ethereum to a reputable and audited western institution, as opposed to rehypothecation of that Ethereum into DeFi yield farming, are on entirely different ends of the spectrum. The risk associated with this reality transcends not just risk for the misled customers of firms like Voyager and BlockFi that stand to lose significant portions of their net worth, but would be something I would categorize as an item of national security interest: an increased likelihood of a hack means an increased likelihood of siphoning of hundreds of millions or even billions of dollars' worth of value out of the western economy and into the hands of, for example, North Korea.[11] While true a western institution using loaned Bitcoin for arbitrage trading could be hacked, this is generally a less likely threat than the risk of a DeFi hack. In short, companies like Voyager and BlockFi misrepresent the risk of utilizing their interest/earn programs since they misrepresent what customer assets are used for, disregarding and concealing risk, for the sake of making a risky quick buck.

Compl. ¶ 65; *id*. at Sanders Supp. ¶¶ 9–10.

Under federal securities laws as construed by the United States Supreme Court in its decision *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) and by the SEC, an investment contract is a form of security under United States securities laws when (1) the purchaser makes an investment of money or exchanges another item of value (2) in a common enterprise (3) with the reasonable expectation of profits to be derived from the efforts of others. Voyager's EPAs offered and sold to Plaintiff and similarly situated consumers were a "security" as defined by the United States securities laws and as interpreted by the Supreme Court, the federal courts, and the SEC. Compl. ¶ 66.

The Securities Act and the Exchange Act were designed to "eliminate serious abuses in a largely unregulated securities market." *United Housing Found., Inc. v. Forman*, 421 U.S. 837, 849 (1975). They are focused, among other things, "on the capital market of the enterprise system: the

---

[11]    https://techcrunch.com/2022/04/15/us-officials-link-north-korean-lazarus-hackers-to-625m-axie-infinity-crypto-theft/ (last accessed May 4, 2022)

sale of securities to raise capital for profit-making purposes . . . and the need for regulation to prevent fraud and to protect the interest of investors. *Id.* Under Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act, a security includes any "note." *See* 15 U.S.C. §§ 77b & 78c. A note is presumed to be a security unless it falls into certain judicially-created categories of financial instruments that are not securities, or if the note in question bears a "family resemblance" to notes in those categories based on a four-part test. *See Reves v. Ernst & Young*, 494 U.S. 56, 64–66 (1990), and its progeny. Applying the *Reves* four-part analysis, the EPAs were notes and thus securities. First, Voyager offered and sold EPAs to obtain crypto assets for the general use of its business, namely to run its lending and investment activities to pay interest to EPA investors, and purchasers bought EPAs to receive interest on the loaned crypto assets. Compl. ¶ 67. Second, EPAs were offered and sold to a broad segment of the general public. *Id.* Third, Voyager promoted EPAs as an investment, specifically as a way to earn a consistent return on crypto assets. *Id.* Fourth, no alternative regulatory scheme or other risk reducing factors exist with respect to EPAs. *Id.*

Under Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act, a security includes "an investment contract." *See* 15 U.S.C. §§ 77b, 78c. Based on the facts and circumstances set forth in the Complaint, the EPAs were securities because they were notes under *Reves v. Ernst & Young*, 494 U.S. 56, 64–66 (1990) and its progeny, and also because Voyager offered and sold the EPAs as investment contracts, under *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946) and its progeny, including the cases discussed by the SEC in its Report of Investigation Pursuant To Section 21(a) Of The Securities Exchange Act of 1934: The DAO. Compl. ¶ 68 (citing https://www.sec.gov/litigation/investreport/34-81207.pdf (last accessed May 4, 2022)). Voyager promised EPA investors a variable interest rate, determined by Voyager on a periodic basis, in exchange for crypto assets loaned by the investors, who could demand that Voyager return their loaned assets at any time. *Id.* Voyager thus borrowed the crypto assets in exchange for a promise to repay with interest. *Id.* Investors in the EPAs had a reasonable expectation of obtaining a future profit from Voyager's efforts in managing the EPAs based on Voyager's statements about how it would generate the yield to pay EPA investors interest. *Id.* Investors also had a reasonable expectation that Voyager would use the invested crypto assets in Voyager's lending and principal investing activity, and that investors would share profits in the form of interest payments resulting from Voyager's efforts. *Id.*

Further, as Rich Sanders demonstrates in his Expert Preliminary Report, once an investor purchases a EPA from Voyager and invests assets into it, Voyager customer assets are consolidated into accounts operated by a common enterprise. Compl. ¶ 68; *id.* at Sanders Supp. ¶ 11. "Blockchains don't lie, and the tracing of Voyager customer deposits to common enterprise accounts is very clear." Compl. ¶ 68; *id.* at Sanders Supp. ¶ 11. Voyager offered and sold the EPAs to the general public to obtain crypto assets for the general use of its business, namely to run its lending and investment activities to pay interest to EPA investors, and promoted the EPAs as an investment. Compl. ¶ 68. Voyager offered and sold securities without a registration statement filed or in effect with the Commission and without qualifying for an exemption from registration; as a result, Voyager violated Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act"). *Id.*; *see also id.*, Ex. F.

Voyager specifically offered and sold Plaintiff a EPA, and he sustained damages as a result. *See* Declaration of Mark Cassidy dated May 4, 2022, attached as **Exhibit A** ("Cassidy Decl."), ¶ 3. The EPA that Voyager sold Plaintiff was no different than any of the other EPAs that Voyager offers and sells throughout the nation, all of which are currently subject to investigation by federal and state regulatory authorities as potentially being unregistered securities, and which number in "at least tens of thousands" in Florida alone. *See* Excerpts of Transcript of Voyager Digital LLC's corporate representative, attached as **Exhibit B**, 41:20–42:15 ("Q. [I]f Mr. Cassidy was in Texas or if he was in California, would there be any differen[ce] that you would look at in this chart in terms of how he was paid interest every month if both people met the minimum amount that was necessary each month? . . . THE WITNESS: **No. His earn would be the same**, as far as I know, in those state -- in those states. Q. **So there's no distinction for the Voyager Earn Program by state**. . . . THE WITNESS: **Yes, as far as I'm aware**."); 107:10–13 ("Q. There's definitely at least tens of thousands of Voyager Platform members that are residents of the State of Florida? A. Oh. Yes."); 133:2–134:13 ("Q. Okay. So . . . my next question is, all of these investigations that are being done by the State AGs and the SEC applies to Mark Cassidy's account? . . . THE WITNESS: I'm not sure. I – I would – I think, yes. . . . Q. What else do you need from us so that you can say, as the corporate rep depo -- deponent who is the most qualified to talk about Mark Cassidy's account, that **his account is the same account that these attorney generals and the SEC are**

saying possibly should be registered securities? . . . THE WITNESS: To the extent I know, they – **they would not be different from any of the other accounts.**").[12]

The Court is not required to resolve these issues at this stage of the litigation, however, Plaintiff submits it is clear that their resolution will be applied equally to Plaintiff's and the Proposed Class Members' claims, making class treatment appropriate.

## RELIEF REQUESTED

The purpose of a class action is to facilitate judicial economy by avoiding multiple suits on the same subject matter, provide a feasible means for asserting the rights of those who would have no realistic day in court if a class action were not available, and deter inconsistent results, assuring a uniform, singular determination of rights and liabilities. *Am. Pipe & Constr., Co. v. Utah*, 414 U.S. 538 (1974).

As explained more fully below, Plaintiff at this stage seeks a very narrow certification order that utilizes Rules 23(a), 23(b)(3), and 23(c)(4) to certify a liability issue class for the purpose of adjudicating first whether the EPAs constitute a security that Voyager should have registered before offering and selling to Plaintiff and Class Members.[13] Rule 23(c)(4) provides that "an action may be brought or maintained as a class action with respect to particular issues." *See In re Tri-State Crematory Litig.*, 215 F.R.D. 660, 697 (N.D. Ga. 2003) (certifying issues of "Defendants' duty to Plaintiffs and whether Defendants breached that duty"). "The theory of Rule [23(c)(4)] is that the advantages and economies of adjudicating issues that are common to the entire class on a representative basis should be secured even though other issues in the case may have to be litigated separately by each class member." *Nelson v. Walmart Stores, Inc.*, 245 F.R.D. 358, 380 (E.D. Ark.

---

[12] After Plaintiff filed the amended complaint, Defendant's counsel raised various issues with Plaintiff's counsel regarding certain exhibits Defendant pretextually marked as confidential without a basis to do so. Counsel for the parties met and conferred via videoconference on May 3, 2022. During that conference, Plaintiff's counsel informed Defendant's counsel that Plaintiff would be filing this motion today. Defendant's counsel reactively attempted to designate the entirety of the deposition transcripts taken in this action confidential as a means to prevent Plaintiff from presenting this clearly nonprivileged and non-confidential information in support of this motion. Attached as **Exhibit C** for the Court's consideration is Plaintiff's counsel's correspondence to Defendant's counsel regarding these issues.

[13] *Jones v. Desantis*, No. 4:19cv300-RH/MJF, 2020 WL 5646124, at *2 (N.D. Fla. Apr. 7, 2020) (a plaintiff may move for class certification of selected counts only) (citing, *inter alia*, *Jenkins v. United Gas Corp.*, 400 F.2d 28, 35 (5th Cir. 1968)).

2007). The Court has this tool and others at its disposal to facilitate common-sense treatment of the common claims and issues as part of its class certification.

In this regard, Plaintiff submits that the Court should certify a liability issue class under Rule 23(a), (b)(3), and (c)(4) so Plaintiff can move forward on expeditiously trying the issue before this Court as to whether Voyager's EPA constitutes an unregistered security—***a method of organizing this litigation that Plaintiff's counsel has used with very recent success in both state and federal class actions.*** *Collins v. Quincy Bioscience, LLC*, No. 19-CV-22864, 2020 WL 3268340 (S.D. Fla. Mar. 19, 2020) (Goodman, M.J.) (recommending certifying a liability issue class and bifurcating proceedings into liability and damages phases where defendant's liability would be determined regarding uniform representations made to the class);[14] *Las Olas Co. v. Fla. Power & Light Co.*, No. CACE19019911-18, 2020 WL 9874296 (Fla. 17th Cir. Ct. Dec. 14, 2020), *aff'd per curiam Infratech Corp. v. Las Olas Co.*, 320 So. 3d 751 (Fla. 4th DCA 2021), *reh'g denied* (Fla. 4th DCA July 13, 2021) (affirming certification of a liability issue class and proceeding to a bifurcated jury trial regarding defendants' liability for causing a single-incident mass tort—which trial lasted one week and resulted in favorable liability verdict for the class). Courts throughout this Circuit have also demonstrated the utility in this approach. *See Andreas-Moses v. Hartford Fire Ins. Co.*, 326 F.R.D. 309 (M.D. Fla. June 18, 2018) ("The Court will exercise its discretion under Rule 23(c)(4) to certify a merits-only class and bifurcate damages from the merits."); *Navelski v. Int'l Paper Co.*, 244 F. Supp. 3d 1275 (N.D. Fla. 2017) (same); *Fabricant v. Sears Roebuck*, 202 F.R.D. 310, 317 (S.D. Fla. 2001) (explaining that "the Court may either appoint a master to resolve actual damages or merely allow class members to bring individual actions with the benefit of a *res judicata* finding of liability").

As there can be no dispute that determining whether Voyager's EPAs are unregistered securities would materially advance the litigation for all Class members, the Court may use Rule 23(c)(4) to certify a Liability Issue Class. Accordingly, Plaintiff respectfully moves the Court for

---

[14] *Collins* is also instructive because in that case Plaintiff's counsel also filed a Motion for Class Certification one week after filing the Amended Complaint, because they were able to marshal and present the necessary supporting evidence. The *Collins* court not only rejected the defendant's arguments that the motion was filed "prematurely" and should be stayed, it in fact *granted* class certification because plaintiffs satisfied all of the requirements of Federal Rule 23.

its Order certifying the following nationwide and Florida state liability issue classes to litigate the selected claims described below (collectively, "the Proposed Classes"):[15]

**(1) <u>Nationwide Voyager Class</u>:** All persons or entities in the United States who, within the applicable limitations period, purchased or enrolled in a EPA.

**(2) <u>Florida Voyager Subclass</u>:** All persons or entities in the state of Florida who, within the applicable limitations period, purchased or enrolled in a EPA.

Excluded from the Proposed Classes are Voyager and its officers, directors, affiliates, legal representatives, and employees, any governmental entities, any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

Plaintiff also respectfully requests that the Court (a) appoint him to serve as Class Representative for the Proposed Classes, and (b) appoint The Moskowitz Law Firm, PLLC, and Grossman Roth Yaffa Cohen, P.A., as Class Counsel.

## APPLICABLE STANDARD

A district court has broad discretion in determining whether to certify a class. *Washington v. Brown & Williamson Tobacco Corp.*, 959 F.2d 1566, 1569 (11th Cir. 1992); *Griffin v. Carlin*, 755 F.2d 1516, 1531 (11th Cir. 1985).

As a threshold matter, courts consider whether "the proposed class is adequately defined and clearly ascertainable." *Palm Beach Golf Ctr.-Boca, Inc. v. Sarris*, 311 F.R.D. 688, 693 (S.D. Fla. 2015).[16] Additionally, "the named plaintiffs must have standing, and the putative class must meet each of the requirements specified in Federal Rule of Civil Procedure 23(a), as well as at least one of the requirements set forth in Rule 23(b)." *Klay v. Humana, Inc.*, 382 F.3d 1241, 1250 (11th Cir. 2004). The party seeking to maintain the class action must affirmatively demonstrate its compliance with Rule 23. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011).

---

[15] To whatever extent that the proposed class definitions should be refined to more clearly cover the class of individuals affected by a defendant's alleged misconduct, the Court has discretion to do so. *Herman v. Seaworld Parks & Ent., Inc.*, 320 F.R.D. 271, 285 (M.D. Fla. 2017)

[16] In *Cherry v. Dometic Corp.*, 986 F.3d 1296 (11th Cir. 2021), the United States Court of Appeals for the Eleventh Circuit disavowed the "administrative feasibility" requirement for establishing ascertainability of class members as a precondition to certification, which it had previously adopted in its unpublished decision in *Karhu*.

Rule 23 "establishes the legal roadmap courts must follow when determining whether class certification is appropriate." *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1187 (11th Cir. 2003). The Rule 23(a) requirements are commonly referred to as the "numerosity, commonality, typicality, and adequacy of representation" requirements. *Valley Drug Co.*, 350 F.3d at 1188. Under Fed. R. Civ. P. 23(b)(3), the Court must find "that the questions of law or fact common to class members predominate over any questions affecting only individual members," and "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Id.*

Voyager has told Plaintiff that it believes that the Court will not allow Plaintiff to file this motion for class certification, until the Court first, fully and completely adjudicates the sole defense issues raised in Voyager's new soon-to-be-filed Motion to Dismiss. Plaintiff already explained in detail why he disagreed. *See* Ex. C.

## LEGAL ARGUMENT

### A.  STANDING

"[A] class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Prado–Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000) (quoting *Gen. Tel. Co. of Sw.*, 457 U.S. at 156) (internal quotations and citation omitted). "[S]tanding is gauged by the specific common-law, statutory or constitutional claims that a party presents." *Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund*, 500 U.S. 72, 77 (1991). "An economic injury is the 'epitome' of a concrete injury." *Lewis v. Mercedes-Benz USA, LLC*, No. 19-CIV-81220-RAR, 2021 WL 1216897, at *5 (S.D. Fla. Mar. 30, 2021) (citing *MSPA Claims 1, LLC v. Tenet Fla., Inc.*, 918 F.3d 1312, 1318 (11th Cir. 2019).

Here, Plaintiff clearly has standing as Voyager offered and sold him a EPA and he suffered economic losses. *See* Cassidy Decl. ¶ 3.

### B.  ASCERTAINABILITY

As the Eleventh Circuit has recently held, to be ascertainable the proposed class need only be "adequately defined such that its membership is capable of determination." *Cherry v. Dometic Corp.*, 986 F.3d 1296, 1304 (11th Cir. 2021) (rejecting any requirement to demonstrate administrative feasibility). Here, membership in each Proposed Class can be readily determined from Voyager's own corporate records. *See* Compl. Ex. A (Voyager explaining that "[b]y the end of calendar 2021, we had 250 employees, 3.2 million verified users and 1.074 million funded

accounts with over $5.9 billion of assets on the platform."); *see also* Ex. B 107:10–13. *See, e.g., In re Health Insurance*, 2021 WL 1341881, at *7 (settlement class adequately defined and clearly ascertainable where membership was objectively determinable from corporate records).

### C.  <u>NUMEROSITY</u>

"To establish numerosity, [a plaintiff] must show that the class is so numerous that joinder of all members is impracticable." *Manno v. Healthcare Revenue Recovery Grp., LLC*, 289 F.R.D. 674, 684 (S.D. Fla. 2013) (internal quotes and citation omitted). "While mere allegations of numerosity are insufficient, Rule 23(a)(1) imposes a generally low hurdle, and a plaintiff need not show the precise number of members in the class." *Id.*; *accord*, *Palm Beach Golf Ctr.*, 311 F.R.D. at 695. The "general rule of thumb in the Eleventh Circuit is that 'less than twenty-one is inadequate, more than forty adequate, with numbers between varying according to other factors.'" *Manno*, 289 F.R.D. at 684 (quoting *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986)); *see, e.g., Kilgo v. Bowman Transp., Inc.*, 789 F.2d 859, 878 (11th Cir. 1986).

Numerosity is easily satisfied for each of the Proposed Classes, given that Voyager reports approximately 3.2 million verified users and 1.074 million funded accounts with over $5.9 billion of assets under management, with tens of thousands in Florida. Compl., Ex. A; *see also* Ex. B 107:10–13.

### D.  <u>COMMONALITY</u>

Commonality requires the identification of an issue that by its nature "is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. Proof of commonality is a "relatively light burden*." County of Monroe, Fla. v. Priceline.com, Inc.*, 265 F.R.D. 659, 667 (S.D. Fla. 2010) (internal quotation marks and citation omitted). Commonality "does not require that all the questions or law and fact raised by the dispute be common." *Id.* "What matters to class certification . . . [is] the capacity of a classwide proceeding to generate common **answers** apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350 (internal quotation marks and citation omitted) (emphasis original). Commonality is readily found where, as here, "[d]efendants have engaged in a standardized course of conduct that affects all class members." *In re Terosozin Hydrochloride,* 220 F.R.D. at 687; *Agan v. Katzman & Korr, P.A.,* 222 F.R.D. 692, 697 (S.D. Fla. 2004).

There are numerous common legal issues subject to classwide resolution that will determine "in one stroke" the issues central to Plaintiffs' claims. *Id.* They include:

    (a) whether the EPAs were unregistered securities under federal and Florida law;

    (b) whether Voyager's offerings and sales of EPAs violate the provisions of the Securities Act and Florida law; and

    (c) the type and measure of damages suffered by Plaintiff and the Class.

Compl., ¶ 116.

The common issues raised in this action are straightforward. If the EPAs are in fact securities that must be registered, Voyager's violations tainted the sales to all investors. Commonality is thus satisfied by these common issues.

### E.  TYPICALITY

"[T]ypicality measures whether a sufficient nexus exists between the claims of the named representatives and those of the class at large." *Prado-Steiman*, 221 F.3d at 1279. The focus of the typicality requirement is whether the named plaintiff will advance the interests of the class members by advancing his own interests. *Agan v. Katzman & Korr, P.A.*, 222 F.R.D. 692, 698 (S.D. Fla. 2004); *Herman*, 320 F.R.D. at 293 (same).

Much like the commonality requirement, the typicality requirement does not require that the claims of the proposed class representative and the proposed class be identical: all that is required is that "the claims or defenses of the class and class representative arise from the same event or pattern or practice and are based on the same theory." *Agan*, 222 F.R.D. at 698 (citing *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984)). Rule 23(a)(3) typicality is thus satisfied where Plaintiff's claims are "reasonably co-extensive" with absent Class Members' claims; they need not be "substantially identical." *In re Checking Account Overdraft Litig.*, 281 F.R.D. 667, 675 (S.D. Fla. 2012). Generally, "a strong similarity of legal theories will satisfy the typicality requirement despite substantial factual differences." *Prado-Steiman*, 221 F.3d at 1279 n.14 (citation omitted).

The question of whether each EPA was a security rests on factors that are identical for Plaintiff and all Class members: whether Class members invested money in the EPAs, whether the investors in the EPAs participated in a common enterprise, whether reasonable investors purchased the EPAs with an expectation of profit from owning them, and whether investors reasonably

expected profits from the EPAs to be derived from the managerial efforts of Voyager, the EPA issuer.

As a result of Voyager's conduct in offering and selling unregistered EPAs, Plaintiff, like every member of the proposed Class, is entitled to recover the consideration paid for the EPAs or damages for the investments in the EPAs that were previously sold. Stated otherwise, Plaintiff's claims and each proposed Class member's claims "arise from the same event or pattern or practice and are based on the same theory." *Agan*, 222 F.R.D. at 698 (citing *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984)).

Accordingly, the typicality requirement is satisfied.[17]

## F. ADEQUACY

Adequacy requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Adequacy is satisfied where (i) counsel for the class is qualified and competent to vigorously prosecute the action, and (ii) the interests of the proposed class representatives are not antagonistic to the interests of the Class. *See, e.g.*, *Fresco v. Auto Data Direct, Inc.*, No. 03-61063-CIV, 2007 WL 2330895, at *2 (S.D. Fla. May 14, 2007). The central component of representative adequacy is the absence of conflicts of interest between the named representative and the class. *Amchem*, 521 U.S. at 625–26 ("The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent. A class representative must be part of the class and possess the same interest and suffer the same injury as the class members." (internal quotation marks and citations omitted)).

Plaintiff's and the Class Member's interests are fully aligned in seeking to determine whether Voyager's EPAs are unregistered securities. Plaintiff has already served the Court and the Class in a representative capacity and has evidenced his commitment through his active prosecution of this lawsuit. *See* Cassidy Decl. (indicating that Plaintiff has reviewed the pleadings,

---

[17] To oppose class certification, Voyager may emphasize that Plaintiff's monetary injury varies in dollar amount from other members of the Proposed Classes. But not only is Eleventh Circuit law clear that individual variations among class members' claims with respect to the extent of their damages do not defeat typicality for purposes of class certification, *Kornberg*, 741 F.2d at 1337 ("Differences in the amount of damages between the class representative and other class members does not affect typicality."), Plaintiff only seeks to certify a narrow and targeted issue class at this stage that would ask this Court to determine whether the EPAs are unregistered securities in the first instance.

provided information to counsel, will respond to interrogatories and document requests, prepare for deposition, is willing to make himself available for trial, and is knowledgeable of the case and of his duties to the Class).

Moreover, as set forth below at greater length in the context of Rule 23(g), proposed Class Counsel is highly experienced in prosecuting class action litigation. *See, e.g., Fruitstone v. Spartan Race, Inc.*, No. 20-cv-20836-BLOOM/Louis, 2021 WL 2012362, at *12 (S.D. Fla. May 20, 2021) (finding in approving class settlement that Class Counsel's "reputation, diligence, expertise, and skill are reflected in the excellent results they have achieved"); *Feller v. Transamerica Life Ins. Co.*, No. 16-cv-01378 CAS (GJSx), 2019 WL 6605886, at *6 (C.D. Cal. Feb. 6, 2019) (same, finding Co-Lead Class Counsel "have demonstrated that they have fully and competently prosecuted all causes of action, claims, theories of liability, and remedies reasonably available to the Settlement Class Members"); *In Re: Champlain Towers South Collapse Litigation*, Case No. 2021-015089 CA 01 (Fla. 11th Jud. Cir. July 16, 2021) (Order Appointing **Co-Chairperson,** Rachel W. Furst, **Co-Lead Class Counsel,** Adam Moskowitz, **Liaison Counsel and Wrongful Death Counsel,** Stuart Grossman).

### G. <u>PREDOMINANCE</u>

The requirement that common questions of law or fact predominate means "the issues in the class action that are subject to generalized proof and thus applicable to the class as a whole, must predominate over those issues that are subject only to individualized proof." *Kerr v. City of West Palm Beach*, 875 F.2d 1546, 1558 (11th Cir. 1989) (citation omitted); *Carriuolo v. Gen. Motors Co.*, 823 F.3d977, 985 (11th Cir. 2016) (The Rule 23(b)(3) predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." (quoting *Amchem*, 521 U.S. at 623)). Here, too, the addition or subtraction of any given member from the Proposed Class would have no substantial effect on the nature or quantity of the evidence offered to prove Voyager's liability, readily satisfying *Brown*'s practical test of predominance.

Nor does proof of causation undermine predominance. Indeed, the only material individual variation in the class claims is the dollar amount of each investor's loss, which is not only recognized as no bar to class certification, *Brown*, 817 F.3d at 1239 ("The 'black letter rule' recognized in every circuit is that 'individual damage calculations generally do not defeat a finding that common issues predominate.'") (quotation omitted); *Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003) ("the presence of individualized damages issues does not

prevent a finding that the common issues in the case predominate.") (internal citations omitted), it is not an issue even remotely presented by the requested *issue class*, which will not at this stage seek to adjudicate Plaintiff's or Class members damages, but would rather focus on adjudicating the issue regarding whether the EPA is in fact an unregistered security. [18]

Common issues predominate with respect to the two causes of action Plaintiff seeks to certify. Both the 1933 Securities Act [15 U.S.C. § 77e(a)] and the FSIPA [Section 517.07] impose liability for the offer or sale of an unregistered security. Thus, "irrespective of the individual issues which may arise, the focus of the litigation concerns the alleged common course of unfair conduct embodied in [Voyager's] scheme" to market and sell unregistered securities. *See Larsen v. Union Bank, N.A. (In re Checking Account Overdraft Litig., MDL No. 2036)*, 275 F.R.D. 666, 676 (S.D. Fla. 2011) (internal quotations omitted). Voyager's participation in this scheme will be substantiated by common evidence—including much of the evidence attached to this motion—which shows that Voyager directed the marketing and sales efforts and spearheaded the effort to sell EPAs without registering them with the SEC despite knowing that they were securities which were required to be registered. This evidence would remain the same regardless of class size or composition. Further, the EPAs are materially identical and a Court could easily conclude that they are all securities based on the *Howey* test. Accordingly, the predominance requirement is met with respect to this claim.

## H. SUPERIORITY

Rule 23(b)(3) superiority requires the court to analyze "the relative advantages of a class action suit over whatever other forms of litigation might be realistically available to the plaintiffs." *Palm Beach Golf Ctr.*, 311 F.R.D. at 699 (quoting *Klay*, 382 F.3d at 1269); *Muzuco v. Re$ubmitIt, LLC*, 297 F.R.D. 504, 521 (S.D. Fla. 2013) (citations omitted). Here, there can be little doubt as to the judicial efficiency in litigation the claims of thousands—if not millions—of EPA purchasers

---

[18] That some class members ultimately may not be successful on their damage claims does not defeat certification where common issues otherwise predominate. *Navelski*, 244 F. Supp. 3d at 1309 (citing *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1136 (9th Cir. 2016) ("[E]ven a well-defined class may inevitably contain some individuals who have suffered no harm as a result of a defendant's unlawful conduct.")); *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009) (observing that it is inevitable "that a class will often include persons who have not been injured by the defendant's conduct;" but "[s]uch a possibility or indeed inevitability does not preclude class certification")).

on a class-wide rather than through individual lawsuits. A comprehensive resolution of the Class members' claims in this action would be far superior to litigating each of their claims separately, and will provide them a better chance at relief:

> Since the damage amounts allegedly owed to each individual [borrower] are relatively low — especially as compared to the costs of prosecuting the types of claims in this case involving complex, multi-level business transactions between sophisticated defendants — the economic reality is that many of the Class members would never be able to prosecute their claims through individual lawsuits.

*Williams v. Wells Fargo Bank, N.A.*, No. 11-cv-21233, 280 F.R.D. 665, 675 (S.D. Fla. Feb. 21, 2012).

There are thousands—if not millions—of potential Class members whose claims are based on an alleged common course of conduct, rendering the litigation more manageable as a class action than as thousands of individual suits. *See* Compl. Ex. A (Voyager explaining that "[b]y the end of calendar 2021, we had . . . 3.2 million verified users and 1.074 million funded accounts with over $5.9 billion of assets on the platform."); *see also* Ex. B 107:10–13. Even if the Class members were able individually to prosecute their claims, "[s]eparate actions by each of the Class members would be repetitive, wasteful, and an extraordinary burden on the courts." *Kennedy v. Tallant*, 710 F.2d 711, 718 (11th Cir. 1983). Thus, there is no other practical method of adjudicating these claims.

## I.  APPOINTMENT OF CLASS COUNSEL

Rule 23(g) governs the appointment of class counsel. In appointing class counsel, the Court is to consider: (1) "the work counsel has done," (2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action," (3) "counsel's knowledge of the applicable law," and (4) "the resources [] counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A).

Here, Proposed Class Counsel have decades of experience handling class action litigation, have demonstrated a sound knowledge of the legal issues pertaining to Plaintiff's and the Class's claims against Voyager, have retained experts needed to address the esoteric securities and cryptocurrency issues that may arise, and certainly have the collective financial wherewithal to capably prosecute these claims on a class-wide basis. *See* Firm Resumes attached as **Composite**

**Exhibit D**. Accordingly, the appointment of The Moskowitz Law Firm PLLC and Grossman Roth Yaffa Cohen, P.A. as Class Counsel is both appropriate and warranted.[19]

## CONCLUSION

For the foregoing reasons, the Court should (a) certify the Proposed Liability Issue Classes; (b) appoint Plaintiff to serve as Class Representative for the Proposed Liability Issue Classes; and (c) appoint The Moskowitz Law Firm, PLLC, and Grossman Roth Yaffa Cohen, P.A., to serve as Class Counsel for the Proposed Liability Issue Classes.

## LOCAL RULE 3.01(g) CERTIFICATION

Plaintiff's Counsel certifies they have conferred with Voyager's Counsel by videoconference on May 3, 2022 to discuss the motion in accordance with LR 3.01(g)(1) in a good faith effort to resolve the motion, and were informed Voyager opposes the motion.

## REQUEST FOR ORAL ARGUMENT

Plaintiff respectfully request oral argument pursuant to Local Rule 7.1(b)(2). This case and Plaintiff's motion raise complex questions of law and fact regarding whether the Classes should be certified. Given the importance of these questions to the determination of this case, Plaintiff believes that the Court's decision-making process would be significantly aided by oral argument. Plaintiff estimates just one hour will be necessary for oral argument.

---

[19] There does not appear to be any law directly on point regarding whether a Plaintiff seeking a certified class under only the state and federal offer and sale of unregistered securities claims (and not federal securities fraud claims) is required to comply with all of the PSLRA regulations, including the twenty (20) day notice, as this Court faced in the recent Robinhood MDL cases. *In re: January 2021 Short Squeeze Trading Litigation,* Case No.: 1:21-md-02989, in the U.S. District Court for the Southern District of Florida, Miami Division. In the abundance of caution, Plaintiff has already had published in many national business and trade publications, which specifically target institutional and sophisticated investors, details about this case, this Court, these claims and our Law Firms' information. Moreover, in further abundance of caution, if any other counsel has a different interpretation of these rules, they could possibly take action within sixty days. Plaintiff and Undersigned Counsel respectfully believe that they have made the necessary showing to be considered as proposed Class Representative and Class Counsel.

Dated: May 4, 2022                          Respectfully submitted,

                                            By: /s/ *Adam Moskowitz*
                                            Adam M. Moskowitz
                                            Florida Bar No. 984280
                                            adam@moskowitz-law.com
                                            Joseph M. Kaye
                                            Florida Bar No. 117520
                                            joseph@moskowitz-law.com
                                            Barbara C. Lewis
                                            barbara@moskowitz-law.com
                                            Florida Bar No. 118114
                                            **THE MOSKOWITZ LAW FIRM, PLLC**
                                            2 Alhambra Plaza, Suite 601
                                            Coral Gables, FL 33134
                                            Telephone: (305) 740-1423

                                            By: /s/ *Stuart Z. Grossman*
                                            Stuart Z. Grossman
                                            Florida Bar No. 156113
                                            szg@grossmanroth.com
                                            Rachel W. Furst
                                            Florida Bar No. 45155
                                            rwf@grossmanroth.com
                                            Ryan J. Yaffa
                                            Florida Bar No. 1026131
                                            rjy@grossmanroth.com
                                            **GROSSMAN ROTH YAFFA COHEN,
                                            P.A.**
                                            2525 Ponce de Leon Blvd Ste 1150
                                            Coral Gables, FL 33134
                                            Office: 305-442-8666

                                            *Co-Counsel for Plaintiff and the Class*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the forgoing was filed on May 4, 2022, with the Court via CM/ECF system, which will send notification of such filing to all attorneys of record.

                              By: /s/ *Adam M. Moskowitz*
                                   ADAM M. MOSKOWITZ
                                   Florida Bar No. 984280

21