### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA

### CASE NO.: 21-24441-CIV-ALTONAGA/Torres

MARK CASSIDY, on behalf of himself
and others similarly situated,

      Plaintiff,

v.

VOYAGER DIGITAL LTD, and
VOYAGER DIGITAL LLC

      Defendants.

_____/

### PLAINTIFF'S RESPONSE IN OPPOSITION TO
### DEFENDANTS' MOTION TO COMPEL ARBITRATION[1]

---

[1] Per the Court's May 24, 2022 Order, [ECF No. 59], Plaintiff is responding only to the portion of Defendant's, Voyager Digital LLC's ("Voyager") Motion, [ECF No. 54], addressing Counts Three and Four. Plaintiff will raise at a later date arguments as to why Voyager Digital LTD cannot enforce any arbitration provision against Plaintiff or putative class members, if necessary.

**TABLE OF CONTENTS**

INTRODUCTION ………………………………………………………………… 1

FACTUAL BACKGROUND ……………….……………………………...……………… 3

1A.   VOYAGER'S DISPUTE RESOLUTION PROCESS……….……………….……… 3

B.   VOYAGER'S UNILATERAL TREATMENT OF THE USER AGREEMENT……… 4

    1.   Voyager's User Agreement Contains Grossly Unfair Terms………….………... 4

    2.   Voyager Operates to Ensure Customers are Bound by Unilateral Revisions to the User Agreement Before They Even Know it. ………….……………….……… 6

C.   PLAINTIFF'S AND OTHER CLASS MEMBERS' TERRIBLE VOYAGER ARBITRATION EXPERIENCES……….……………….……………….……………... 9

    1.   Mark Cassidy's Bad Experience……..………….……………….……………... 9

    2.   Zainab Ali's Bad Voyager Experience ……………………………………….……... 11

    3.   Daniel Schaefer's Bad Voyager Experience …… …….……………….…………… 12

    4.   Hundreds of Unanswered Complaints from Voyager Customers…… .………...… 14

LEGAL ARGUMENT ……………………………………………………….…………….....… 14

I.   LEGAL STANDARD……………….……………….……………….……………… 14

II.   NEW JERSEY LAW APPLIES TO THIS DISPUTE. ………….……………….…… 15

III.   NO AGREEMENT TO ARBITRATE WAS FORMED BECAUSE OF THE LACK OF MUTUALITY. …………….……………….……………….……………….……… 17

IV.   THE DELEGATION PROVISION IS UNENFORCEABLE BECAUSE IT IS PROCEDURALLY AND SUBSTANTIVELY UNCONSCIONABLE………………... 18

    1.   The Unconscionability Standard……………………………...…………………… 19

    2.   The Delegation Clause is Substantively Unconscionable…………………………… 20

    3.   The Delegation Clause is Procedurally Unconscionable…………………………... 23

V.   THE DELEGATION CLAUSE CANNOT BE SAVED BY MODIFYING THE LANGUAGE OR SEVERING UNCONSCIONABLE TERMS, WHICH ARE INTEGRAL TO THE AGREEMENT. …………….……………….……………….…… 24

VI.   THE ARBITRATION AGREEMENT IS UNCONSCIONABLE FOR THE SAME 27

REASONS AS THE DELEGATION PROVISION. …………..……..……..…………

VII.   THE   CLASS   WAIVER   CANNOT   SURVIVE   INDEPENDENT   OF   THE
ARBITRATION PROVISION. …………..…………..…………..…………..…...     28

CONCLUSION…………………………………………..…………………………..…….     30

REQUEST FOR ORAL ARGUMENT…………..…………..…………..…………..…..     30

CERTIFICATE OF SERVICE……………………………………………………………...     iii

## INTRODUCTION

Arbitration is a matter of contract. The Federal Arbitration Act ("FAA") makes written arbitration agreements "valid, irrevocable, and enforceable, save upon such grounds at law or in equity for the revocation of any contract. Nonetheless, a party cannot be required to submit to arbitration any dispute which it has not agreed so to submit. *Olsher Metals Corp. v. Olsher,* No. 01-3212-Civ, 2003 WL 25600635, at *3 (S.D. Fla. Mar. 26, 2003).

Plaintiff certainly agrees with Voyager that "Congress and numerous appellate courts have made clear that courts must 'rigorously enforce' arbitration agreements," [ECF No. 54] ("Mot." at 1) but as explained below, it is *not true* that "Courts routinely enforce analogous arbitration agreements formed in *precisely this manner*," or that "[n]othing that arose in discovery provides a basis to deny enforcement here." *Id*. In fact, discovery that was permitted *in this case* (over Voyager's objection) confirmed that the Delegation Clause and Arbitration Provision in Voyager's User Agreement in force at the specific time of Plaintiff's membership, [ECF No. 54-2, Ex. A] ("VUA") are both atypical, unenforceable, and procedurally and substantively unconscionable. This is the rare set of facts where an arbitration agreement and delegation clause *cannot* and *should not* be enforced.

There are multiple, independent grounds for this Court to refuse enforcement of the VUA, and its Delegation Clause, to Plaintiff Representative Cassidy, *pursuant to New Jersey law*, which Voyager proudly proclaims and insists is required by the VUA.

*First,* the Arbitration Provision is unenforceable for lack of mutuality of obligation, as there is no dispute that Voyager retains the exclusive right to unilaterally change the agreement "at any time" and "without prior notice" in Voyager's "sole discretion." *See* VUA, at 2, 17, 18, 23. As the language Voyager drafted into its VUA renders its performance "entirely optional," the Court should "not compel arbitration based on a provision Plaintiff may invoke, modify, or ignore at its sole discretion without notice to and agreement by Defendant." *Raymours Furniture Co., Inc. v. Rossi*, CIV. 13-4440 JBS, 2014 WL 36609, at *9 (D.N.J. Jan. 2, 2014). This is particularly the case, where Voyager has undertaken a conscious and calculated effort on multiple occasions, to unilaterally revise the VUA (and specifically both its Delegation Clause and Arbitration Provision) in a manner that ensures it purports to bind its users, before they ever become aware the revisions took place (i.e. it did not matter when Voyager sent their confirmation email to

Plaintiff informing him of the change because "we did not have to inform any of the class members" as to any of our changes in the VUA.

**Second,** under the VUA's Complaint and Arbitration provisions, **only** failing to resolve a "Complaint" through Voyager's pre-arbitration dispute resolution procedures triggers the obligation to arbitrate disputes, including disputes concerning the enforcement of Voyager's arbitration provision. As defined in the VUA, only a Voyager *user* can have a "Complaint," and therefore only users are required to initiate Voyager's pre-arbitration dispute resolution procedures, the failure of which **only then** triggers the mandatory obligation for arbitration. Conversely, Voyager is clearly under no such obligation, and so there is no mechanism in the VUA for Voyager to either initiate the pre-arbitration dispute resolution procedures or any obligation for Voyager to submit any of *its* disputes to arbitration, leaving it free to pursue its own claims against users in court or, as the evidence shows, through self help measures that Voyager contends leaves it users with "no remediation available to you for reconsideration." *See* Declaration of Zainab Ali dated May 25, 2022, attached as **Exhibit A** ("Ali Decl."), ¶¶ 8–12. Under New Jersey law, this one-sided nature of Voyager's arbitration scheme, especially when coupled with other onerous pre-arbitration dispute resolution procedural requirements, renders both the Delegation Clause and Arbitration Provision unconscionable and unenforceable. *Dvorak v. AW Dev., LLC*, A-3531-14T2, 2016 WL 595844, at *4–5 (N.J. Super. Ct. App. Div. Feb. 16, 2016).

**Third,** the **sole case** cited by any party which has an identical Arbitration Provision and Delegation Clause to the VUA, is in the recent *Bielski v. Coinbase* class action before Judge Alsup. United States District Judge William Alsup entered an order against Voyager's biggest competitor, Coinbase, denying their motion to compel the same arbitration provision, finding a **materially identical arbitration scheme** to be unconscionable where, similar to here, only claims by the employee could trigger the obligation to arbitrate, and where, like here, the agreement provided for a one-sided pre-arbitration dispute resolution procedure. *Bielski v. Coinbase, Inc.*, C 21-07478 WHA, 2022 WL 1062049 (N.D. Cal. Apr. 8, 2022); *see also Med. Transcription Billing, Corp. v. Dardashti*, CV 15-8976(MAS)(DEA), 2016 WL 6471020, at *4 (D.N.J. Oct. 28, 2016) (explaining that New Jersey's test for unconscionability "examines similar factors set forth under California law") (citing *G & F Graphic Servs., Inc. v. Graphic Innovators, Inc.*, 18 F. Supp. 3d 583, 594 (D.N.J. 2014)).

Although Voyager was undoubtedly aware of this incredibly significant ruling against their main competition, and although Plaintiff already cited this case in this case, Voyager's conscious decision ***to not even cite Bielski*** to this Court speaks volumes.[2] Simply put, they realized they had no way to factually or legally distinguish the well-reasoned and logical rulings of the very well-respected and experienced District Judge William Alsup, and thus the VUA's Delegation Clause and Arbitration Provision should similarly be found to be unenforceable.

## FACTUAL BACKGROUND

### A.  VOYAGER'S DISPUTE RESOLUTION PROCESS.

Voyager's Statement of Facts inexplicably omits <u>any reference</u> to Paragraph 21 of the VUA, which specifically includes (identical to the *Coinbase* case) the pre-arbitration dispute resolution process and defines the term "Complaint" that is incorporated into the Arbitration Provision, stating:

> . . .
>
> **If <u>you</u> have a complaint or dispute with Voyager in connection with the Voyager Service (a "Complaint")**, <u>**you**</u> agree to contact Voyager through Voyager's support team at support@investvoyager.com in order to attempt to resolve any such Complaint amicably. When submitting a Complaint, please provide us with your name, address, and any other information that we may need in order to identify you and your Voyager Account. Voyager will acknowledge receipt of your Complaint after receipt. Upon receipt of a Complaint, a Voyager support member will review the Complaint based upon the information provided in such Complaint and, if necessary, reach out to you via e-mail in order to attempt to resolve such Complaint.
>
> . . .

VUA at ¶ 21. Thus, "Complaint" is clearly defined to include *only* disputes that *users* may have with the Voyager Platform.

Paragraph 22, in turn, requires that the parties "agree to attempt informal resolution of any **<u>Complaint</u>** arising in connection with this Agreement, my Voyager Account, the Voyager Platform, or the Voyager Services consistent with the procedures outlined in Section [21] ***prior to any demand for adjudication***." Paragraph 22 goes on to state that "if we cannot solve such **<u>Complaint</u>** informally and consistent with the procedures outlined in Section [21], **<u>any such</u>** **<u>dispute</u>** [i.e., a User's Complaint] shall be finally settled in binding arbitration, on an individual basis, *in accordance with the American Arbitration Association's rules for arbitration of*

---

[2] Plaintiff has already twice specifically cited to *Bielski* to this Court, *see* [ECF Nos. 55, 58].

*consumer-related disputes*, and Voyager and I hereby expressly waive trial by jury and right to participate in a class-action lawsuit or class-wide arbitration." *Id*. Although this sentence purports to delegate gateway issues of arbitrability to the arbitrator through its incorporation of the AAA rules, it only does so in connection with a "Complaint," meaning that Voyager is not obligated to arbitrate any dispute it might have with a user regarding such gateway issues, nor can any such dispute Voyager might have against a user trigger the Delegation Clause. *Id*.

Conversely, the VUA is silent as to how any dispute Voyager may have with a user is to be resolved, and any dispute Voyager might have with a user can neither trigger the Arbitration Provision nor its Delegation Clause. *See* VUA, ¶¶ 21–22. To be sure, *every single time* Voyager has a dispute with any of its users, as demonstrated below, rather than initiate any arbitration proceedings, Voyager will simply unilaterally take such measures as restricting a user's access to their account, deactivating their account completely, or liquidating their investments, which Voyager purports to reserve the right to keep if they claim to have incurred any costs.

**B.  VOYAGER'S UNILATERAL TREATMENT OF THE USER AGREEMENT.**

**1.  Voyager's User Agreement Contains Grossly Unfair Terms.**

Voyager's VUA is rife with provisions that make clear that Voyager can unilaterally amend the Agreement (including the Arbitration Provision and its Delegation Clause) "at any time" and "without prior notice" to Plaintiff or its customers; there is no express limitation that any such amendments would only apply prospectively; there is no meaningful right to opt out or to reject any revisions, as simply logging in to the Platform *or even viewing the Website* would constitute acceptance of terms that users are entirely unaware of—and to the extent users have money in their account, signing in and "accepting" these revised terms would be a necessity in order to even initiate a transfer of assets off of the Voyager Platform.

As just one example that was explained and confirmed by Voyager's corporate representative, the following provisions in the applicable VUA in effect at the time Plaintiff created his account, *see* VUA at 2, 17, 18, 23, make clear that Voyager purportedly retains the right to unilaterally revise the Customer Agreement (which it refers to as "Account Documents" along with a litany of other types of unrelated documents), at any time, without notice to its users—and unless users can find and object to the revision within 24 hours of "delivery" (which includes quietly posting the revised agreement to the website), Voyager treats the matter as "concluded."

I understand that Voyager reserves the right to change or modify the terms and conditions of this Agreement, including but not limited to any policy or guideline at any time and at Voyager's sole discretion. I understand that this Agreement will be amended by Voyager, with revised terms posted on Voyager's website at www.investvoyager.com (the "*Website*") emailed to me, or by any other means that Voyager may choose to adopt in the future. The method of notification for any changes to this Agreement shall be at Voyager's sole discretion. All changes and modifications will be effective immediately upon posting or sending such notification to me via electronic means. I understand that my continued use of the Voyager Platform, accessing my Voyager Account, and participating in the Voyager Service constitutes an act of acceptance with respect to any such changes or modifications that Voyager may make. If I do not agree to the terms in effect when I am accessing my Voyager Account, I must stop using the Voyager Platform.

*Id.*, 2

a)   Consent to Electronic Delivery of Documents. By agreeing to electronic delivery, I am giving my informed consent to electronic delivery of all Account Documents, as defined below, other than those I have specifically requested to be delivered in paper form. "Account Documents" include notices, disclosures, current and future account statements, regulatory communications (such as privacy notices), trade confirmations, and any other information, documents, data, and records regarding my Voyager Account and the services (including amendments to this Agreement)

*Id.*, 17

b)   Electronic Delivery System. I acknowledge that Voyager's only methods of communication with me include (A) posting information on the Website, (B) providing information via the App, (C) sending email(s) to my email address of record, and, to the extent required by law (D) SMS and Push notifications and (E) providing me with notice(s) that will direct me to the App or the Website where I can read and print such information. Unless otherwise required by law, Voyager reserves the right to post Account Documents on the Website without providing notice to me. Further, Voyager reserves the right to send Account Documents to my postal or email address of record, or via the App. I agree that all Account Documents provided to me in any of the foregoing manners is considered delivered to me personally when sent or posted by or on behalf of Voyager, whether I receive it or not. All e-mail notifications regarding Account Documents will be sent to my e-mail address of record. I understand that e-mail messages may fail to transmit promptly or properly, including being delivered to SPAM folders. I further understand that it is my sole responsibility to ensure that any emails from Voyager or Voyager's Affiliates are not marked as SPAM. Regardless of whether or not I receive an e-mail notification, I agree to check the Website regularly to avoid missing any information, including time-sensitive or otherwise important communication. Additionally, I acknowledge that the Internet is not a secure network and agree that I will not send any confidential information, including Voyager Account numbers or passwords, in any unencrypted e-mails. I also understand that communications transmitted over the Internet may be accessed by unauthorized or unintended third-parties and I agree to hold Voyager, Voyager's Affiliates, and Voyager's and Voyager's Affiliates' respective officers and employees harmless for any such access regardless of the cause. I agree to promptly and carefully review all Account Documents when they are delivered and notify Voyager in writing immediately after delivery (but in no event later than 24 hours after delivery) if I object to the information provided. If I fail to object in writing immediately (but in no event later than 24 hours after delivery) after delivery, Voyager is entitled to treat such information as accurate and conclusive.

*Id.*, 18

f)   Amendment. Voyager may at any time amend this Agreement without prior notice to me. The current version of the Agreement will be posted on the Website and my continued Account activity after such amendment constitutes my agreement to be bound by all then-in-effect amendments to the Agreement, regardless of whether I have actually reviewed them. Continued use of the App, the Website or any other Voyager services after such posting will constitute my acknowledgment and acceptance of such amendment. I agree to regularly consult the Website for up-to-date information about Voyager services and any modifications to this Agreement. Voyager is not bound by any verbal statements that seek to amend the Agreement.

*Id.*, 23

5

### 2. Voyager Operates to Ensure Customers are Bound by Unilateral Revisions to the User Agreement Before They Even Know it.

Plaintiffs are grateful to the Court for allowing brief discovery related specifically to arbitration, because the facts now are certainly different from the incomplete picture presented by Voyager (prior to any discovery). Voyager's Corporate Representative confirmed in deposition testimony that Voyager's regular practice is that it not only **unilaterally "makes continuous revisions"** to the VUA, but it also undertakes a conscious effort to ensure that its customers are **not notified of any of these changes**—Voyager does not even have *a phone number* for customers like Plaintiff to contact customer support—so customers can actually decide whether they want to agree to them before Voyager attempts to bind them, as was the case with Plaintiff. *See* Deposition Transcript of Shannon Casey dated April 26, 2022, attached as **Exhibit B** ("VDL Tr."), 51:15–52:13

> THE WITNESS: In reviewing the -- the terms he agreed to it's discussed that as the -- that they may change and that they're where they're available and that he can go look at them and make sure that he's still in agreement with them.
>
> Q. But how would he know that those changes have been made?
>
> . . .
>
> THE WITNESS: That would be his responsibility.

VDL Tr. 57:1–57:11

> Q. Okay. And just so I'm perfectly clear, regardless of whether Voyager lets Mr. Cassidy know that there's been an amendment, it's Mr. Cassidy's responsibility on his own to go find out and monitor the site to make sure there's no changes made?
>
> . . .
>
> THE WITNESS: Yes. The user, after they've agreed to it, is -- that is part of what they are agreeing to.

VDL Tr. 59:23–60:6

> Q. Okay. So Pam [Kramer, Voyager's Chief Marketing Officer] writes "Also, based on the specific updates, do you think this warrants an email to customers? This summary is very helpful in that regard." So what we just looked at in the email, the form email, that was sent out that you testified about dated April 16th [sic], that didn't provide a summary to any of the customers. It just said your user agreement has been updated, correct?
>
> A. Yes.
>
> Q. Do you know why the internal summary that Voyager was aware of isn't provided to the customers of Voyager?

. . .

THE WITNESS: No.

Q. Okay. As the corporate rep today with the person with the most knowledge about the uniform -- the User Agreements, including any revisions thereto, have you ever spoke to anybody about providing your customers with a summary of the changes?

A. No.

. . .

Q. I mean, wouldn't you think that would be helpful if somebody wanted to know?

A. I suppose it could be helpful for some people.

VDL Tr. 78:12–79:25

Q. [Plaintiff] says under oath he reviewed your declaration in support of the motion and he said "I did not receive the April 18th email notifying of the April 16th update to the Customer Agreement," that you had testified went out to this mass mailing of 1.2 million.

My question is very simple. Do you have any shred of evidence, anything, to indicate that he is wrong and that he did receive that email, not that the mass marketing email went out, but that he, in fact, received it?

. . .

THE WITNESS: I -- I personally do not, no.

. . .

Q. Mr. Cassidy says: I didn't receive any emails, any notifications, or any other form of actual notice of any other versions of the Customer Agreement referred to in Shannon Casey's declaration.

You talked about six different modifications that were done over time. Mr. Cassidy under oath is saying I never received any of those.

Do you, sitting here today, have any evidence to show that Mr. Cassidy received any of these other updates or emails?

A. No. We only sent the update on the April 18th email.

VDL Tr. 97:18–99:11

Q. Okay. Paragraph 10 says after he – Users apparently can't contact Defendants by phone regarding the questions of their account. Is that correct?  Is there a number that I can call and say, hey, I'm having a problem logging in to my account, can you help me, Voyager LLC?

A. That's correct, there's -- we do not have phone support.

VDL Tr. 102:16–23.

Additionally, throughout the deposition, Voyager confirmed numerous, important facts, which make the facts in this case much different than any case where arbitration was upheld:

- that a user cannot create an account with Voyager without checking the box next to the statement "By creating an account, you agree to our Terms," but they are not even obliged to claim that they reviewed the terms (as with other click agreements). VDL Tr. 48:5–49:15;

- there is no policy justification for not providing users with notices of updates to the user agreement or summaries of the applicable changes, that it "would be [Plaintiff's] responsibility" to continuously check the VUA for updates before each log in to the Voyager Platform, that "regardless of whether Voyager lets Mr. Cassidy know that there's been an amendment, it's Mark Cassidy's responsibility on his own to go find out and monitor the site to make sure there's no changes made." VDL Tr. 50:3–63:19;

- the only notice ever provided to Voyager customers of an update to the VUA was a single email sent two days after revision became effective, and that "the minute they made this update on April 16, it was binding on Mark Cassidy and all other users regardless if they saw it or knew it or were told about it" two days later. *Id.*, 66:3–68:1[3]

- there is no evidence that this sole email advising of revisions to VUA was actually received by Plaintiff or any other customers, and that although Voyager internally discussed "based on these specific updates—do you think this warrants an email to customers? This summary is very helpful in that regard," Voyager intentionally chose never to provide any summary to its customers. *Id.*, 68:2–79:25;

- that the version of the Arbitration Provision in effect when Plaintiff signed up for his Voyager account in fact ***violated the AAA's own regulations***. 81:1–89:25; and

- that no evidence contradicts Mr. Cassidy's sworn testimony in his Declarations regarding (a) being locked out of his account as a retaliatory act for filing this lawsuit and (b) never receiving any notification of any amendments to the VUA; that not only does Voyager not provide phone support to customers, but it would not even respond to the voicemails left with the only available phone number for investor relations (like the one Plaintiff admittedly left); and that Voyager has never revised the VUA in response to a customer attempting to negotiate a change because it is offered on a take-it-or-leave-it basis. *Id.*, 94:8–107:18; 144:25–148:2.

Discovery further revealed major deficiencies in the January 2021 version of the VUA. Janice Barrilleaux, Voyager's Chief Administrative Officer, in reviewing the January 2021 version of the VUA with the new Voyager general counsel, secretly advised her peers that "**I just think that we need to be aware that things [sic] *grossly outdated***" and that customers "***need to be put in their little corner***," and proposed shortening a 6-month deadline for customers to dispute an error to only 30 days. *See* **Exhibit C** (VOYAGER_001890–91) (emphasis added). Later, David

---

[3] Recall that, according to the User Agreement, Voyager purports to bind its users if they do not object to a revision posted on the Voyager Website within 24 hours of its posting. VUA, 18.

Brosgol, Voyager's General Counsel, agreed with Janice and stated that, rather than simply revise the January 2021 VUA in effect when Plaintiff created his Voyager account, "***it seems that it might be best to do a significant overhaul.***" VDL Tr. 138:8–141:5, VDL Tr. Ex. 14 (emphasis added). There simply can be no debate that Voyager internally and secretly, admitted that their existing Arbitration Provision was insufficient, "grossly outdated" and required a "significant overhaul."

Further, discovery revealed that, prior to July 26, 2021, not only did Voyager *never* submit any version of its Arbitration Provision to the AAA for review, but when it finally did in connection with Mr. Daniel Schaefer's arbitration (as described below), the AAA determined that Voyager's requirements that "the arbitration will occur in New Jersey and will be conducted confidentially by a single, neutral arbitrator" constituted "a material or substantial deviation from the Consumer Rules and/or Protocol" and requested that Voyager waive those requirements for all future consumer arbitrations under the VUA.[4] There is simply no evidence in the record to refute these serious deficiencies with Voyager's relevant Arbitration Provision and Delegation Clause.

Under these circumstances, especially where Voyager fully retains the unfettered right to unilaterally modify the VUA, at will, without providing ***any*** advance notice to its customers, applicable law holds that no agreement has been formed or could have been formed. Thus, not only was Plaintiff not bound by any amendments to the VUA, relevant New Jersey law mandates that he did not enter into **any** agreement to arbitrate (or delegate issues of arbitrability) with Voyager.

### C. PLAINTIFF'S, AND OTHER CLASS MEMBERS', TERRIBLE VOYAGER ARBITRATION EXPERIENCES.

As a result of an extensive investigation and research, Undersigned Counsel are in the valuable position of having spoken to many putative class members (not just Plaintiff) about their similar and dreadful customer experiences with Voyager. As discussed below, Plaintiff's unfavorable experience with Voyager is not unique, but is in fact common among many class members.

### 1.   Mark Cassidy's Bad Experience.

Plaintiff created his Voyager account on March 17, 2021. *See* Declaration of Mark Cassidy dated February 9, 2022, attached to VDL Tr. at Ex. 8 ("Cassidy Decl. 1"), ¶ 3. He placed specific

---

[4] *See* VDL Tr. Ex. 7 (VOYAGER_001951–52).

9

trades identified in the complaint, *see* Compl. ¶ 107; Decl. ¶ 4. Plaintiff has not conducted additional trades on the platform, but he admittedly did <u>not cancel</u> his Voyager account. *Id*. ¶ 6.

It was impossible for Plaintiff to reach anyone at Voyager to ask any questions. On January 31, 2022, Plaintiff attempted to log in to the Voyager account to obtain information regarding his account activity for this lawsuit, but he was prevented from accessing his account. *Id*. ¶ 7. Plaintiff submitted a "forgot my password" request, received a link, and reset his password. *Id*. ¶ 8. Upon attempting to log in to his account with the new password, Plaintiff received a notification that now his email was invalid and/or not associated with any Voyager account. *Id*. Plaintiff repeated the process a second time with a new password, and he received the same notification. *Id*. ¶ 9.

The reason this is so important is because Defendants do not allow any users to contact them by phone with questions about their account—the only available number is for an unknown contact called: "Investor Relations." *Id*. ¶ 10. Plaintiff placed several calls to "Investor Relations" and left a voicemail to the Investor Relations number to get an answer regarding the apparent deactivation and freezing of his account, <u>but even to date has received no response</u>. *Id.* Unable to access his Voyager account or even get any human on the phone to speak, Plaintiff's only other avenue to contact Voyager was through a written request submitted on a fillable form on Voyager's website provided by Zendesk, which uses a combination of automated forms, artificial intelligence and bots to receive customer support requests with no apparent human intervention. *Id*. ¶ 11; *see also* https://www.zendesk.com/. Although Plaintiff's request sought information regarding his account and an explanation for his account closure, he received an automated response that solely provided a link to his "tax/transaction report request form," with no further explanation. *Id*. ¶¶ 11–12. To date, Plaintiff is waiting for a response to his phone calls and voicemail he left on Defendants' Investor Relations line. *Id*. ¶ 13.

Plaintiff has only one email account associated with his Voyager account. *See* Declaration of Mark Cassidy dated February 23, 2022, attached to VDL Tr. at Ex. 9 ("Cassidy Decl. 2"), ¶ 7. Although he has received numerous emails from the no-reply@investvoyager.com marketing email address referenced in Shannon Casey's declaration submitted by Defendant, he did not receive any email notification retroactively notifying of the April 16, 2021, update to the Customer Agreement. *Id*., ¶¶ 7–8. No such notification was marked as SPAM or delivered to a SPAM folder, nor is one in his trash folder. *Id*., ¶ 8. In fact, Plaintiff has never received any email, notification, or any other form of actual notice of any of the other versions of the Customer Agreement

referenced in Shannon Casey's declaration. *Id*., ¶ 9. Further, Plaintiff never received any form of explanation regarding what revisions were made to the Customer Agreement at any time. *Id*., ¶ 9.

Conversely, when Coinbase, another crypto-trading app, updated its "User Agreement," effective January 31, 2022, the Coinbase app was configured to immediately prompt users upon opening the app to review the new User Agreement, Coinbase provided a summary of changes for its users to review, and asked users to affirmatively accept the new terms before continuing with their use of the app (or discontinue use, thereby declining to accept the new terms.[5] Coinbase also created a dedicated webpage entitled "January 2022 Coinbase User Agreement Update," which provided all of this information to users *in advance* of the January 31, 2022 effective date of the amended User Agreement. [6]

### 2.   Zainab Ali's Bad Voyager Experience.

Similar to Plaintiff, Ms. Ali had a very bad experience with Voyager, based upon the same impossible structure that Voyager intentionally created (so their customers could never contact them to report a complaint and/or ask a question) and how they intentionally retaliate (by locking the accounts) after any complaints are made.

Zainab Ali is represented by Plaintiff's Counsel and will be among the class members moving as a group to be appointed lead plaintiff in the coming months. *See* Ali Decl. As was done to Plaintiff Mark Cassidy, Voyager also suddenly deactivated Zainab's account without any notice nor explanation to her after she raised a complaint and/or question. *See* Ali Decl., 7.

Zainab had an issue with her bank accounts and immediately reached out to Voyager Support through the email address designated in the User Agreement to discuss the issue. *Id*., ¶¶ 3–6. Similar to Plaintiff Cassidy, Mrs. Zainab did not receive any response, until she emailed three times over the course of a week. *Id*. Voyager's response, initially, was that her account was deactivated because of a closed account, and that she would need to submit identifying information in order to have the deactivation reconsidered. *Id*., ¶ 7. Although Zainab complied with the request, Voyager then simply deactivated and closed her account, claiming that "we have uncovered activity that doesn't meet our requirements and demonstrates a level of risk which we deem unacceptable," and that Voyager's "decision is final and there is no remediation available to you

---

[5] *See* https://help.coinbase.com/en/coinbase/other-topics/legal-policies/coinbase-user-agreement-updates (last accessed February 23, 2022).
[6] *Id*.

for reconsideration at this time." *Id.*, ¶¶ 8–10. Zainab disputed the decision, and Voyager's sole response was that "we do not support a call service at this time" and that "due to security purposes, we are unable to discuss our review results," reiterating "our decision is final and there is no remediation available to you for reconsideration at this time." *Id.*, ¶¶ 11–12.

Zainab then filed a complaint with the Better Business Bureau, to which Voyager never responded, and Voyager ignored her emails over the next few weeks. *Id.*, ¶ 13. On February 15, 2022, a different Voyager Support representative emailed Zainab, explaining that Voyager "made a business decision" to deactivate her account, and that after 90 days, Voyager would "sell any remaining assets on the open market at the prevailing market price and return the proceeds (less any damages, fee, costs, or other obligations to which Voyager is entitled) to the valid bank account linked to your Voyager account." *Id.*, ¶ 14. Because the dispute resolution process through Voyager Support was clearly not working, Zainab found CEO Stephen Ehrlich's email address and reached out to him directly. *Id.*, ¶¶ 16–17. As a result of her direct communication with Ehrlich *outside* of Voyager's onerous pre-arbitration dispute resolution process, her account was then finally reinstated two weeks later. *Id.*, ¶¶ 18–19.

### 3. Daniel Schaefer's Bad Voyager Experience.

Voyager stated in discovery that they have a "valid arbitration process" and proudly touted that they successfully completed a AAA arbitration with one of their satisfied customers, Mr. Daniel Schaefer. To be clear and direct, Mr. Schafer's stated under oath that his Voyager arbitration experience was one of the ***worst experiences*** in his professional life.

To date, Daniel Schaefer appears to be the only Voyager customer who has ever made it through Voyager's pre-arbitration dispute unilateral resolution process and subsequently through an arbitration against Voyager. As explained in his Sworn Declaration, Voyager also (similar to what they did to Plaintiff and Ms. Ali) intentionally disabled his account, directly after he began asking questions to Voyager Support and CEO Stephen Ehrlich about discrepancies he observed with his interest payments  *See* Declaration of Daniel Schaefer dated May 26, 2022, attached as **Exhibit D** ("Schaefer Decl."),¶¶ 4–9. Not content to simply freeze his account, Voyager then even liquidated Dan's Voyager account and sent the money back to his bank account. *Id.*, ¶ 10. As with Plaintiff and Ms. Ali, Daniel did not receive any response and Voyager did not even contact him until after he directly messaged Ehrlich on LinkedIn. *Id.*

After months of written complaints and demands to Voyager to amicably resolve the dispute, all of which were ignored, Daniel finally filed a demand for arbitration with the American Arbitration Association on July 20, 2021. *Id.*, ¶ 25. He was told by Voyager that he was required under the VUA conduct his Confidential Arbitration in the state of New Jersey, and so they did. *Id.* Although he served the demand on Voyager via email, as well as to Voyager's designated New Jersey office and Minnesota registered agent, Voyager did not respond. *Id.* It was not until he again reached out to Mr. Ehrlich personally, that he learned that the New Jersey "headquarters" for Voyager Digital LLC was "a coworking space and we have not been given the mail from them." *Id.* ¶¶ 25–26.

Voyager finally appeared at the AAA arbitration over nine months after Voyager liquidated Daniel's portfolio and deactivated his account, Voyager was represented by Barry Kazan, of the law firm Mintz & Gold LLP,[7] and Christopher Jung and Asa Chao from Voyager. ¶ 27. Voyager's initial response to Daniel's claim included a counterclaim for at least $15,000, as well as attorneys' fees and costs. ¶ 28. Voyager refused to respond to any of Mr. Schaefer's requests for information (although he complied with all of their requests), repeatedly sought to delay the arbitration, including a filing the night before the final hearing which they never even shared their exhibits for the final hearing with him, although that was specifically required by the arbitrator's scheduling orders. ¶¶ 29–38. Ultimately, the arbitrator sided with Voyager nearly a year and a half after this initial dispute arose. *Id.*, ¶ 38. According to Daniel, "It is very clear to me that Voyager stole money from my account, treated me in an unprofessional and unresponsive manner (including locking my account as a direct result of my complaints to the CEO) and their Arbitration process and procedures were abusive, unfair and stacked against me from the very start." ¶ 39.

---

[7] Mintz and Gold is a New York City law firm with extensive experience in defending major financial firms in connection with regulatory investigations and enforcement actions, including recently in defending attorneys against claims that they perpetuated the $4 billion OneCoin fraud. https://mintzandgold.com/self-regulatory-investigations-litigation-defense/ (last accessed May 28, 2022); https://www.reuters.com/legal/litigation/4-billion-onecoin-fraud-jurisdiction-dooms-claims-against-ex-big-law-partner-2021-09-22/ (last accessed May 28, 2022). Barry Kazan has nearly 30 years of experience in defending companies like Voyager in class actions and arbitrations. https://mintzandgold.com/people/barry-m-kazan/ (last accessed May 28, 2022). To say Mr. Schaefer was outmanned and outgunned in these proceedings would be a gross understatement.

#### 4.   Hundreds of Unanswered Complaints from Voyager Customers.

These are certainly not isolated Voyager incidents, either. Consistently, although the User Agreement requires compliance with a pre-arbitration dispute resolution process with Voyager before a user will be authorized to initiate arbitration proceedings, Voyager refuses to participate in the process when a user raises a Complaint. Even without taking merits discovery, Plaintiff has confirmed that there are currently ***148*** unanswered user complaints on the BBB website that Voyager has never addressed, the vast majority of which complain that Voyager is unresponsive to emails to Voyager Support. *See* **Exhibit E**. Conversely, whenever Voyager has a perceived dispute with a user, Voyager resorts to self-help measures, often times without notice or explanation to its users. *See generally* Ali Decl.; Schaefer Decl. Voyager is not required to attempt to resolve any disputes through the pre-arbitration dispute resolution process, nor is it required to arbitrate any disputes by the plain language of the User Agreement.

## LEGAL ARGUMENT

### I.   LEGAL STANDARD.

Under the Federal Arbitration Act ("FAA"), 9 U.S.C § 1, et seq., agreements to arbitrate are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Thus, an arbitration agreement may be found unenforceable pursuant to "generally applicable contract defenses, such as fraud, duress, or unconscionability." *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68 (2010).

Under New Jersey law, which all parties agree applies in this case, *see* Section II, where an arbitration agreement contains a clause that delegates to an arbitrator the decision whether an arbitration agreement is enforceable, "[a] court cannot reach the question of the arbitration agreement's enforceability unless a party challenged the delegation clause and the court concludes that the delegation clause is not enforceable." *Williams v. Medley Opportunity Fund II, LP*, 965 F.3d 229, 237 (3d Cir. 2020) (quoting *MacDonald v. CashCall, Inc.*, 883 F.3d 220, 226 (3d Cir. 2018)). This burden, however, is more formalistic than substantive, as the Third Circuit has held that in "challenging a delegation clause, a party may rely on the same arguments that it employs to contest the enforceability of other arbitration agreement provisions." *Robbins v. Playhouse*

*Lounge*, 119CV08387NLHKMW, 2021 WL 2525709, at *7 (D.N.J. June 21, 2021) (quoting *MacDonald*, 883 F.3d at 226–27).[8]

If the court determines that the Delegation Clause is unconscionable, and declines to sever it from the Arbitration Provision, it may properly conclude that the larger Arbitration Provision is unenforceable for the same reasons. *Muhammad v. Cnty. Bank of Rehoboth Beach, Delaware*, 189 N.J. 1, 26, 912 A.2d 88, 103 (2006) (citations omitted); *see also MacDonald,* 883 F.3d at 226; *Parm v. Nat'l Bank of Cal., N.A.*, 835 F.3d 1331 (11th Cir. 2016); *Bielski*, 2022 WL 1062409, at *6 ("Our court of appeals has stated that '*Rent-A-Center* contemplate[d] that a delegation provision may be unenforceable for the same reason as the broader arbitration agreement.'") (quoting *Brice v. Haynes Invs., LLC*, 13 F.4th 823, 827 (9th Cir. 2021)).

## II.   NEW JERSEY LAW APPLIES TO THIS DISPUTE.

New Jersey law governs this dispute. "[S]tate law generally governs whether an enforceable contract or agreement to arbitrate exists." *Douglas v. Johnson Real Est. Invs., LLC*, 470 F. App'x 823, 825 (11th Cir. 2012) (citing *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1368 (11th Cir. 2005)). Defendants are correct that Florida choice of law principles apply here. Mot., 12. Without any analysis, however, Defendants conclude that "it may be inferred that Florida law" will govern this Court's consideration of their motion. *Id.* (citing *Fioretti v. Massachusetts Gen. Life Ins. Co.*, 53 F.3d 1228, 1235 (11th Cir. 1995)). But the court in *Fioretti* made clear that *lex loci contractus* applies only "in the ***absence*** of a contractual provision

---

[8] Plaintiff respectfully notes that this case is distinguishable from the Eleventh Circuit's recent opinion in *Attix. v. Carrington Mortgage Svcs., LLC*, No. 20-13575 (11th. Cir. May 26, 2022), in that this case must be resolved pursuant to New Jersey law, and further in that this case presents argument that the Delegation Clause, specifically, is entirely unenforceable as unconscionable, not that the Delegation Clause carves out any specific arbitrability issues from the arbitrator's domain. These facts also distinguish this case from this Court's decision in *Mendez v. T-Mobile USA, Inc.*, No. 1:21-cv-23545-CMA, [ECF No. 27] (S.D. Fla. Jan. 10, 2022) (which was not cited by Voyager), where plaintiff "unequivocally rest[ed] his opposition to arbitration on the contention that 'the entire [a]greement [was] unenforceable," not even just the arbitration provision, and "not a single one of Plaintiff's arguments specifically challenge[d] the arbitration clause's delegation provision." Plaintiff only asks the Court to determine whether the Arbitration Provision itself is unenforceable if the Court first finds that the Delegation Clause is unenforceable. *See also Parm v. Nat'l Bank of Cal., N.A.*, 835 F.3d 1331 (11th Cir. 2016) (finding delegation clause unenforceable where arbitration agreement designated illusory arbitral forum, then finding arbitration agreement unenforceable for the same reason).

specifying the governing law," and conducted that analysis only because "[i]t [was] *undisputed* that the insurance policy in [that] case *contained no such clause*." *Id.* (emphasis added).

Rather, "Florida enforces choice-of-law provisions unless the law of the chosen forum contravenes strong public policy." *Mazzoni Farms, Inc. v. E.I. DuPont De Nemours & Co.*, 761 So. 2d 306, 311 (Fla. 2000). A choice-of-law provision will be presumed valid; it is the burden of the party opposing the provision to demonstrate why it should not be enforced. *Id.*

Here, the sole Arbitration Provision between the parties dictates what law should be applied in interpreting the agreement:

> **"Any dispute between the parties will be governed by this Agreement and the laws of the State of New Jersey and applicable United States law, without giving effect to any conflict of laws principles that may provide for the application of the law of another jurisdiction."**

*See* VUA, at 16–17 (emphasis added).

Moreover, the VUA includes *an additional* provision that provides that "[t]he laws of the State of New Jersey (regardless of the choice of law rules thereof) shall govern this Agreement . . ." *Id.* at 24. These provisions make clear that the parties intended for New Jersey law to apply to the Arbitration Provision and Delegation Clause. *See Vivas v. Safra Nat'l Bank of New York*, No. 1:10-CV-21811-ASG, 2010 WL 11602462, at *4 (S.D. Fla. Nov. 8, 2010) (where the plaintiffs only contested the "validity of the [arbitration] clause, arguing that it [was] unconscionable" and the agreement containing the arbitration clause contained a choice-of-law clause providing that Florida law applied, this Court analyzed whether the arbitration clause was procedurally or substantively unconscionable *pursuant to Florida law*); *see also Douglas*, 470 F. App'x at 824–25 (11th Cir. 2012) (affirming denial of motion to dismiss and finding arbitration agreement illusory pursuant to Massachusetts law, which was designated pursuant to arbitration agreement's choice of law provision).

Further, Voyager has not raised any "strong public policy" as to why New Jersey law should not apply, nor any reason why the Court should disregard the choice-of-law provision that *Voyager* drafted into the agreement.[9] Accordingly, the Court should determine the enforceability

---

[9] Voyager cites to *Gunson v. BMO Harris Bank, N.A.*, 43 F. Supp. 3d 1396, 1400 (S.D. Fla. 2014) and *Orn v. Alltran Fin., L.P.*, 779 F. App'x 996, 998 (3d Cir. 2019), Mot. at 17, neither of which require the Court to apply Florida law here. In *Gunson*, which concerned whether a *non-signatory* could compel arbitration, the Court noted that application of Florida law was consistent with "[the

of the Delegation Clause and the Arbitration Provision pursuant to New Jersey law, as intended by the parties.

### III.   NO AGREEMENT TO ARBITRATE WAS FORMED BECAUSE OF THE LACK OF MUTUALITY.

Under general principles of New Jersey contract law, an agreement, including one to arbitrate disputes, based only upon an illusory promise is unenforceable. *Jaworski v. Ernst & Young U.S. LLP*, 119 A.3d 939, 947 (N.J. Super. Ct. App. Div. 2015) (citing *Del Sontro v. Cendant Corp.*, 223 F.Supp.2d 563, 578 (D.N.J.2002) (citing *Bryant v. City of Atl. City*, 309 N.J.Super. 596, 621, 707 A.2d 1072 (App.Div.1998))). "An illusory promise has been defined as[ ] a 'promise which by [its] terms make[s] performance entirely optional with the promisor whatever may happen, or whatever course of conduct in other respects he may pursue.' " *Id.* (citing *Bryant*, 309 N.J.Super. at 620, 707 A.2d 1072 (quoting Restatement (Second) of Contracts, § 2 cmt. e (1979)) (internal quotations marks omitted); *Customized Distribution Servs. v. Zurich Ins. Co.*, 373 N.J.Super. 480, 493, 862 A.2d 560 (App.Div.2004) ("An illusory promise is defined as one 'in which the promisor does not bind himself.'" (quoting Black's Law Dictionary 1213 (6th ed. 1990))), *certif. denied*, 183 N.J. 214, 871 A.2d 91 (2005)).

Under New Jersey law, therefore, an arbitration agreement may be found void as illusory for a lack of mutuality where one contracting party retains the unilateral right to change or modify the agreement at any time with or without advance notice and at its sole discretion. *Raymours Furniture Co., Inc. v. Rossi*, CIV. 13-4440 JBS, 2014 WL 36609, at *9 (D.N.J. Jan. 2, 2014) (distinguishing *Blair v. Scott Specialty Gases,* 283 F.3d 595, 604 (3d Cir.2002), which applied Pennsylvania law and found no lack of mutuality where "the employer maintained the right to make material changes to the handbook only after putting the change in writing, providing a copy to the employees, and allowing the employees to accept the change by continuing employment.").

Other courts, including this one, have held similarly. *See, e.g., Todorovich v. Accrediting Bureau of Health Education Schools, Inc.*, No. 17-20744-CIV-ALTONAGA/O'Sullivan, 2017 WL 7726705, at *6–7 (S.D. Fla. July 24, 2017) (Altonaga, J.) (analyzing Florida law and

---

plaintiff's] own briefing in opposition to the Motions to Compel, which relies heavily on Florida law." 43 F. Supp. 3d at 1400-01 (citations omitted). And the court in *Orn* applied the contract's choice of law provision. Moreover, this Court has, since *Gunson*, applied an arbitration agreement's choice-of-law provision even to whether a non-signatory can compel arbitration. *See, e.g.*, *Haasbroek v. Princess Cruise Lines, Ltd.*, 286 F. Supp. 3d 1352, 1361 (S.D. Fla. 2017) (applying arbitration agreement's Bahamas choice of law provision).

concluding that no contract was formed where one party had illusory obligation due to contractual ability to unilaterally revise agreement while forcing other party to comply, holding that the agreement "does not manifest the mutuality of obligation required to form a contract."); *see also Crump v. MetaSource Acquisitions, LLC*, 373 F. Supp. 3d 540, 545–46 (E.D. Pa. 2019) (finding arbitration agreement illusory where "the agreement page specifically stated that [defendant] need not give 'notice at any time' of any modifications. Nor is there any term providing for the employee's acceptance of modifications. Nor is there any statement *limiting the effect of any modifications to future incidents*. Thus, the agreement permits [defendant] to change any of its obligations (other than at-will employment) at any time, simply by putting its desired changes in writing—without so much as telling its employees of these changes.") (emphasis added); *Douglas*, 470 Fed. Appx. at 826 ("[Defendant] could modify the [arbitration agreement] unilaterally—that is, without [plaintiff's] agreement or knowledge. Therefore, [Defendant's] promise to arbitrate was illusory, and the [arbitration agreement] was unenforceable."); *National Federation for the Blind v. Container Store, Inc.*, 2016 WL 4027711, at *12 (D. Mass., Jul. 27, 2016); *In re Zappos.com, Inc., Customer Data Sec. Breach Litig.*, 893 F. Supp. 2d 1058, 1065-66 (D. Nev. 2012).

Here, there is no dispute that Voyager can unilaterally amend the VUA (including the Arbitration Provision and its Delegation Clause) "at any time" and "without prior notice" to Plaintiff or its customers; there is no express limitation that any such amendments would only apply prospectively; there is no meaningful right to opt out or to reject any revisions, as simply logging in to the Platform *or even viewing the Website* would constitute acceptance of terms that users are entirely unaware of—and to the extent users have money in their account, signing in and "accepting" these revised terms would be a necessity in order to even initiate a transfer of assets off of the Voyager Platform. And, unless users can find and object to a revision to the VUA within 24 hours of "delivery" (which includes quietly posting the revised agreement to the website), Voyager treats the matter as "concluded" and therefore binding on the users. As in *Rossi*, *Crump*, *Todorovich*, *Douglas*, and others, the Court should similarly conclude that no agreement to arbitrate was formed where there is such a startling lack of mutuality of obligation.

## IV.   THE DELEGATION PROVISION IS UNENFORCEABLE BECAUSE IT IS PROCEDURALLY AND SUBSTANTIVELY UNCONSCIONABLE.

Even if the Court finds that Plaintiff and Voyager did form the Arbitration Provision, it is unenforceable because the wholly one-sided nature of the Delegation Clause (as well as the Arbitration Provision) renders it unconscionable. *See Dvorak v. AW Dev., LLC*, No. A-3531-14T2,

2016 WL 595844, at *5 (N.J. Super. Ct. App. Div. Feb. 16, 2016) ("Most important in [this] unconscionability analysis is the one-sided nature of the [] provision."); *see also Bielski* 2022 WL 1062049, at *2 ("A delegation clause lacking mutuality imposes an unfair burden that qualifies as unconscionable."); *Armendariz v. Found. Health Psycare Servs., Inc.*, 24 Cal. 4th 83, 117 (2000) (to be enforceable, a delegation provision, as well as an arbitration agreement generally, must have a "modicum" of bilaterality).

In this regard, *Bielski* is highly persuasive and should inform this Court's analysis, not only because it is so factually similar, in that it appears Voyager modeled its unconscionable dispute resolution process after Coinbase's, but the tests for unconscionability in New Jersey and California are very similar. *See Dardashti*, 2016 WL 6471020, at *4 (explaining that New Jersey's test for unconscionability "examines similar factors set forth under California law") (citing *G & F Graphic Servs., Inc.*, 18 F. Supp. 3d at 594).

### 1. The Unconscionability Standard.

An adhesion contract is one that is "presented on a take-it-or-leave-it basis, commonly in a standardized printed form, without opportunity for the 'adhering' party to negotiate except perhaps on a few particulars." *Muhammad v. County Bank of Rehoboth Beach, Del.,* 189 N.J. 1, 912 A.2d 88, 96 (N.J. 2006). Such agreements "necessarily involve indicia of procedural unconscionability," but "[t]he determination that a contract is one of adhesion ... is the beginning, not the end, of the inquiry into whether a contract, or any specific term therein, should be deemed unenforceable based on policy considerations." *Id.* at 96–97 (quotations and citations omitted). "Because adhesion contracts invariably evidence some characteristics of procedural unconscionability, the Court require[s] a careful, fact-sensitive examination into substantive unconscionability. *Id*. at 97.

To determine unconscionability in the context of an adhesion contract, New Jersey courts look at four factors: "[ (1) ] the subject matter of the contract, [ (2) ] the parties' relative bargaining positions, [ (3) ] the degree of economic compulsion motivating the adhering party, and [ (4) ] the public interests affected by the contract." *Dvorak*, 2016 WL 595844, at *4 (citing *Delta Funding Corp. v. Harris,* 189 *N.J.* 28, 40 (2006)). Courts also consider the "take-it-or-leave-it nature" of the contract. *Id.* (citing *Id*.). Overall, courts apply "a sliding-scale approach to determine overall unconscionability, considering the relative levels of both procedural and substantive unconscionability." *Id.* (citing *Id*.). *See also Sitogum Holdings Inc., supra,* 352 N.J. Super. at 565–

66, 800 *A*.2d 915 (noting that courts have employed a "sliding scale" analysis when considering, in tandem, the two factors of procedural and substantive unconscionability).

Procedural unconscionability refers to defects in the contracting process, including "lack of sophistication, hidden or unduly complex contract terms, bargaining tactics, and the particular setting existing during the contract formation process." *Dvorak*, 2016 WL 595844, at *4 (citing *Raymours Furniture,* 436 N.J. Super. at 317). *See also Morris v. Redwood Empire Bancorp*, 128 Cal. App. 4th 1305, 1317 (2005) (quotation and citation omitted ("Oppression occurs where a contract involves lack of negotiation and meaningful choice, surprise where the allegedly unconscionable provision is hidden within a prolix printed form."). Substantive unconscionability "generally involves harsh or unfair one-sided terms;" it "simply suggests the exchange of obligations so one-sided as to shock the court's conscience." *Dvorak*, 2016 WL 595844, at *4 (citing *Raymours Furniture,* 436 N.J. Super. at 317).

Notably, "[a] court finding *either* form of unconscionability has broad discretion over the remedy. *Falk v. Aetna Life Ins. Co.*, No. CV1900434MASDEA, 2019 WL 4143882, at *3 (D.N.J. Aug. 31, 2019)[10] (citing *Sitogum Holdings, Inc. v. Ropes*, 800 A.2d 915, 919 (N.J. Super. Ct. Ch. Div. 2002). "[T]he court may refuse to enforce the entire agreement, strike the unconscionable provision and enforce the remainder of the agreement, or limit the application of the unconscionable provision as to avoid an unconscionable result." *Id.* (quoting *id.*); N.J. Stat. Ann. § 12A:2-302.

## 2. The Delegation Clause is Substantively Unconscionable.

In *Dvorak*, noting that the "[m]ost important" aspect of its unconscionability analysis was the arbitration provision's "one-sided nature," the Supreme Court of New Jersey found an arbitration provision to be unconscionable where the "Defendant reserved for itself the right to cure any default, while denying plaintiffs a comparable right" because the "Plaintiffs [could] not seek any consequential damages, yet defendant's right to do so [was] unfettered. *Dvorak v. AW Dev.*, LLC, No. A-3531-14T2, 2016 WL 595844, at *5 (N.J. Super. Ct. App. Div. Feb. 16, 2016).

---

[10] The *Falk* court found that the arbitration agreement was not procedurally unconscionable because plaintiff was "free to decline it and would not have suffered negative consequences as a result of his decision," i.e., his employment relationship with defendant would have continued anyway. *Falk*, 2019 WL 4143882, at *5. Here, there was no ability for Plaintiff to opt out of the Arbitration Provision or its Delegation Clause—either he agreed, or his relationship with Voyager would end.

The Court found that "[t]his grossly imbalanced approach to the availability of interlocutory or emergent relief constitute[d] harsh and unfair one-sided terms that [did] not deserve judicial enforcement." *Id*. at *5.

Similarly, in *Bielski*, Judge Alsup aptly determined that "whether the delegation clause imposes an unconscionable burden that differs from a generic delegation clause require[d] backtracking through the nested provisions of Coinbase's 'Arbitration Provision'" and its pre-arbitration procedures. Reviewing Coinbase's agreement—which operates startlingly similar to Voyager's—Judge Alsup determined that the lack of mutuality in Coinbase's complaint process was "expressly incorporated" into the delegation clause through the arbitration agreement's defined terms, and found Coinbase's delegation provision substantively unconscionably where "the delegation clause only delegates questions of arbitrability that emerge from the user agreement's tripartite dispute-resolution procedures, not arbitration, generally." 2022 WL 1062049, at *2–6. *See also Nyulassy v. Lockheed Martin Corp.*, 120 Cal. App. 4th 1267, 1281 (2004) (cleaned up, citation omitted) ("The paramount consideration in assessing substantive consciability is mutuality."); *Pinela v. Neiman Marcus Grp., Inc.*, 238 Cal. App. 4th 227, 246 (2015) (citation omitted) (holding a delegation clause "may be found substantively unconscionable where it imposes an unfair burden that is different from the inherent features and consequences of delegation clauses"); *see also Rent-A-Center*, 561 U.S. at 68–69.

As explained above, Paragraph 21 of the VUA, which specifically includes (identical to *Bielski*) the pre-arbitration dispute resolution process and defines the term "Complaint" that is incorporated into the Arbitration Provision, provides:

> . . .
> **If you have a complaint or dispute with Voyager in connection with the Voyager Service (a "Complaint"), you** agree to contact Voyager through Voyager's support team at support@investvoyager.com in order to attempt to resolve any such Complaint amicably. When submitting a Complaint, please provide us with your name, address, and any other information that we may need in order to identify you and your Voyager Account. Voyager will acknowledge receipt of your Complaint after receipt. Upon receipt of a Complaint, a Voyager support member will review the Complaint based upon the information provided in such Complaint and, if necessary, reach out to you via e-mail in order to attempt to resolve such Complaint.
> . . .

VUA at ¶ 21. Thus, "Complaint" is clearly defined to include *only* disputes that *users* may have with the Voyager Platform.

Paragraph 22, in turn, requires that the parties "agree to attempt informal resolution of any **Complaint** arising in connection with this Agreement, my Voyager Account, the Voyager Platform, or the Voyager Services consistent with the procedures outlined in Section [21] ***prior to any demand for adjudication***." Paragraph 22 goes on to state that "if we cannot solve such **Complaint** informally and consistent with the procedures outlined in Section [21], **any such dispute** [i.e., a User's Complaint] shall be finally settled in binding arbitration, on an individual basis, *in accordance with the American Arbitration Association's rules for arbitration of consumer-related disputes*, and Voyager and I hereby expressly waive trial by jury and right to participate in a class-action lawsuit or class-wide arbitration." *Id.* (emphasis added).

To sum up then, like the "nesting boxes" Judge Alsup analyzed in *Bielski*, the Delegation Clause incorporates defined terms that specify the matters delegated to the arbitrator, as outlined in the VUA's multilevel dispute resolution procedure. *First*, the user must contact Voyager's Support team and provide all necessary information to submit a "Complaint." *Second*, the user must wait for Voyager Support to review the Complaint and "if necessary, reach out to you via e-mail in order to attempt to resolve it." *Third*, the should that process fail to resolve the grievance then, and only then, may the consumer seek arbitration.

The plain language of the informal complaint procedure prior to arbitration only contemplates complaints raised by the *user*, not by Voyager. The informal complaint process specifies "If **you** have a complaint or dispute with Voyager in connection with the Voyager Service (a 'Complaint'), **you** agree to contact Voyager through Voyager's support team at support@investvoyager.com" VUA, ¶ 21 (emphasis added). The Arbitration Provision states that, "*Voyager and I agree* to attempt informal resolution of any Complaint arising in connection with this Agreement" VUA, ¶ 22. (*ibid.*, emphasis added). But only the *user* is required to file a complaint, and the procedures for handling a complaint outlined in the agreement anticipate only a *user's* complaint and Voyager's eventual response, not the reverse scenario.

In its totality, the Delegation Clause as a whole addresses only those disputes that have previously gone through the pre-arbitration complaint procedure. Because only Voyager *users* can raise a complaint though the informal complaint procedure, which predates any entry into arbitration, the Delegation Clause imposes no obligation on Voyager itself to submit its disputes with users to binding arbitration.

Further, the unduly onerous preconditions to arbitration that are included in the VUA further indicate that the Delegation Clause is substantively unconscionable. *See Bielski*, 2022 WL 1062049, at *5 (citing *Baltazar v. Forever 21, Inc.*, 62 Cal. 4th 1237, 1250 (2016); *Nyulassy*, 120 Cal. App. 4th at 1282–83). For starters, in contrast to the more substantial relationship between an employee and the employer, the VUA governs a less formal, less particularized, consumer relationship. Because the unconscionability determination is highly context-specific, the Court's analysis "includes both the commercial setting and purpose of the arbitration contract and any procedural unconscionability in its formation." *Bielski*, 2022 WL 1062049, at *5 (citing *OTO, LLC v. Kho*, 8 Cal. 5th 111, 136 (2019); *De La Torre v. CashCall, Inc.*, 5 Cal. 5th 966, 984 (2018)); *see also Ricciardi v. Abingdon Care & Rehab. Ctr.*, A-3255-18T1, 2019 WL 5418379, at *2 (N.J. Super. Ct. App. Div. Oct. 23, 2019) (noting that "[t]he issues are fact-sensitive" and declining to enforce arbitration as applied to plaintiff).

As discussed, Voyager's informal complaint process requires users to jump through multiple, antecedent hoops before resorting to arbitration. Voyager users are first required to submit a "Complaint" to Voyager Support via email, including various information to be included. At this point, the evidence shows that Voyager Support is extremely unresponsive, mostly run by AI bots, and many users were required to separately attempt to reach out directly to Voyager's CEO, Stephen Ehrlich, before they received any response. *See, e.g.,* Ali Decl.; Schaefer Decl.; Cassidy Decl. 1; Cassidy Decl. 2; Ex. E. On the other hand, Voyager is not similarly held to this process, and instead of ever handling disputes in accordance with either the informal dispute resolution process or the Arbitration Provision, Voyager simply utilizes various self-help measures that leave its users wondering what happened.

In sum, the fact that Voyager users—and only Voyager users—are required to jump over multiple burdensome obstacles prior to even initiating the process of arbitrating disputes, while the same procedure or obligation is never even triggered for Voyager, renders the Delegation Clause in the VUA unconscionable. *Bielski*, 2022 WL 1062049, at *5 (citing *Aremendariz*, 24 Cal. 4th at 117–18; *Pokorny*, 601 F.3d at 998–1000).

### 3. The Delegation Clause is Procedurally Unconscionable.

While the substantive unconscionability of the Delegation Clause alone renders the provision unenforceable, *Falk*, 2019 WL 4143882, at *3, the analysis into procedural unconscionability leads to the same conclusion.

Not surprisingly, courts have routinely found that non-negotiable, take it or leave it contracts like Voyager's are procedurally unconscionable; indeed, it is so much of an obvious conclusion that courts refer to such agreements as "online adhesion contracts." *Selden v. Airbnb, Inc.*, 2016 WL 6476934, at *4 (D.D.C. Nov. 1, 2016), *aff'd*, 4 F.4th 148 (D.C. Cir. 2021); *see also AT&T Mobility LLC v. Concepcion*, 563 U.S. 346–47 (2011) (noting "the times in which consumer contracts were anything other than adhesive are long past."). As the Third Circuit explained in *Alexander v. Anthony Intern., L.P.*, "Plaintiffs nevertheless were still presented with a 'take-it-or-leave-it' agreement to arbitrate by a multinational corporation. Because plaintiffs had no real choice but to accept these terms, they have established the existence of procedural unconscionability." 341 F.3d 256, 266 (3rd. Cir. 2003).[11]

The defendant in *Dvorak* "reserved for itself the right to cure any default while denying plaintiffs a comparable right," which the court found represented the defendant's "greater bargaining power," thus rendering the arbitration agreement procedurally unconscionable under New Jersey law. *Dvorak*, 2016 WL 595844, at *5. Here too, the manner in which Voyager drafted the VUA allowed it to reserve for itself the option of seeking remedies entirely outside of the arbitration process, an option that was not given to users, as explained above. Therefore, the Court should similarly find here that the "sliding scale" tilts towards a finding of procedural unconscionability. Further, Voyager drafted and presented the user agreement to Plaintiff (and other users) on a take-it-or-leave-it basis, which deprived Plaintiff of both the ability to negotiate any meaningful choice. *Pinela*, 238 Cal. App. 4th at 242 (quotation omitted). And, as Voyager confirmed, a user cannot create an account with Voyager without checking the box next to the statement "By creating an account, you agree to our Terms," and Voyager has never revised the VUA in response to a customer attempting to negotiate a change because it is offered on a take-it-or-leave-it basis. VDL Tr. 48:5–49:15; 94:8–107:18; 144:25–148:2.

Voyager's Delegation Clause has been presented to users, including Plaintiff, by a large, multinational corporation, on a take it or leave it basis, with no opportunity to opt out, and subject

---

[11] In fact, the Ninth Circuit has found such adhesion contracts to be per se "oppressive (and therefore procedurally unconscionable)," *Newton v. Am. Debt Servs., Inc.*, 549 F. App'x 692, 694 (9th Cir. 2013), and has repeatedly stated that "a contract is procedurally unconscionable under California law if it is 'a standardized contract, drafted by the party of superior bargaining strength, that relegates to the subscribing party only the opportunity to adhere to the contract or reject it.'" *Pokorny*, 601 F.3d at 996 (*citing Ting v. AT&T*, 319 F.3d 1126, 1148 (9th Cir. 2003)).

to a unilateral modification provision that has been exercised nearly half a dozen times since Plaintiff signed up with Voyager. Mot., 5; ECF No. 54-2 Exs. A–E. The Delegation Clause is procedurally unconscionable.

## V.   THE DELEGATION CLAUSE CANNOT BE SAVED BY MODIFYING THE LANGUAGE OR SEVERING UNCONSCIONABLE TERMS, WHICH ARE INTEGRAL TO THE AGREEMENT.

Finally, even if the Court wanted to sever the unconscionable provisions in the delegation agreement to make it enforceable pursuant to the agreement's severability clause, it would be unable to do so. Severability is not an option because the unconscionable provisions concern the core of the agreement and permeate the entire agreement and consequently, severing them would render the entire agreement concerning arbitration unenforceable.

"Courts can sever an invalid provision of a contract unless striking the illegal provision 'defeats the primary purpose of the contract.'" *Guc v. Raymours Furniture Co., Inc.,* No. A-3452-20, 2022 WL 729539, at *3 (N.J. Super. Ct. App. Div. Mar. 11, 2022) (citing *Jacob v. Norris, McLaughlin & Marcus,* 128 N.J. 10, 33 (1992). In answering this question, a court considers whether the unenforceability of the offending provision(s) "renders the remainder of the contract unenforceable." *Id. See also NAACP of Camden Cnty. E. v. Foulke Mgmt. Corp.,* 421 N.J. Super. 404, 437, 24 A.3d 777, 798 (App. Div. 2011) (citing *Jacob*) ("Severability is only an option if striking the unenforceable portions of an agreement leaves behind a clear residue that is manifestly consistent with the 'central purpose' of the contracting parties, and that is capable of enforcement.").

The Delegation Clause cannot be saved by severability because the unilaterality that exists as a result of the offending provisions extends to the entire Arbitration Provision. As discussed above, the Delegation Clause arises only in the context of a "Complaint" as defined in the Arbitration Provision, which only applies to when a user seeks to bring a claim against Voyager, and therefore only obligates the user. Any attempts by the Court to strike the "offending" provisions would "render[] the remainder of the contract unenforceable" because without a "Complaint" there is nothing to arbitrate. *Guc*, 2022 WL 729539, at *3. In other words, to save the Delegation Clause, the Court would be required to rewrite the entire agreement, a task the Court is not allowed to do. *See Guc v. Raymours Furniture Co., Inc.,* No. A-3452-20, 2022 WL 729539, at *4 (N.J. Super. Ct. App. Div. Mar. 11, 2022) (citing *Karl's Sales & Serv., Inc. v. Gimbel Bros.,* 249 N.J. Super. 487, 493, 592 A.2d 647, 650 (App. Div. 1991)) (holding that courts cannot rewrite

terms in a contract simply to make "a better contract for the parties than they themselves have seen fit to enter into, or to alter it for the benefit of one party and to the detriment of the other"). "[W]hen courts construe an instrument, a judge is not to insert what has been omitted, or to omit what has been inserted." *Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937, 954 (2008) (quotation omitted); *see also U.S. v. 1.377 Acres of Land*, 352 F.3d 1259, 1265–66 (9th Cir. 2003); *Brinderson-Newberg Joint Venture v. Pac. Erectors, Inc.*, 971 F.2d 272, 278–79 (9th Cir. 1992).

The Third Circuit's analysis in *MacDonald v. CashCall, Inc,* 883 F.3d 220 (3d Cir. 2018) provides guidance. In *MacDonald*, a borrower sued a lender alleging that the loan agreement was usurious and unconscionable and the lender moved to compel arbitration pursuant to the arbitration clause in the loan agreement. *Id*. at 223. The arbitration agreement stated that disputes would be resolved by "The Cheyenne River Sioux Tribal Nation" and pursuant to its laws and not state or federal law. *Id.* The District Court of New Jersey had found that that these provisions rendered the delegation agreement illusory and therefore unenforceable and further, that the provisions were not severable because it would 'defeat the central purpose of the contract.'" *MacDonald v. CashCall, Inc*, No. CV 16-2781, 2017 WL 1536427, at *4 (D.N.J. Apr. 28, 2017), *aff'd*, 883 F.3d 220 (3d Cir. 2018). The Third Circuit affirmed the district court's ruling, finding that these provisions were "an integral, not ancilliary, part of the parties' agreement to arbitrate, despite the inclusion of a severability clause in the contract." *MacDonald v. CashCall*, Inc, 883 F.3d 220, 230 (3d Cir. 2018). The Court noted that the tribal forum was referenced in the paragraphs discussing arbitration which indicated that "the primary purpose of the Loan Agreement was to arbitrate disputes subject to CRST oversight and its laws." *Id*. Here, similarly, the inclusion of the term "Complaint" throughout the user agreement—e.g. in the section discussing the informal complaint process—shows that the goal of the agreement was to require *users* to submit their claims against Voyager to arbitration.

As with Voyager here, the defendant in *Dvorak* "created an exception to arbitration only for itself," specifically providing in the agreement that it could "seek injunctive and emergent relief" but plaintiffs had to complete arbitration before seeking any relief in court. *Id.* at *5. The court first concluded that "[t]his grossly imbalanced approach" "constitutes harsh and unfair one-sided terms that do not deserve judicial enforcement." *Id*. It went on to find that the "one-sided nature of the provision [could not] be cured by striking the unenforceable parts" because "it was "uncertain that striking the emergent relief language would leave behind a 'clear residue that is

26

manifestly consistent with the central purpose of the contracting parties, and that is capable of enforcement.'" *Id.* (citing *NAACP of Camden Cnty. E.,* 24 A.3d at 798).[12]

Here, as the *Bielski* court found, "the inability to cleanly remove the unconscionable language weighs against severance." 2022 WL 1062049, at \*7. *See also Guc v. Raymours Furniture Co., Inc.,* No. A-3452-20, 2022 WL 729539, at \*4 (N.J. Super. Ct. App. Div. Mar. 11, 2022) (refusing to enforce arbitration agreement in contracts between the parties where the offending provisions made the agreements substantively unconscionable "in their entirety" and to sever the offending provisions "would require a rewriting of the contract").[13]

For the reasons mentioned above, severability of the unconscionable provisions of the delegation agreement is not possible, and the Court should find it entirely unenforceable.

## VI.    THE ARBITRATION AGREEMENT IS UNCONSCIONABLE FOR THE SAME REASONS AS THE DELEGATION PROVISION.

Because Plaintiff has challenged the validity of the Delegation Clause in the Arbitration Provision, the Court may properly consider Plaintiff's challenges to the agreement to arbitrate and should conclude that the reasons that make the Delegation Clause unenforceable apply equally to the Arbitration Provision. *See MacDonald v. CashCall, Inc,* 883 F.3d 220, 227 (3d Cir. 2018) (accepting plaintiff's argument "that the Loan Agreement's delegation clause and arbitration provisions are unenforceable for the same reasons"); *Bielski,* 2022 WL 1062049, at

---

[12] The court also noted that the agreement in *Dvorak* did not contain a severability clause, but in any event, under New Jersey law, Court may not rely on a severability clause  and sever language from an agreement "where doing so would 'defeat the central purpose of the contract.'" *MacDonald v. CashCall, Inc,* 883 F.3d 220, 230 (3d Cir. 2018) (citing *Jacob v. Norris, McLaughlin & Marcus,* 128 N.J. 10, 33 (1992)); *see also Est. of Yetta Novosett v. Arc Villages II, LLC,* 189 So. 3d 895, 896 (Fla. 5th DCA 2016); (citing *Shotts v. OP Winter Haven, Inc.,* 86 So. 3d 456, 478 (Fla. 2011)) ("[t]he existence of a severability clause in an agreement is clearly not dispositive of whether a void clause invalidates the entire contract."). And it is clear from its analysis that the *Dvorak* court would not have severed, anyway.

[13] While Plaintiff maintains the New Jersey law applies, the analysis under Florida law on this point warrants the same conclusion. In Florida, in determining whether severability is possible, courts look to whether the unenforceable provision goes "to the heart" of the agreement. *Osprey Health Care Ctr., LLC v. Pascazi by & through Outwater,* 329 So. 3d 177, 187 (Fla. 2nd DCA 2021). "Stated differently, if an arbitration agreement is otherwise enforceable, a 'court should sever the offending provisions ... so long as such severance does not undermine the parties' intent.'" *Id.* (citing *Lemos v. Sessa,* 319 So. 3d 135, 141 (Fla. 3d DCA 2021). And, like New Jersey, Florida law prohibits "[s]everance of a void provision" "if it requires a court 'to rewrite the agreement and to add an entirely new set of procedural rules and burdens and standards.'" *Id.* (citing *Shotts v. OP Winter Haven, Inc.,* 86 So. 3d 456, 480 (Fla. 2011)).

\*2–6 ("Having found the delegation clause unenforceable, this order must consider whether the arbitration agreement as a whole is unenforceable. . . . The 'Arbitration Provision' imposes a burdensome and unfair pre-arbitration dispute process on users and sends their complaints, but not Coinbase's complaints, to binding arbitration. This order finds the arbitration agreement as a whole unconscionable and, hence, unenforceable.") (citations omitted); *Lim v. TForce Logistics, LLC*, 8 F.4th 992, 1006 (9th Cir. 2021) ("Because the district court correctly held that the delegation clause was unenforceable as procedurally and substantively unconscionable, the district court properly proceeded to determine the gateway issue of arbitrability. In doing so, the district court correctly concluded that the same bases for concluding that the delegation clause was procedurally and substantively unconscionable…also rendered the arbitration provision unconscionable. And for the same reasons it did not err by declining to sever the unconscionable terms with respect to the delegation clause, the district court did not err by not severing those same terms and declining to enforce the arbitration provision.").

## VII.   THE CLASS WAIVER CANNOT SURVIVE INDEPENDENT OF THE ARBITRATION PROVISION.

According to Voyager, the Arbitration Provision "expressly waives the right to participate in a class-action lawsuit." Motion at 4 and 6. However, this is not a separate class action waiver and only serves to clarify for customers what the effect of "individual arbitration" is, and that the class action waiver must fall *with* the arbitration agreement of which it is part and parcel.

"[T]he most plausible way to interpret a class action waiver in the middle of an arbitration provision is as part of the explanation of the rules, rights, and procedures that apply if a dispute is arbitrated—'*not* as an independently effective waiver of the right to pursue a class action outside the arbitration context." *Vine v. PLS Fin. Servs., Inc.*, 807 F. App'x 320, 328 (5th Cir. 2020). The court in *Vine* found that the language of the arbitration provision indicated that the class waiver was contingent upon the agreement to arbitrate. The defendant there sought to enforce a class waiver that was within the terms of the arbitration agreement. *Id*. at 320. The Court held that, precisely because the waiver was within the terms of the arbitration agreement, the plaintiffs "gave up their right to participate in a class action *by virtue of* their agreement (to

arbitrate)." *Id*. at 328. The. However, once the agreement was held unenforceable, the plaintiffs "were free to select another form of dispute resolution, including a class action." *Id*.[14]

The United States District Court for the District of New Jersey reached the same conclusion in an analogous case, *White v. Mills*, No. CV 17-1775, 2021 WL 6750766, at *1 (D. N.J. Dec. 29, 2021). The defendant there argued that the plaintiffs had waived their right to bring any claims as a class pursuant to the waiver in the "Terms and Conditions" they had received when they purchased their television. *Id*. at *4. However, the Court found that the defendant had waived its right to arbitration by delaying their motion to compel arbitration (amongst other reasons). *Id*. at *2. The Court then analyzed whether the class action waiver, which was part of the terms of the arbitration agreement, was nonetheless enforceable. *Id*. at *4. It was not. The Court reasoned that, because the waiver was part of the arbitration agreement, which was not enforceable, it was similarly unenforceable, noting that the "[d]efendant's position that the Waiver is a standalone provision untethered to the Arbitration Provision is unsupported by the structure of the Terms and Conditions." *Id. See also In re Rivers*, No. 03-05671-NPO, 2010 WL 5375950, at *3 (Bankr. S.D. Miss. Dec. 22, 2010) (construing a class action waiver located between the agreement to arbitrate and the procedures applicable to arbitration as to only applying to proceedings in arbitration).

---

[14] In *Figueredo-Chavez v. RCI Hosp. Holdings, Inc.,* No. 1:21-CV-21733-KMM, 2021 WL 5763577, at *5 (S.D. Fla. Dec. 3, 2021), *reconsideration denied*, No. 1:21-CV-21733-KMM, 2022 WL 457848 (S.D. Fla. Jan. 6, 2022), the court attempted to distinguish *Vine* and understood *Vine* to hold that collective action waivers outside of the context of arbitration were *always* unenforceable, which the court found went against the Supreme Court's holding in *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612 (2018). *See e.g.*, *id.* at *6 (stating that, "to find the collective action waiver unenforceable would be to do precisely what the Supreme Court refused to do in *Epic*, that is: to read a non-waivable right to collective action into a statute where none exists"); *see also id*. at *5 ("In *Epic*, U.S. Supreme Court Justice Neil M. Gorsuch, writing for the majority, rejected the dissenting Justices' view that a right to collective action should be read into the National Labor Relations Act [], which would render arbitration clauses unenforceable"). But the holding in *Vine* was not as far-reaching as presumed by the Court; on the contrary, the *Vine* holding was very narrow and based on the court's interpretation of what was intended by the parties *there* by agreeing to a separate collective action waiver that was placed within an arbitration agreement. Here, similarly, the class action waiver does not operate as a separate standalone provision; instead, it explains to users that by agreeing to individually arbitrate a Complaint (as "Complaint" is defined within the terms of the Arbitration Agreement), the user is agreeing to waive a right to a jury trial or to bring an action collectively *on that Complaint*.

Voyager cannot enforce the class action waiver because the waiver is not a stand-alone provision. The waiver reads as follows:

> **Voyager and I further agree that if we cannot solve such Complaint informally and consistent with the procedures outlined in Section 20, any such dispute shall be finally settled in binding arbitration, on an individual basis, in accordance with the American Arbitration Association's rules for arbitration of consumer-related disputes, and Voyager and I hereby expressly waive trial by jury and right to participate in a class-action lawsuit or class-wide arbitration.**

*See* VUA at 16-17. The waiver is also located within the section numbered 22, titled "**ARBITRATION**." *Id*. As such, the waiver's placement within the agreement to arbitrate is inextricably tied to the agreement to arbitrate "Complaint[s]" that are not resolved through Voyager's (onerous) informal resolution process. Because the Arbitration Provision (as with the Delegation Clause) is unenforceable, the waiver is likewise unenforceable. *See White*, 2021 WL 6750766, at *1 ("Reading the Waiver in its context, it is clear that the language of the class action waiver is inextricably tied to the arbitration provision itself, which the Court has already found to be waived.").

## <u>CONCLUSION</u>

Plaintiff respectfully requests that the Court deny Defendants' Motion to Compel Arbitration as to Counts III and IV, together with such other and further relief as the Court deems just, equitable, and proper.

## <u>REQUEST FOR ORAL ARGUMENT</u>

Plaintiff respectfully requests that the Court hear oral argument on Defendants' Motion, and respectfully submit that one hour should be sufficient for all Parties to argue the issues presented.

Dated: May 30, 2022                    Respectfully submitted,

                                       By: /s/ Adam Moskowitz
                                       Adam M. Moskowitz
                                       Florida Bar No. 984280
                                       adam@moskowitz-law.com
                                       Joseph M. Kaye
                                       Florida Bar No. 117520
                                       joseph@moskowitz-law.com
                                       Barbara C. Lewis
                                       barbara@moskowitz-law.com
                                       Florida Bar No. 118114
                                       **THE MOSKOWITZ LAW FIRM, PLLC**
                                       2 Alhambra Plaza, Suite 601
                                       Coral Gables, FL 33134
                                       Telephone: (305) 740-1423

                                       By: /s/_ Stuart Z. Grossman
                                       Stuart Z. Grossman
                                       Florida Bar No. 156113
                                       szg@grossmanroth.com
                                       Rachel W. Furst
                                       Florida Bar No. 45155
                                       rwf@grossmanroth.com
                                       GROSSMAN ROTH YAFFA COHEN, P.A.
                                       2525 Ponce de Leon Blvd Ste 1150
                                       Coral Gables, FL 33134
                                       Office: 305-442-8666

                                       *Co-Counsel for Plaintiff and the Class*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the forgoing was filed on May 30, 2022, with the Court via CM/ECF system, which will send notification of such filing to all attorneys of record.

                                       By: /s/ Adam M. Moskowitz
                                        ADAM M. MOSKOWITZ
                                        Florida Bar No. 984280