# Exhibit B

Page 1

```
 1                UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF FLORIDA
 2
                      CASE NO:  21-24441-CIV-ALTONAGA/Torres
 3                     2009-CA-212-O
 4   MARK CASSIDY, on behalf of himself
     and others similarly situated,
 5
             Plaintiff,
 6
     vs.
 7
     VOYAGER DIGITAL LTD, and
 8   VOYAGER DIGITAL LLC,
 9           Defendants.
     _____/
10
     VIDEOTAPED
11   DEPOSITION OF:        SHANNON CASEY, AS 30(b)(6)
                           CORPORATE REPRESENTATIVE OF
12                         VOYAGER DIGITAL LLC,
13   DATE TAKEN:           Tuesday, April 26, 2022
14   TIME:                 10:07 a.m. to 2:28 p.m.
15   PLACE:                Videoconference
16   TAKEN BY:             The Plaintiff
17   REPORTED BY:          LISA K. WORKMAN,
                           Court Reporter and Notary
18                         Public, State of Florida
19
20
21
22
23
24
25
```

1      Q.   You -- you physically copied it and sent it to

2    somebody and then somebody put together this

3    declaration?

4      A.   I took the screenshot.  Yes.

5      Q.   Okay.  And it says "The 'did_agree' field in

6    the database reflected in the above image is set to true

7    when the user clicks 'Continue' after having checked the

8    box confirming that 'By creating an account, you agree

9    to our Terms.'"

10           What does that mean?  What is the true part?

11     A.   The true confirms that the -- the box was

12   checked.

13     Q.   Could there be a way when you don't check the

14   box but you become a consumer, a member of Voyager?

15     A.   No.  You can't move forward in the onboarding,

16   or creation of an account, if you don't check that box.

17     Q.   So what does true mean?  Is there a false?

18     A.   I don't know.

19     Q.   Do you see there's a little mark after the

20   true; it says up and down?

21           If you went into this database and you took

22   the screenshot, what else can you change true to?

23           MR. SADEGHI:  Objection to form.

24           THE WITNESS:  You can't chain -- I don't have

25      right -- access to the database, so I can't change

```
 1      anything.
 2   BY MR. MOSKOWITZ:
 3      Q.   You can just view this.  You can't actually go
 4   into the database?
 5          MR. SADEGHI:  Objection, form.
 6          THE WITNESS:  I can view it and I can't change
 7      it.  I have read access only.
 8   BY MR. MOSKOWITZ:
 9      Q.   Okay.  Did you -- so somebody asked you to
10   find out if Mr. Cassidy clicked the box.  You knew he
11   did before you even started because you said you can't
12   trade on the account unless you click the box, right?
13   There's no exceptions?
14      A.   Not that I'm aware of you can't create an
15   account.
16      Q.   Did you click in here "Mr. Cassidy's user_ID
17   redacted for privilege [sic]"?  Did you enter that in
18   the program?
19      A.   I'm sorry, enter what?
20      Q.   When you have the screenshot here, it says
21   under the "user_id" box "Mr. Cassidy's user_id redacted
22   for privacy," right?
23          We have his user ID because we just looked at
24   the prior document, which showed what his ID was.  But
25   who typed in his user ID in order to find this
```

Page 50

1    information?

2        A.   I did.

3        Q.   Okay.  Is there any other time in the Voyager

4    process where a consumer needs to actually click a box

5    to accept any revisions or changes to the User

6    Agreement?

7        A.   Not that I'm aware of, no.

8        Q.   Do you know why?

9        A.   No.

10       Q.   Would that show you, then, that they actually

11   read it and they agreed to it if you had this same

12   procedure for subsequent modifications?

13           MR. SADEGHI:  Objection to form.

14           THE WITNESS:  I don't think I would ever know

15       if someone read something.

16   BY MR. MOSKOWITZ:

17       Q.   Well, you're -- you're telling me you do

18   because you're saying the reason I put this in paragraph

19   12 is it shows me that the "did_agree" reflects that the

20   user clicked continue after reading the box, right?

21           MR. SADEGHI:  Objection to form.

22   BY MR. MOSKOWITZ:

23       Q.   What's the purpose of this?

24       A.   Is that the user has confirmed that they have

25   read it.  So we --

Page 51

```
 1      Q.   Okay.

 2      A.   -- rely on that confirmation.

 3      Q.   So there is a way for Voyager to set up a

 4  system to make sure that people read and agreed to;

 5  clicking the box, correct?

 6           MR. SADEGHI:  Objection to form.

 7           THE WITNESS:  I can always know they have

 8       clicked the box and that they have said that they

 9       have read it, but I don't know if they've actually

10       read it.

11  BY MR. MOSKOWITZ:

12      Q.   But at least they're clicking a box and

13  telling you that they say they read it, right?

14      A.   Yes.

15      Q.   I'm asking you do you know why, when Voyager

16  makes continuous revisions to the User Agreement -- and

17  you're aware of that, right?  Every couple --

18      A.   Yeah.

19      Q.   -- months or years there's changes to this

20  agreement?

21           MR. SADEGHI:  Objection to form.

22           THE WITNESS:  Yes.

23  BY MR. MOSKOWITZ:

24      Q.   Okay.  Why -- for those subsequent changes

25  that are made why doesn't Voyager just follow the same
```

Page 52

1    easy process of having this click this button, and if

2    you click it, then you could go back, type in the user

3    ID, and you can see, simply, if they clicked it and read

4    it or even received it; why don't you do that?

5         A.   I don't know.

6         Q.   Have you ever asked anybody?

7         A.   No.

8         Q.   Do you know of any reason, sitting here today

9    as the director of operations that's in charge of the

10   Voyager Platform User Agreement, why Voyager can't do

11   this same process for subsequent amendments?

12             MR. SADEGHI:  Objection to form.

13             THE WITNESS:  No.

14   BY MR. MOSKOWITZ:

15        Q.   None?

16        A.   Can you ask the question again?

17        Q.   Yeah.  I mean, we'll break it down.

18             Do you know any internal policy reason why

19   Voyager can't just follow the same procedure that you

20   have personal knowledge of here in 12 where when he

21   first registered with the account he had to actually

22   physically click a box so that you have a record here

23   forever that he, in fact, received it?

24             My question is:  For all of the subsequent

25   revisions, which Voyager is continuously making, do you

```
 1    know of any reason why Voyager can't just have the same
 2    click-box system so that you can go back and confirm
 3    that people at least received the amendment?
 4              MR. SADEGHI:  Objection to form.
 5              THE WITNESS:  No.
 6    BY MR. MOSKOWITZ:
 7         Q.   You don't know any technical reason, correct?
 8         A.   I'm not a technical person.  But, no.
 9         Q.   And you don't know any business reason that's
10    ever been provided to you?
11         A.   Again, I've never asked.  So, no.
12         Q.   Okay.  So if you want to know, Miss Casey,
13    they say to you, let's see if Mr. Cassidy agreed or
14    received any subsequent amendment like you were asked to
15    do here in paragraph 12; how would you do that?
16         A.   I'm sorry, can you repeat that?
17         Q.   Yeah.  Yeah.
18              They told you personally, because you're the
19    director of operations, to make sure to have the proof
20    that Mr. Cassidy received the Voyager Terms and
21    Conditions on this User Agreement, and you said, sure,
22    it's easy, I could go back to Voyager's internal
23    database, I could type in his user ID, and it'll show
24    that he physically clicked the box and agreed to the
25    terms.
```

Page 54

1          I'm asking you, if you want to see if they

2     changed the agreement six months later and you want to

3     see if he, in fact, received it, how would you do that?

4          A.   I wanted to make that change at Voyager?

5          Q.   No.

6          Say Voyager decided to change their user

7     agreement, which you just said you know they do

8     periodically, and somebody asked you, Miss Casey, just

9     like they did in paragraph 12, could you go back and

10    check that he actually received it?

11         You could for the March 17th account because

12    you say you typed in his user ID and you have this

13    algorithm someone created that shows that he clicked it

14    by creating the account.

15         What I'm asking you is, you said we don't do

16    this for any subsequent amendments.  So how would you

17    confirm that he actually received any subsequent changes

18    to the account?

19         A.   Well, part of the User Agreement states that

20    you know that it's available on our website and are --

21    you are -- part of your being the user is to keep

22    yourself apprised of those updated terms, and you agree

23    when you agree here to do that.

24         Q.   What does that mean?  So -- so if Mark Cassidy

25    sign -- clicked this agreement on March 17 at 4:28,

1   you're saying that it also was his responsibility to

2   monitor the User Agreement that's on the site and, what,

3   periodically, like every week, go back and check to make

4   sure that none of the provisions have changed?

5       A.   I don't know how often he would want to do

6   that, but yes.

7       Q.   And would that be his responsibility?

8           MR. SADEGHI:  Objection to form.

9           THE WITNESS:  I believe so, yes.

10  BY MR. MOSKOWITZ:

11      Q.   Does Voyager have any responsibility in that

12  process in terms of informing Mr. Cassidy specifically

13  that there's been a change that has been made to what he

14  previously signed?

15          MR. SADEGHI:  Objection to form.

16          THE WITNESS:  Well, I'm not a -- a lawyer, so

17      I don't know what our responsibility or obligation

18      would be.

19  BY MR. MOSKOWITZ:

20      Q.   I'm not asking your legal opinion.  I'm asking

21  you, as a director of operations who's the corporate rep

22  deposition regarding Voyager's Platform User Agreement,

23  including all revisions thereto, what is Voyager's

24  practice and procedures for making subsequent changes?

25          Your testimony is he has to stay updated

1   himself.  I'm asking you is there any obligation or

2   responsibility of Voyager to update Mr. Cassidy about

3   any changes?

4               MR. SADEGHI:  Objection --

5               THE WITNESS:  Again --

6               MR. SADEGHI:  -- to form.

7               THE WITNESS:  -- I don't know.

8   BY MR. MOSKOWITZ:

9        Q.   You don't know what?

10       A.   If there is.

11       Q.   You're the corporate rep deposition.  So are

12   you telling me today that Mr. Cassidy has to do anything

13   after he clicked this box on March 7th -- 17th to be

14   bound to any subsequent changes?

15       A.   Can you repeat that?

16       Q.   Yeah.

17            Are you saying -- and let's start from square

18   one.  You're saying that Mr. Cassidy is bound to

19   whatever the User Agreement said as of March 17th, 2021,

20   correct; is that your testimony?

21       A.   Yes.

22       Q.   Okay.  Now, when there's subsequent

23   modifications and changes that you say Voyager makes

24   routinely, how are those changes bound to Mr. Cassidy?

25               MR. SADEGHI:  Objection to form.

1           THE WITNESS:  In reviewing the -- the terms he

2      agreed to it's discussed that as the -- that they

3      may change and that they're where they're available

4      and that he can go look at them and make sure that

5      he's still in agreement with them.

6  BY MR. MOSKOWITZ:

7      Q.   But how would he know that those changes have

8  been made?

9           MR. SADEGHI:  Objection to form.

10          THE WITNESS:  That would be his

11     responsibility.

12  BY MR. MOSKOWITZ:

13     Q.   But -- but let's talk practical, Miss Casey.

14  Would he have to go back to the Voyager website once a

15  week and carefully peruse through the 300-page User

16  Agreement just to make sure that there were no changes

17  made that day to the agreement; is that what you're

18  saying his responsibilities are?

19          MR. SADEGHI:  Objection to form.

20          THE WITNESS:  I don't believe it's 300 pages.

21     But he would see if there was an updated date and

22     would then be able to know if it was different than

23     the day he signed up and then -- could then review

24     it.

25

Page 58

1    BY MR. MOSKOWITZ:

2        Q.   Okay.  Is there any responsibility on Voyager

3    to specifically inform Mr. Cassidy about these changes?

4        A.   I don't know.

5        Q.   It's okay if you say no.  I mean, you just

6    don't know what the policy is at Voyager?

7             MR. SADEGHI:  Objection to form.

8             THE WITNESS:  No.  I don't know what the

9             obligation is, no.

10   BY MR. MOSKOWITZ:

11       Q.   Who -- who would know, then?  I mean, you're

12   the corporate rep on what's binding on Mr. Cassidy.  Are

13   you saying today that Mr. Cassidy is bound by the

14   March 17, 2021 User Agreement and that's it?  I mean,

15   what is your position today on what he's bound by?

16       A.   He agreed to that one and any that took

17   place -- changes that took place during his time trading

18   on the platform.

19       Q.   Now, how did he agree to any of the changes

20   that he was trading on the platform?  Where is that

21   stated?

22       A.   When he agreed to this -- this one, the

23   initial one, 3/17.

24       Q.   Where does it say that?

25       A.   I believe we produced those.  I don't know

Page 59

1   exactly where.

2        Q.   You say you've produced some records that says

3   by clicking this first agreement on March 17 he's bound

4   to any other agreement that Voyager unilaterally changes

5   but he may not have received because it's his

6   responsibility to know if those changes are made?

7              MR. SADEGHI:   Objection to form.

8              THE WITNESS:   I don't know the exact language,

9        but that's my understanding.

10  BY MR. MOSKOWITZ:

11       Q.   That's what I'm trying to understand.   This is

12  very, very important.   I just want to know your

13  understanding and I don't want to put words in your

14  mouth.

15             So, if you could, explain to me what is

16  Voyager's policy.   Once you prove that on March 17, 2021

17  he clicked this box, please explain to me how he's bound

18  by any subsequent revisions while he's trading on the

19  app?

20       A.   Because in the agreement that he clicked

21  and -- you know, clicked that he reviewed, that is part

22  of that agreement.

23       Q.   Okay.   And just so I'm perfectly clear,

24  regardless of whether Voyager lets Mr. Cassidy know that

25  there's been an amendment, it's Mr. Cassidy's

1   responsibility on his own to go find out and monitor the

2   site to make sure there's no changes made?

3          MR. SADEGHI:  Objection to form.

4          THE WITNESS:  Yes.  The user, after they've

5       agreed to it, is -- that is part of what they are

6       agreeing to.

7          MR. MOSKOWITZ:  Okay.  We've been going a

8       little over an hour, and I certainly don't want you

9       to feel uncomfortable or pressured.  So why don't

10      we take a 10-minute break.  Is that good enough for

11      you or would you like a little more time,

12      Miss Casey?

13         THE WITNESS:  Ten minutes is fine.

14         MR. MOSKOWITZ:  Okay.  So why don't we come

15      back at 11:30.  How about giving you 15 minutes?

16         THE WITNESS:  Okay.

17         MR. MOSKOWITZ:  We'll --

18         THE VIDEOGRAPHER:  The time --

19         MR. MOSKOWITZ:  -- see you --

20         THE VIDEOGRAPHER:  -- is --

21         MR. MOSKOWITZ:  -- at 11:30.

22         THE VIDEOGRAPHER:  -- 11:12 a.m. and we are

23      now off the video record.

24         (Brief break.)

25         THE VIDEOGRAPHER:  The time is 11:32 a.m. and

1          we are now on the video record.

2                MR. MOSKOWITZ:  Good afternoon, Miss Casey.

3          Thank you for coming back.

4                Joey, could you show Exhibit 4?  I want to

5          show the chart on page 2 and just ask Miss Casey

6          some questions about this chart.

7                MR. KAYE:  (Complies.)

8   BY MR. MOSKOWITZ:

9          Q.   Miss Casey, I'm showing you still your

10  affidavit that was provided in our case, and you kind of

11  go -- go through the procedure of how people -- and I

12  take it this is the same uniform procedure for all

13  Voyager customers, not just Mark Cassidy, correct?

14         A.   Yes.

15         Q.   Okay.  So you say -- you direct users to the

16  User Agreement in this bold, purple hyperlink as part of

17  the account opening.  So people have to type in their

18  email, they type in a password -- what is a reward code;

19  do you know?

20         A.   I do.  That's -- when a friend referred you,

21  they have a code they provide that we capture there.

22         Q.   And then for that you get, like, a certain

23  bonus?

24         A.   Yes.

25         Q.   Okay.

Page 62

```
 1      A.   If you --
 2      Q.   And then --
 3           Go ahead.  I'm sorry.
 4      A.   If you meet whatever the requirement is.
 5      Q.   Okay.  Do you know what that requirement is?
 6      A.   It could -- it could be different for the
 7   different codes.
 8      Q.   Okay.  Then physically you have to just click
 9   the box, and by clicking that box and then hit continue,
10   you're now approved to use the Voyager Platform,
11   correct?
12      A.   There's a number of other things you need to
13   do.  I don't -- I don't remember where this falls in the
14   onboarding process.
15      Q.   Okay.  Well, this is just Number 7 in your
16   declaration.
17           And then you say:  To open an account you have
18   to agree to the terms, and the terms are right here on
19   this chart.  So do you know the -- do you know what a
20   clickwrap is, by any chance?
21      A.   No.
22      Q.   Do you know what a brousewrap is?
23      A.   No.
24      Q.   Okay.  So I just want to know, physically by
25   clicking this box, you never have to actually read any
```

```
 1   of the terms and agreements before you sign on and you
 2   agree, correct?
 3        A.   You are saying you did.
 4        Q.   Right.  No.  It's saying by creating an
 5   account you agree to our terms.  It doesn't mean that
 6   you actually went through and read them.
 7             It doesn't require you to go through and read
 8   them, correct?
 9        A.   Yes.
10        Q.   Yes what?
11        A.   That's correct.
12        Q.   Okay.  'Cause there's some agreements, like
13   brousewraps, where you have to actually physically
14   scroll down all the terms and conditions and then click
15   a button.  Here, if you don't want to click that purple
16   "Terms" button, you could just click the box and you'd
17   never have to read the terms and conditions, correct?
18             MR. SADEGHI:  Objection to form.
19             THE WITNESS:  Yes.
20   BY MR. MOSKOWITZ:
21        Q.   Okay.  Going back to where we talked about the
22   Miami 2022 event, I just wanted to clarify one question.
23             You said that Kim -- Pam Kramer was definitely
24   there.  Is her official title chief marketing officer
25   for Digital Ltd?
```

1       A.   This is the information from the system that

2   sent out the email about the update to the agreement.

3       Q.   Okay.  So I just want to be clear based on

4   your sworn testimony before.  You said once Voyager

5   makes a change to their User Agreement, that's binding

6   on all of the customers; regardless of if they've seen

7   it or not, it's their responsibility.

8            Is that why this update for April 16th was

9   sent out on April 18th -- I mean, it was sent two days

10  later -- because these provisions are already bound on

11  all of the customers once they're made by Voyager?

12           MR. SADEGHI:  Objection to form.

13           THE WITNESS:  I'm sorry, could you ask -- I'm

14      not sure what the question was.

15  BY MR. MOSKOWITZ:

16      Q.   Of course.

17           If you look in the right box -- this is the

18  generic email that you sent to -- I mean, we'll get to

19  it -- about a million people on a marketing list.

20           It says "Dear Voyagers, We want to let you

21  know...we recently updated our Customer Agreement as of

22  April 16...  In addition, we encourage you to review our

23  Private [sic] Policy and our Risk Disclosure.  Thank

24  you, as always, for being a loyal...customer."

25           My question is, your testimony was the minute

Page 67

```
 1   they made this update on April 16, it was binding on
 2   Mark Cassidy and all other users regardless if they saw
 3   it or knew it or were told about it, correct?
 4              MR. SADEGHI:  Objection to form.
 5              THE WITNESS:  Yes.
 6   BY MR. MOSKOWITZ:
 7        Q.   Okay.  And that's why it didn't matter --
 8              MR. MOSKOWITZ:  If you go to the left now,
 9        Joey.
10   BY MR. MOSKOWITZ:
11        Q.   Let's go to the left side.  It was sent out,
12   in fact, two days after the amendment was made.  It
13   wasn't sent, like, a month or two months before to say
14   to people, hey, get ready, there may be a major change
15   here.  It was already done because it's already binding
16   on them, right?
17              MR. SADEGHI:  Objection to form.
18              THE WITNESS:  What's the exact question?
19   BY MR. MOSKOWITZ:
20        Q.   Yeah.
21              As of April 18 this email change -- this --
22   this User Agreement change that you made on April 16th
23   was already binding on Mark Cassidy regardless if he got
24   this Marketing Master email or not, according to your
25   testimony all morning?
```

Page 68

```
 1        A.    Yes.
 2        Q.    Okay.  So this document just shows that there
 3   was a mass email -- that we see on the right -- sent to
 4   a Marketing Master 2021.  What is that list?
 5        A.    I understand that to be the list of the
 6   recipients of this email.
 7        Q.    Okay.  But I don't have -- you already
 8   produced the whole thing.  Are these people that are
 9   just under a marketing email for Voyager or are they all
10   customers of Voyager or do you know?
11        A.    I don't know.
12        Q.    So you don't know who comprises this list,
13   whether they're customers or not?
14        A.    No.
15        Q.    Did you discuss this document with your
16   counsel?
17        A.    Yes.
18        Q.    And did you ask any questions that you didn't
19   know?
20        A.    No.
21        Q.    Okay.  So -- so walk me through it.  When it
22   says here Marketing Master 2021, did you ask her, well,
23   who actually got this email?
24              MR. SADEGHI:  Objection to form.
25              THE WITNESS:  We just discussed that
```

Page 69

```
 1        Mr. Cassidy's name was on the list to receive the
 2        email.
 3   BY MR. MOSKOWITZ:
 4        Q.   Okay.  We'll get back to the next exhibit.
 5   But on this exhibit, it shows that it was mailed out to
 6   1 million 279 people 869; is that correct?
 7        A.   Yes.  That's what it says.
 8        Q.   And it took 6 hours to send out this email?
 9             MR. SADEGHI:  Objection to form.
10   BY MR. MOSKOWITZ:
11        Q.   What does "STO Window" mean?
12        A.   I don't know.
13        Q.   Did you ask?
14        A.   No.
15        Q.   Okay.  "Campaign state:  Finished," do you
16   know what that means?
17        A.   No.
18        Q.   "utm_campaign:  None," do you know what that
19   means?
20        A.   I'm sorry, where are you looking?
21        Q.   Sure.  It's three more slots down.
22        A.   No.
23        Q.   Okay.  Where does it say if any of these
24   emails bounced back?  Like, of the million emails, how
25   do you know that all the emails were actually received?
```

Page 70

1    You don't, right?

2        A.   No.

3        Q.   I'm sorry?

4        A.   I don't know.

5        Q.   Okay.  So this information doesn't provide us

6    any information as to whether any of the 1.2 million

7    people actually got this email?

8             MR. SADEGHI:  Objection to form.

9             THE WITNESS:  I don't -- I don't know.

10   BY MR. MOSKOWITZ:

11       Q.   You don't know which -- which way what?

12       A.   Can you ask the question again?

13       Q.   Yeah.

14            Is there anywhere on this document that shows

15   that all 1.2 million people on this marketing list

16   actually received the email?  You know?  You know emails

17   get bounced back, there's no more email address, it gets

18   lost.  There's no record anywhere on this evidence that

19   shows that any of the 1.2 million actually received it?

20       A.   Not when I -- when I look at it, I don't see

21   that information, no.

22       Q.   Okay.  Are you aware of any information,

23   sitting here today as the corporate rep deposition, that

24   anyone received this April 18th mass marketing email

25   that went out?

Page 71

1         A.    Can you repeat that?

2         Q.    Yeah.

3               Sitting here today, as the director of

4    operations and the corporate rep for Voyager Digital

5    LLC, do you have any information or evidence that any of

6    the 1.2 million people under this marketing list that

7    were sent this email ever actually received the email?

8         A.    I do not, no.

9         Q.    Okay.  Now, we looked earlier today about the

10   click agreement.  So when somebody signs up with the

11   account they have to actually click a box so that today

12   if you type in their user number, you can see if they,

13   in fact, clicked the box.

14               Could you have done that for this email as

15   well?  Is there any reason why you couldn't?

16               MR. SADEGHI:  Objection to form.

17               THE WITNESS:  All right.  What's the exact

18        question?

19   BY MR. MOSKOWITZ:

20        Q.    Could you have used the exact same procedure

21   where you send the customer a little box which they have

22   to click which would confirm that they actually -- is

23   there any reason that you -- that Voyager couldn't

24   follow that same procedure?

25        A.    You're -- you're cutting out quite a bit.  Do

```
 1   you --
 2        Q.   Okay.  Let me --
 3        A.   I don't know if anyone else is hearing that.
 4             MR. SADEGHI:  Yes, I -- I am also hearing your
 5        cutout in your audio.
 6             MR. MOSKOWITZ:  Okay.  Let me try to see if
 7        I -- let me see.  I'm trying to just check the
 8        Wi-Fi.  Okay.  Hopefully this will be better.  I'm
 9        on another Wi-Fi.
10   BY MR. MOSKOWITZ:
11        Q.   Okay.  So going back to what we looked at, is
12   there any reason why, to your knowledge, Voyager
13   couldn't send out the same click box that they do when
14   you first initially sign up for each of these eventual
15   amendments?
16        A.   I'm not a technical person, so I don't know a
17   reason, no.
18        Q.   Okay.  Let's go to Exhibit 6 because I think
19   you've referenced that there was a document that shows
20   that his email address was on this marketing master
21   list.
22             MR. MOSKOWITZ:  So let's show that, Joey.
23             (Plaintiff's Exhibit Number 6 was marked for
24        identification.)
25
```

Page 73

```
1    BY MR. MOSKOWITZ:
2         Q.   Are you familiar with what we've marked as
3    Exhibit 6?
4         A.   Yes.
5         Q.   Okay.  Did you help put this together or help
6    search for the information?
7         A.   No.
8         Q.   Okay.  You were just shown the document and
9    the -- and you were informed what it says?
10        A.   Yes.  As part of my preparation for today.
11        Q.   Okay.
12             MR. MOSKOWITZ:  Joey, let's go to the top so
13        we can see the headings of these.
14             MR. KAYE:  (Complies.)
15   BY MR. MOSKOWITZ:
16        Q.   Can you tell me what -- column 1 has a number.
17   Do you know what that number is, 80,237?  Oh, I'm sorry,
18   802,357; is that the number of emails sent out?
19        A.   I would -- I would be guessing.  I don't know
20   what that number is exactly.
21        Q.   Okay.  What's the column here that you
22   created, Event Name?
23        A.   I didn't make this document.  I don't know
24   what that is.
25        Q.   Do you know who made the document?
```

Page 74

1        A.    No.

2        Q.    Okay.  The next column says predict --

3    prediction I.D.  Do you know what that means?

4        A.    No.

5        Q.    Is that Mark Cassidy's I.D. down -- that's

6    highlighted there (indicating)?

7        A.    Some part of it might be.  I don't -- I'm not

8    looking at his I.D., so I don't know.

9        Q.    Okay.  Then it says email.  Is that the only

10   email that you have registered for Mark Cassidy?

11       A.    Mark initially signed up with a typo in his

12   email.  So we have a record, but this is the only

13   account we have with Mark Cassidy.

14       Q.    So if you were going to send an email to Mark

15   Cassidy, that's the account you would send it to?

16       A.    I believe so, yes.

17       Q.    Okay.  But, again, there's nothing on this

18   chart, Exhibit 5 -- Exhibit 6, or Exhibit 5 which shows

19   that Mark Cassidy actually received this email, correct?

20       A.    Not as far as I know.

21       Q.    Okay.  What is Catalog Lookup Count; do you

22   know what that means?

23       A.    No.

24       Q.    Do you know what the next heading, Templated,

25   means?

Page 75

```
 1      A.   No.
 2      Q.   Do you know what Message Bus I.D. --
 3      A.   No.
 4      Q.   Okay.  What about Message I.D.?
 5      A.   No.
 6      Q.   What about Created At?
 7      A.   No.
 8      Q.   You don't know if that's the date and time
 9   that the email was created?
10      A.   I don't know.
11      Q.   You don't know, okay.
12           Campaign I.D., don't know?
13      A.   No, I don't know.
14      Q.   Channel I.D., don't know?
15      A.   I do not know.
16      Q.   Message Typed I.D.?
17      A.   I don't know what that means.
18      Q.   Okay.  So why did you give Exhibit 6, just to
19   show that his email was included in the 1.2 mass mailing
20   list?
21      A.   I don't know -- I didn't -- I don't know the
22   reason for producing that, no.
23      Q.   Well, this is supposedly showing us that he
24   was included in some mass mailing.  But we don't have --
25   what was attached to your declaration.  We don't have
```

Page 76

```
 1   anything that shows what the Marketing Master 2021 is,
 2   do you?
 3       A.   I do not, no.
 4       Q.   So we don't know if Mark Cassidy's email,
 5   sitting here today, was in fact included in the
 6   Marketing Master 2021?
 7       A.   I'm sorry, do you have a question?  Did you
 8   ask a question?
 9       Q.   Oh, yeah, yeah, yeah.  Very clearly.
10            You're the corporate representative today and,
11   I just want to make sure, you have no testimony that
12   Mark Cassidy's email was included, what's marked on
13   Exhibit 5, as the Marketing Master 2021 list?
14       A.   This is the excerpt from that list.
15       Q.   Well, that's what I asked you before.  You
16   said you weren't sure where this came from.
17       A.   Oh, I thought you meant who provided it.
18       Q.   No.
19            How do you know that this is a subset of the
20   Marketing Master 2021 list?
21       A.   I'm relying on internal cou- -- counsel for
22   sharing that with me.
23       Q.   So someone just told you included among the
24   Monitoring [sic] Master 2021 list -- let me show you one
25   page of it.  Somebody told you that?  And this is one
```

Page 77

```
 1   page of it.

 2        A.    I don't know if I would say it like that,

 3   but --

 4        Q.    Tell me how you would say it.  I'm sorry, I

 5   don't want to put words in your mouth.  How would you

 6   explain what you were shown and what were you were told

 7   this represents?

 8        A.    This is an excerpt of the Master Marketing

 9   2021 list that was sent, the email you previously

10   referenced.

11        Q.    Okay.  And when I asked you about the

12   marketing master list, you said you don't know who's on

13   it, you don't know if it's all customers, you don't know

14   who it's comprised of?

15        A.    Correct.

16             (Plaintiff's Exhibit Number 5a was marked for

17             identification.)

18   BY MR. MOSKOWITZ:

19        Q.    Let me show you next what we'll mark as

20   Exhibit 5a just because it's -- it's a little out of

21   order, but I wanted to keep it in our order.  So 5a will

22   just be a one-page email.

23             It's Bates stamped from Voyager,

24   Voyager_001962.  It's a document, Miss Casey, I can

25   represent to you, that was produced by your counsel to
```

```
 1   us.  It was supposedly responsive to our requests about

 2   our client and the Voyager arbitration agreement, and

 3   it's an email from Pam K.  We talked before about Pam K.

 4   Pam Kramer is the chief marketing officer?

 5        A.   Yes.

 6        Q.   Okay.  And this is a summary of the changes to

 7   the Voyager agreement, which is redacted.  You see, we

 8   can't see it, it's black.  And it's from Brian Nistler,

 9   who is an associate counsel who testified in our case a

10   couple days ago.  Do you know who Brian is?

11        A.   Yes.

12        Q.   Okay.  So Pam writes "Also, based on these

13   specific updates--do you think this warrants an email to

14   customers?  This summary is very helpful in that

15   regard."

16             So what we just looked at in the email, the

17   form email that was sent out that you testified about

18   dated April 16th, that didn't provide a summary to any

19   of the customers.  It just said your User Agreement has

20   been updated, correct?

21        A.   Yes.

22        Q.   Do you know why the internal summary that

23   Voyager was aware of isn't provided to the customers of

24   Voyager?

25             MR. SADEGHI:  Objection to form.
```

1            THE WITNESS:  No.

2    BY MR. MOSKOWITZ:

3        Q.    Okay.  As the corporate rep today with -- the

4    person with the most knowledge about the unifor- -- the

5    User Agreements, including any revisions thereto, have

6    you ever spoke to anybody about providing your customers

7    with a summary of the changes?

8        A.    No.

9        Q.    Okay.  In your personal opinion, would it be

10   helpful to provide your customers with a summary of the

11   changes to the Voyager agreement?

12       A.    In my personal opinion?

13       Q.    Yeah.

14       A.    I don't know.  I don't think people -- I don't

15   know what people read on email.  I don't know is the

16   answer.

17       Q.    I mean, would you want to provide that

18   information to them so if they -- if something drastic

19   changed about this arbitration clause they could at

20   least read what it was about?

21            MR. SADEGHI:  Objection to form.

22   BY MR. MOSKOWITZ:

23       Q.    I mean, wouldn't you think that would be

24   helpful if somebody wanted to know?

25       A.    I suppose it could be helpful for some people.

```
 1   BY MR. MOSKOWITZ:
 2        Q.   Okay.  Let me show you what's marked as
 3   Exhibit 7.  It's dated July 26, 2021 and it was produced
 4   by your counsel to us because we asked about
 5   arbitrations that have been brought against Voyager,
 6   and -- and they were very helpful and they gave us this
 7   document from one of the arbitrations that were brought
 8   called Daniel Schaefer versus Digital -- Voyager Digital
 9   LLC.  This letter is dated July 26, 2021.  Did you
10   review this letter before today's testimony?
11        A.   I -- I believe, no.
12             MR. MOSKOWITZ:  Can you make it bigger, Joey,
13        just so Miss Casey can see it?
14             MR. KAYE:  (Complies.)
15   BY MR. MOSKOWITZ:
16        Q.   You didn't go over this document with Ailsa or
17   with your outside counsel?
18        A.   No.
19        Q.   Are you aware of the Schaefer versus Voyager
20   Digital arbitration?
21        A.   I'm aware of two arbitrations.  I don't know
22   the names of them specifically.
23        Q.   Okay.  What happened to those arbitrations?
24        A.   Oh.  One I know we won, and one I know the
25   user didn't provide the correct documents to -- for the
```

Page 82

1    arbitration, and I believe it was closed.

2        Q.   Okay.  The one that you won, what do you mean,

3    like, you won?  I mean, did you have the arbitration

4    hearing?  Did you personally play any role in that

5    arbitration?

6        A.   No.

7        Q.   Okay.  Were you asked to get any documents and

8    materials regarding the plaintiff?

9        A.   I don't know.

10       Q.   So how do you know that there was these two

11   arbitrations and one of them you won?

12       A.   As part of the preparation for today.

13       Q.   Okay.  And as part of the preparation, the one

14   that you won, did it actually go through the arbitration

15   and there was an award by the arbitrators?

16       A.   I don't know.

17       Q.   Okay.  This letter on July 26th from the AAA

18   to Voyager Digital LLC says that the arbitration

19   provision that existed as of July 26, 2021 "has a

20   material or substantial deviation from the Consumer

21   Rules and/or Protocol.  Specifically, the provision

22   states:  THE ARBITRATION WILL OCCUR IN NEW JERSEY AND

23   WILL BE CONDUCTED CONFIDENTIALLY BY A SINGLE NEUTRAL

24   ARBITRATOR."  Were you aware of that?

25       A.   Was I aware of what?

Page 83

1      Q.   That the AAA said that Voyager's existing

2  arbitration agreement did not comply with the Consumer

3  Rules and Protocols of the AAA.

4           MR. SADEGHI:  Objection to form.

5  BY MR. MOSKOWITZ:

6      Q.   What it says right here on the page.  You

7  can --

8      A.   I --

9      Q.   -- read it, Miss Casey.  I'm sorry.

10     A.   I did know that they said it -- it didn't have

11  to occur in New Jersey.  That's the extent.

12     Q.   Okay.  Well, it says here your arbitration

13  provision does require that it will occur in New Jersey

14  and then that it does require it's going to be conducted

15  confidentially.  Do you see that?

16     A.   Yes.

17           MR. SADEGHI:  Objection to form.

18  BY MR. MOSKOWITZ:

19     Q.   And do you see where it says "The abi-" --

20  "The above provision violates Principle 7:  Reasonably

21  Located [sic] Location," right?

22     A.   I'm sorry, where are you?

23     Q.   The bottom -- the bottom paragraph.

24     A.   It does say that.

25     Q.   Did you discuss with anybody that your -- that

Page 84

1  your existing arbitration agreement violated the AAA's

2  regulations?

3              MR. SADEGHI:  Objection to form.

4              THE WITNESS:  I just knew this and that this

5        one took place over Zoom.

6  BY MR. MOSKOWITZ:

7        Q.   I'm sorry, you just knew this; what does that

8  mean?

9        A.   That the setting -- the arbitration occurring

10  in New Jersey was not -- wasn't -- not part of their

11  rules, so it had to be changed.

12       Q.   So you had to change the Voyager Standard

13  Agreement at that time?

14       A.   I don't know.

15       Q.   Well, that's what you just said.  So how do

16  you know that?

17       A.   I don't know the results.  I don't know what

18  the res- -- the result of this would be.

19       Q.   You knew that at least this arbitration had to

20  take place by Zoom and not in person in New Jersey?

21              MR. SADEGHI:  Objection to form.

22              THE WITNESS:  I don't know why it took place

23        in New Jer- -- in -- by Zoom.

24  BY MR. MOSKOWITZ:

25       Q.   Okay.  Well, reading this, it says "The above

Page 85

1    provision violates Principle 7:  Reasonably Convenient

2    Location."  So were you aware of that, sitting here

3    today?

4         A.   Aware of what?

5         Q.   That the Voyager standard arbitration

6    provision as of this date, June 26, 2021, violated the

7    AAA's regulations.

8         A.   I just knew it was changed.

9         Q.   What do you mean by changed?

10        A.   The -- that the arbitration agreement was

11   changed.

12        Q.   By who?

13        A.   The legal team.

14        Q.   And how was it changed?

15        A.   What do you mean how?

16        Q.   You said that it was by Zoom so they didn't

17   have to go to New Jersey, but how else was it changed?

18        A.   I don't know specifics.

19        Q.   Do you know if it was conducted confidentially

20   before a single neutral arbitrator?

21        A.   I don't know.

22        Q.   Well, you're here as the person with the most

23   knowledge about the Voyager Platform User Agreement

24   including revisions thereto.  Is there somebody that

25   would have more knowledge than you about how this

1    agreement was changed?

2         A.    The legal team.

3              MR. SADEGHI:   Objection, form.

4    BY MR. MOSKOWITZ:

5         Q.    I'm sorry?

6         A.    The legal team.

7         Q.    But you're the one who's the corporate

8    representative today.  I can't ask Kayvan.  I can't put

9    him under oath and ask him questions.  You've been

10   designated by the company to answer my questions.  So

11   I'm trying to figure out as much as I can because you're

12   supposed to be prepared today on all of the revisions.

13             So if there's only one arbitration that ever

14   existed and that changed, can you -- can you help me out

15   a little bit and kind of tell me a little bit how you

16   know it was changed?  Did you watch the arbitration?

17   Did you physically see that it was changed?

18             MR. SADEGHI:   Objection to form.

19             THE WITNESS:   I know that reviewing in

20        preparation for today the various User Agreements,

21        that that was changed over the course of time.

22   BY MR. MOSKOWITZ:

23        Q.    So the agreement was chain -- I got you.

24             So the agreement was changed for everybody

25   over time so that the arbitration did not have to occur

Page 87

```
 1    in New Jersey and did not have to be conducted
 2    confidentially by a single neutral arbitrator in
 3    subsequent versions of the Standard User Agreement?
 4              MR. SADEGHI:  Objection to form.
 5              THE WITNESS:  I don't know the exact changes.
 6    BY MR. MOSKOWITZ:
 7        Q.   Okay.  Well, try the best that you can as the
 8    corporate representative.  The standard triple -- the
 9    standard Voyager Arbitration Agreement at this stage
10    required you to arbitrate in New Jersey and required it
11    to be conducted confidentially by a single neutral
12    arbitrator.
13              Please tell us under oath what you believe any
14    of the revisions were subsequent.
15              MR. SADEGHI:  Objection to form.  You're
16         asking her to testify from memory for the content
17         of the specific agreements that you -- you have.  I
18         mean, that --
19              MR. MOSKOWITZ:  No.  I mean, she -- she a) was
20         identified in the initial disclosures as having
21         personal knowledge of the Voyager Platform User
22         Agreement and all revisions thereto; and then we're
23         here today and she's the corporate rep on the
24         arbitration agreement and how it was ever changed.
25              So I'm just asking her.  She says I know it
```

Page 88

```
 1       was changed at some point.  So I just want a little
 2       clarity on how it was changed and when.
 3  BY MR. MOSKOWITZ:
 4       Q.   Miss Casey?
 5       A.   I mean, I would have to look at them side by
 6  side to see the changes.  I don't have them memorized.
 7       Q.   Okay.  But at least as to these two, without
 8  belaboring the point, you said the Voyager agreement did
 9  change, specifically it no longer required it to be in
10  New Jersey and it no longer required it to be under
11  confidentiality by a single new -- neutral arbitrator.
12  You know those two changes --
13            MR. SADEGHI:  Form.
14            MR. MOSKOWITZ:  Let me just finish the
15       question.
16  BY MR. MOSKOWITZ:
17       Q.   -- you just -- you just may not know other
18  changes?
19            MR. SADEGHI:  Objection to form.  Misstates
20       the testimony.
21            THE WITNESS:  I know the New Jersey change.  I
22       do not know about the other change.
23  BY MR. MOSKOWITZ:
24       Q.   Okay.  And you say the New Jersey change.  I
25  just want to be clear on the record, what is the
```

Page 89

1    New Jersey change?

2        A.    That the arbitration must occur in New Jersey

3    and now that has been -- that's not part of it.

4        Q.    Okay.  And what about -- you don't have any

5    knowledge on this second part, that it "will be

6    conducted confidentially," or today the arbitration is

7    required to be held confidentially?

8        A.    No.

9        Q.    No, I don't know, or, no, they're not --

10   they're not required to be kept confidentially?

11       A.    I have to look at the -- if it changed in

12   the -- the wording of the two agreements.  I don't know.

13       Q.    Okay.  Let's look at the second page of this

14   letter.  In order for this to go forward, the AAA says,

15   we're requiring you to waive the above provisions

16   because we will not enforce the agreement as is.

17            This is what we've been provided.  So do you

18   have any other form of this where it was actually signed

19   and dated?

20       A.    When you say -- I -- I don't personally, no.

21       Q.    Well, we don't.  So how else would we know --

22   I mean, do you know if we were prodi- -- provided with

23   all of the relevant documents?  Did you see one that was

24   actually signed by the company?

25       A.    I didn't see this document.

Page 94

1   pay their own arbitration fees and costs; do you know if

2   your User Agreement required Mr. Cassidy to pay for the

3   arbitration costs and fees?

4          A.   I don't remember.

5               (Plaintiff's Exhibit Number 8 was marked for

6          identification.)

7   BY MR. MOSKOWITZ:

8          Q.   Okay.  Let's now go to Exhibit 8, which is a

9   Declaration of Mark Cassidy.

10              Okay.  Miss Casey, I'll show you what's a

11  declaration, which is a sworn statement, that was

12  provided by Mark Cassidy in this case about certain

13  actions he took and about his arbitration agreement and

14  emails.

15              Did you review this four-page document to

16  prepare for your deposition?

17         A.   No.

18         Q.   Have you ever seen it before?

19         A.   I don't -- I don't know.  I don't think so.

20         Q.   Okay.  Let's look on page 1.

21              MR. MOSKOWITZ:  Joey, go up.

22              MR. KAYE:  (Complies.)

23  BY MR. MOSKOWITZ:

24         Q.   Mr. Cassidy says that he only has --

25              MR. MOSKOWITZ:  Go a little higher.

Page 95

1          MR. KAYE:  (Complies.)

2   BY MR. MOSKOWITZ:

3      Q.   -- "I only have one email account associated

4   with my Voyager account.  Since opening my Voyager

5   account through February 15th, 2022, I have received the

6   following emails from no-reply@investvoyager.com to that

7   email account."

8          Are you aware of any other email account that

9   Mark Cassidy may have had with Voyager?

10     A.   No.

11     Q.   Okay.  Then Mark Cassidy actually lists and

12  discloses all of the emails that he received from

13  Voyager during that time frame.

14         Do you have any knowledge, sitting here today

15  as the corporate representative, that Mr. Cassidy

16  received any other emailS that are physically in his

17  mailbox under his sworn affidavit?

18         MR. SADEGHI:  Objection to form.

19         THE WITNESS:  No.  I wouldn't be able to know

20     that.

21  BY MR. MOSKOWITZ:

22     Q.   Okay.  And if the email that you showed us

23  before from the mass mailing, if that never arrived in

24  his email box, you don't have any testimony here today,

25  as the corporate rep of Voyager, to say that it did in

Page 96

```
 1   fact arrive at Mark Cassidy, correct?
 2        A.   I'm sorry, can you rephrase that?
 3        Q.   Yeah.
 4        A.   I'm not sure I understand.
 5        Q.   Mark Cassidy swears under oath that here
 6   physically are copies of every email that he was sent by
 7   Voyager.
 8             My question to you is, do you have any
 9   evidence, as the corporate rep, to contradict
10   Mr. Cassidy's testimony that these specific emails are
11   the only ones he received from Voyager?
12        A.   Well, I know that the -- we have provided that
13   the list of the updates from the marketing list went out
14   on the April customer agreement update.
15        Q.   Right.  And we got that testimony that you
16   sent out the 1.2 emails.  But you had said you have no
17   evidence at all that those emails were actually received
18   from the consumers.
19             So my question to you is, Mark Cassidy is
20   saying under oath here is a set of every email I ever
21   received from Voyager, that email from -- from
22   April 18th was never sent to me.
23             Do you have any contrary evidence to say that
24   he did receive the email?
25             MR. SADEGHI:  Objection to form.
```

1          THE WITNESS:  No.  But I also don't know that

2       he didn't.  I don't know what he looked at.

3    BY MR. MOSKOWITZ:

4       Q.   Well, okay.  Look at paragraph 8.  This is a

5    sworn statement that he made.

6            "I reviewed the Declaration of Shannon Casey

7    in support of Defendants' Motion to Compel Arbitration."

8            That's you, right?  Right, Miss Casey?

9       A.   Yes.

10      Q.   "I did not receive the April 18, 2021, email

11   notifying of the" previous "April 16th...update to the

12   User [sic] Agreement."

13           So, you see, he's saying under oath he never

14   received it.  You don't have any evidence anywhere that

15   contradicts that statement that he actually received it,

16   correct?

17      A.   Can you restate that?

18      Q.   He says under oath he reviewed your

19   declaration in support of the motion and he said "I did

20   not receive the April 18th...email notifying of the

21   April 16th...update to the Customer Agreement," that you

22   had testified went out to this mass mailing of 1.2

23   million.

24           My question is very simple.  Do you have any

25   shred of evidence, anything, to indicate that he is

Page 98

```
 1   wrong and that he did receive that email, not that the

 2   mass marketing email went out, but that he, in fact,

 3   received it?

 4             MR. SADEGHI:  Objection to form.

 5             THE WITNESS:  I -- I personally do not, no.

 6   BY MR. MOSKOWITZ:

 7        Q.   Okay.  And then it concludes "It was not

 8   marked as SPAM or delivered to a SPAM folder, nor was it

 9   in the trash folder."

10             You have no personal knowledge, as the

11   corporate representative, that maybe that email went

12   into his spam folder or was delivered into any other

13   trash folder, do you?

14        A.   No, I do not.

15        Q.   Okay.  Number 9, he says "I did not receive

16   any email, notification, or any other form of actual

17   notice of any...other versions of the Customer Agreement

18   referenced in Shannon Casey's declaration."

19             You have no evidence, standing here today,

20   that he did, in fact, receive any of those other

21   notices, correct?

22        A.   What other notices?

23        Q.   Any other notices.

24        A.   I'm just not sure what you're referring to.

25        Q.   Mr. Cassidy says:  I didn't receive any
```

Page 99

1  emails, any notifications, or any other form of actual

2  notice of any other versions of the Customer Agreement

3  referred to in Shannon Casey's declaration.

4          You talked about six different modifications

5  that were done over time.  Mr. Cassidy under oath is

6  saying I never received any of those.

7          Do you, sitting here today, have any evidence

8  to show that Mr. Cassidy received any of these other

9  updates or emails?

10     A.   No.  We only sent the update on the April 18th

11  email.

12     Q.   Okay.

13     A.   The others would have been available on our

14  website and in the -- in the app.

15     Q.   Oh.  So only one mass marketing email was

16  sent, but for all those other updates you didn't send an

17  email?

18     A.   Not to my knowledge.

19     Q.   Okay.  And then for that email -- I'm sorry

20  for being repetitive, but we've really got to nail this

21  down.

22          For that April 18th email, there is no

23  evidence that Voyager has that Mr. Cassidy actually

24  received the email?

25     A.   I don't know.  I do not have that.

```
                                                    Page 100

 1              (Plaintiff's Exhibit Number 9 was marked for

 2         identification.)

 3   BY MR. MOSKOWITZ:

 4         Q.   Okay.  Let's go now to Exhibit 9.  This is

 5   Mr. Cassidy's Declaration in Support of a Motion for an

 6   Order to Show Cause.  It's three pages long.  It's dated

 7   February 9th, 2022.

 8              Before this deposition, Miss Casey, did you

 9   have a chance to read this three-page declaration?

10         A.   No.

11         Q.   Were you aware, sitting here today, that

12   Mr. Cassidy said that he was locked out of his Voyager

13   account after he filed the lawsuit?

14         A.   I know he said that, yes.

15         Q.   Okay.  How do you know he said that?  You say

16   you didn't read this declaration.  But you were just

17   told that?

18         A.   Yes.  You're very far away.

19         Q.   Okay.  Can you hear me now?

20         A.   Yes.

21         Q.   Okay.  Paragraph 7 says "On January 31st...I

22   attempted to log in to the Voyager account to obtain

23   information regarding my account activity for this

24   lawsuit, but my account was inaccessible."

25              Do you have any belief -- any knowledge or
```

Page 101

1    evidence that his account was not inaccessible?

2         A.   I'm sorry, can you repeat the question?

3         Q.   Sure.

4              He says in paragraph 7 under oath that he

5    attempted to log in to his account but his account was

6    inaccessible to him.

7              Do you have any evidence or proof to say that

8    it was working perfectly on January 31th [sic], 2022?

9    Did you go back and check any of these allegations?

10        A.   In reviewing his account, there is no reason

11   that it would have been inaccessible to him.

12        Q.   What do you mean by in reviewing his account?

13   What did you do?

14        A.   I looked in our account management system --

15        Q.   Uh-huh.

16        A.   -- and looked at the activity on the -- on the

17   account, and there was nothing to suggest that he would

18   not be able to get in his account.

19        Q.   Okay.  Paragraph 8 says "I submitted a 'forgot

20   my password' request, received a link, and reset my

21   password.  Upon attempting to log in to my account with

22   my new password, I received notification that now my

23   email was invalid...or not associated with a Voyager

24   account."

25              That should be in your records, correct, if

Page 102

```
1   that was sent out to him?  Like what you just said, you
2   checked his user account, and it would show any activity
3   in his account?
4       A.   It would show activity and changes on his
5   account.
6       Q.   Would it show a notification that went to him
7   that said his email was invalid and/or not associated
8   with a Voyager account?
9       A.   Not if he put in the proper email address.
10      Q.   And you're saying his email password has never
11  changed?
12           MR. SADEGHI:  Objection to form.
13           THE WITNESS:  I don't know.  I didn't look at
14       that.
15  BY MR. MOSKOWITZ:
16      Q.   Okay.  Paragraph 10 says after he -- users
17  apparently can't contact Defendants by phone regarding
18  the questions of their account.
19           Is that correct?  Is there a number that I can
20  call and say, hey, I'm having a problem logging in to my
21  account, can you help me, Voyager LLC?
22      A.   That's correct, there's -- we do not have
23  phone support.
24      Q.   Okay.  So the only available number he found
25  is for Investor Relations.  He placed several calls and
```

Page 103

1    left at least one email -- voicemail to the Investor

2    Relations to get an answer regarding the apparent

3    deactivation of his account.

4            Were you aware of that recorded call?

5        A.   I know he called the Investor Relations, yes.

6        Q.   And did you listen to that voicemail that was

7    provided to us where he says I've tried to log in, that

8    I submitted my forgot password, that I received a

9    notification that said my email wasn't valid; you heard

10   that, correct?

11       A.   No.

12       Q.   What did you hear?

13       A.   I'm sorry?

14       Q.   What did you hear?  You said you know that he

15   left a message with Investor Relations.  Did they play

16   you the message?

17       A.   No.

18            MR. SADEGHI:  Objection, form.

19   BY MR. MOSKOWITZ:

20       Q.   Then how do you know he left a message?

21       A.   I recall seeing an email.

22       Q.   And why did nobody call him back?

23            MR. SADEGHI:  Objection to form.

24            THE WITNESS:  We don't have phone support.

25

Page 104

1  BY MR. MOSKOWITZ:

2      Q.   What does that mean?  If I can't get into my

3  account and I leave a message for Investor Relations,

4  what is your procedure for Investor Relations to follow

5  up with those calls?

6           MR. SADEGHI:  Objection to form.

7           THE WITNESS:  They do not follow up with those

8      calls.

9  BY MR. MOSKOWITZ:

10     Q.   Who follows up with those calls?

11     A.   They send them to the service team, and the

12  service team will send an email, hopefully.

13     Q.   To who?

14     A.   To the person who called or --

15     Q.   But in this case -- in this case you've looked

16  and you've -- you see that no service team member ever

17  got back to Mr. Cassidy, correct?

18           MR. SADEGHI:  Objection to form.

19           THE WITNESS:  I -- I don't recall.

20  BY MR. MOSKOWITZ:

21     Q.   Were you able to find a shred of evidence -- a

22  telephone call, an email, anything -- that shows that

23  you followed up with Mr. Cassidy?

24     A.   I don't know.

25     Q.   What do you mean you don't -- I mean, it's

Page 105

1   either yes or no.

2            Have you found any evidence, as the corporate

3   representative of Voyager, where you followed up on this

4   voicemail that you certainly received because we have a

5   copy of it, that you've produced?

6            You said:  Hopefully our service team followed

7   up with him.

8            Were you able to find any evidence that the

9   service team followed up with him?

10           MR. SADEGHI:  Objection to form.

11           THE WITNESS:  I don't -- I don't know.  I

12       didn't look for that.

13  BY MR. MOSKOWITZ:

14       Q.   You didn't find any, correct?

15       A.   I didn't look for it.

16       Q.   Well, your job here was to gather all the

17  documents regarding Mr. Cassidy and his dealings with

18  Voyager.  And he left a message on the machine of

19  Investor Relations.  You said that hopefully someone

20  from our service team got back to him.

21           You're not aware, sitting here today, of any

22  evidence -- he says they didn't.

23           You're not aware of any contrary evidence that

24  anybody got back to him, correct?

25           MR. SADEGHI:  Objection to form.

1           THE WITNESS:  I'm not personally aware, no.

2     BY MR. MOSKOWITZ:

3       Q.   Okay.  It says:  My other avenue to contact

4     Voyager was from a written request on a form to the

5     website Zendesk.

6       A.   Zendesk is a service platform, a third-party

7     platform, that we use.

8       Q.   And when you say "we use," is that agreement

9     between Voyager LLC or Voyager Ltd?

10      A.   Voyager LLC.

11      Q.   Okay.  So Voyager LLC has a contract with

12    Zendesk, and what's the purpose of it?

13      A.   Provide a service (audio cuts out) --

14      Q.   Okay.  Is --

15           THE REPORTER:  This is the reporter.  Excuse

16      me.  Your answer cut out, if you could please

17      repeat it.

18           THE WITNESS:  What was the last thing you

19      heard?  Hello?

20           THE REPORTER:  "Provide a service" was the

21      last thing I heard.

22           THE WITNESS:  Oh.  They provide a customer

23      support platform to manage customer support

24      inquiries.

25

1   BY MR. MOSKOWITZ:

2        Q.   Okay.  So Mark Cassidy testifies under oath

3   that on February 1st at 8:04 a.m. he received an email

4   response from Zendesk just sending him a link to

5   "tax/transaction report request form," but he was given

6   no explanation about the status of his account.

7             Do you have any other information or knowledge

8   that Zendesk provided him with any other information?

9        A.   No.

10       Q.   And do you know why, sitting here today, he

11  was never called back by anybody at Voyager to be given

12  any explanation?

13       A.   There is no -- there's nothing in his account

14  that would indicate that he's not able to get in.

15       Q.   Even though he's saying in his voicemail I

16  can't get in?

17       A.   Yes.

18       Q.   Okay.

19            MR. MOSKOWITZ:  Why don't we go another 15

20       minutes, is that good, and then we'll take a lunch

21       break?  Or, Miss Casey, would you like a break now?

22            THE WITNESS:  Could somebody tell me what time

23       it is?

24            MR. MOSKOWITZ:  12:30.

25            THE WITNESS:  Fif- -- another 15 minutes is

Page 138

1           MR. SADEGHI:  But you can answer in your

2       personal capacity to the extent you know.

3           THE WITNESS:  To the extent I know, they --

4       they would not be different from any of the other

5       accounts.

6   BY MR. MOSKOWITZ:

7       Q.   Okay.  Thank you.

8           (Plaintiff's Exhibit Number 14 was marked for

9       identification.)

10  BY MR. MOSKOWITZ:

11      Q.   Let me show -- now show you what we have as

12  Exhibit 14.  And we have two emails that were produced

13  to us from Voyager.  We'll start with the first one.

14          MR. MOSKOWITZ:  If you could focus in on the

15      top, Joey.

16  BY MR. MOSKOWITZ:

17      Q.   It's an email from Dave Brosgol to Janice

18  Barrilleaux dated March 5th, 2021.  I understand that

19  Janice Barrilleaux -- is she now the chief

20  administrative officer of Voyager Ltd?

21      A.   I don't know.

22      Q.   Do you know what her -- her position is?

23      A.   She's the chief administrative officer, I

24  know, of LCC -- LLC.  Sorry.

25      Q.   But you don't know if she's also the chief

1    administrative officer of Ltd?

2         A.   I don't know.

3         Q.   Okay.  Do you know at the time in 2021, when

4    this was written, she was the chief compliance and

5    customer officer?  Did you hear that?

6         A.   I'm sorry.  No, I didn't hear that.  Can you

7    repeat that?

8         Q.   Yeah.

9              At the time, back in 2021, she was the chief

10   compliance and customer officer; does that sound

11   accurate?

12        A.   That sounds accurate.

13        Q.   Okay.  So David is writing an email to Janice,

14   and he said "Hi Janice, Thank you for sending me the

15   current User Agreement and the redline for the January

16   changes.  I have reviewed and will be working with

17   Lowenstein to update."  Who is Lowenstein?

18        A.   I don't know.

19        Q.   You have no idea?

20        A.   I know -- I know personally they're -- I

21   believe they're a law firm.

22        Q.   Lowenstein is the name of a law firm?

23        A.   That's part of the name of a law firm, yes.

24        Q.   Okay.  So he's going to be working with the

25   law firm to update it.

1                "Having discussed it with Ethan..."

2                Do you know who Ethan is?

3        A.   No.

4        Q.   Do you have a guess?  Who would Ethan be?

5        A.   I don't know.

6        Q.   "Having discussed it with Ethan, it seems that

7    it might be best to do a significant overhaul."

8                Are you aware that there was done a

9    significant overhaul over the User Agreement?

10       A.   I know there was an up -- there were updates

11   done to the agreement, yes.

12       Q.   And when was that, around this time frame of

13   March 2021?

14       A.   I don't remember.

15       Q.   And when was that one email sent out that we

16   looked at before, April 18th?

17       A.   Yes.

18       Q.   Okay.  And you said there's no other emails

19   that have ever been sent out to any other Voyager

20   customer except the April 18th email, correct?

21       A.   I don't know about ever, but I know in the

22   time period that we are looking at here.

23       Q.   Okay.  And that one email said there's been

24   changes made to the User Agreement, but I think you

25   admitted earlier it doesn't give a summary or any

Page 141

 1   information about the change.  It just says there's --
 2   there's been changes made, correct?
 3               MR. SADEGHI:  Objection to form.
 4               THE WITNESS:  Yes, the email said there were
 5          changes made.
 6   BY MR. MOSKOWITZ:
 7        Q.   Okay.  It says "That said, I know you are the
 8   person with the most knowledge of the Voyager specific
 9   issues that need to be considered and reflected so Ethan
10   and I would love to get your input and help."
11               Did you know that Janice is the person with
12   the most knowledge about the Voyager-specific issues
13   that were revised in the User Agreement?
14               MR. SADEGHI:  Objection to form.
15               THE WITNESS:  No, I didn't.
16   BY MR. MOSKOWITZ:
17        Q.   You didn't.
18               "I'd like to schedule some time to sync up and
19   discuss the issue/process."
20               Did you have personal involvement in the
21   significant overhaul of the User Agreement?
22        A.   Yes.
23        Q.   What did you do?  What was your personal role?
24        A.   My personal role was to look at anything that
25   would require customer service or any customer service

Page 144

```
1        find out some of that information, then I may have
2        one more question, but that's it.
3             THE VIDEOGRAPHER:  All right, Mr. Moskowitz.
4             The time now is 2:01 p.m. and we are now off
5        the video record.
6             (Brief break.)
7             THE VIDEOGRAPHER:  This is Media Unit 2.  The
8        time is 2:15 p.m. and we are now on the video
9        record.
10            MR. MOSKOWITZ:  Thank you.
11  BY MR. MOSKOWITZ:
12       Q.   Miss Casey, before we took the break we had
13  some questions about the Voyager Digital office in
14  Florida.  Were you able to obtain any information about
15  that office?
16       A.   Voyager does not have an office in Florida.
17       Q.   Okay.  So what is located at 1201 Hays Street,
18  Tallahassee, Florida?
19       A.   That's a corporate agent office to receive
20  service.
21       Q.   It's Voyager's corporate agent or is it a
22  separate company?
23       A.   It's a separate company.
24       Q.   Separate company, okay.
25            Okay.  I just have one last question.  I want
```

Page 145

```
 1   to try to figure out if there's an official policy or

 2   not.  We talked about the User Agreement, and there's no

 3   dispute that your testimony is Voyager can unilaterally

 4   change anything; number two, you don't have to inform

 5   the users about it; number three, there's one email that

 6   was sent out after one of the changes but it wasn't

 7   necessary; and then you said, if I'm a customer and I

 8   happen to read the change, I could -- now this is what I

 9   want to get clear -- I could call and complain, or what

10   can I do if I now realize there's a provision I don't

11   like?  Is there some guideline I can follow, some

12   written official procedure of Voyager?

13             MR. SADEGHI:  Objection, form.  Misstates

14        prior testimony.

15             MR. MOSKOWITZ:  Okay.

16             THE WITNESS:  Would you repeat the question?

17             MR. MOSKOWITZ:  Yeah.

18   BY MR. MOSKOWITZ:

19        Q.   I have all of the Voyager User Agreements

20   here.  I have almost every one.  Is there somewhere in

21   there that you can point to me -- because you said

22   Voyager can unilaterally make any changes they want and

23   that they don't have to send emails out, in this case

24   they just sent one out after the changes were made but

25   they didn't have to.
```

1          Then I asked you what if I objected to a

2    change that was made, and your testimony earlier today

3    was a customer would call and -- you used the word

4    "complain," and I just didn't understand what that was.

5          Is there somewhere in the user manual which

6    actually tells the consumer that they have a right to

7    follow some standard procedure or are you -- are you

8    just, you know, making this up, like, just from what you

9    remember or is there an actual provision for customers

10   to appeal a provision?

11          MR. SADEGHI:  Objection to form.

12          THE WITNESS:  The customer, when they click

13       the -- when they agree to the terms, agree that

14       they'll keep themselves aware of the changes of the

15       terms by referring to them again, as I said before.

16          And, to answer your question, I -- I recall

17       seeing that in preparation in the User Agreement

18       but I don't remember exactly where.  I'd have to

19       look --

20   BY MR. MOSKOWITZ:

21       Q.   See --

22       A.   -- at it again.

23       Q.   Seeing what in the User Agreement?

24       A.   That you can contact Voyager LLC if you had a

25   disagreement with the User Agreement.

Page 147

1     Q.    And how do you contact them?  Because we -- we

2  saw from Mark Cassidy -- you told me that there's no way

3  to call a number, we don't have a customer service

4  hotline.

5     A.    There are -- there's an email address in the

6  customer -- in the agreement, in the terms.

7     Q.    So you're saying the form says somewhere in

8  the form if I disagree with a provision I could email

9  Voyager to what, consider taking it out for me or taking

10 it out for everybody?

11         MR. SADEGHI:  Objection to form.

12         THE WITNESS:  I don't recall what it says

13     exactly.

14 BY MR. MOSKOWITZ:

15     Q.    What do you think it says?

16     A.    I don't -- I don't remember.  I just -- I

17 don't remember.

18     Q.    But it says something about you can send an

19 email in if you want.

20         Are you aware, sitting here today as the

21 corporate rep deposition -- deponent, has anyone ever

22 sent in an email questioning a specific provision of the

23 User Agreement?

24     A.    Not that I'm aware.

25     Q.    And are you aware of any changes that were

```
                                                   Page 148
 1    ever made as a result of any emails?
 2         A.   Not that I'm aware.
 3              MR. MOSKOWITZ:  Okay.  I don't have any
 4         further questions at this time.
 5              MR. SADEGHI:  Sure.  Just a couple questions
 6         from -- from me and then we can wrap things up.
 7                     CROSS EXAMINATION
 8    BY MR. SADEGHI:
 9         Q.   You -- you mentioned you wanted to clarify one
10    thing after the lunch break.  What was that?
11         A.   I --
12              MR. MOSKOWITZ:  Objection to form.  I'm sorry.
13         Objection to form.
14    BY MR. SADEGHI:
15         Q.   What would you like to clarify?
16              MR. MOSKOWITZ:  You can answer.
17              THE WITNESS:  I want to clarify that the
18         rewards are paid out by Voyager Digital LLC.
19    BY MR. SADEGHI:
20         Q.   And you were asked some questions earlier
21    about 2022 revenue.  Did you review any information
22    concerning 2022 revenue in connection with preparation
23    for this deposition?
24         A.   Yes.
25         Q.   And what -- what can you tell us about 2022
```

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.: 21-24441-CIV-ALTONAGA/Torres**

MARK CASSIDY, on behalf of himself
and others similarly situated,

Plaintiff,

v.

VOYAGER    DIGITAL    LTD.,    and
VOYAGER DIGITAL LLC

Defendants.

_____/

**<u>DECLARATION OF SHANNON CASEY</u>**

I, Shannon Casey, declare that:

1.      I am employed by Voyager Digital LLC ("Voyager LLC") as a Director of Operations.  I have served in that role since February 2021. As part of my responsibilities, I am familiar with Voyager LLC's records with respect to the Voyager LLC User Agreement and communications with customers with respect thereto.

2.      I am also familiar with the lawsuit filed against Voyager Digital Ltd ("Voyager Ltd") and Voyager LLC by Mark Cassidy. I submit this declaration in support of the Motion to Compel Arbitration and to Dismiss to be filed on behalf of Voyager LLC and Voyager Ltd.

3.      This declaration is based upon my personal knowledge, including knowledge gained through my review of company records and confirmed with other experienced Voyager employees, and I would testify to the following facts if called as a witness in a court of law. I am also familiar with Voyager LLC's business practices, and understand the records referenced herein to have been created and maintained in the course of Voyager LLC's regularly conducted activity.



EXHIBIT

Plf's Exhibit 4

4.      Voyager LLC operates the Voyager Platform accessible through Voyager's mobile phone application and website.

5.      Voyager Ltd is a foreign holding company parent of Voyager LLC with no operations or employees.  Voyager Ltd does not operate or market the Voyager Platform.

6.      Users of the Voyager Platform must agree to Voyager LLC's User Agreement to access and use the Voyager Platform.  Voyager LLC publishes its User Agreement through its App and on its website. Voyager LLC's User Agreement can be viewed on the company's website via a hyperlink on the website's landing page (https://www.investvoyager.com/), which directs the user to the User Agreement at https://www.investvoyager.com/useragreement/.

7.      Voyager LLC also directs users to its User Agreement via a bold, purple hyperlink as part of the account opening process in its App, as shown below:



2

8.      To open an account and use the Voyager Platform, each user is required to first check the box confirming that "By creating an account, you agree to our **Terms**."  No user would have been able to proceed with opening a Voyager account without first checking the box confirming their agreement to the terms of the User Agreement.

9.      Clicking on the word "Terms" on the account opening screen takes the user to the version of Voyager's User Agreement that is in place at the time the user clicks on the link. When Plaintiff signed up for a Voyager account on March 17, 2021, the "Terms" link directed the user to the Voyager User Agreement last revised January 2021.

10.      Voyager LLC's records confirm that Mr. Cassidy did check the box confirming his agreement to the User Agreement when he opened his account on March 17, 2021.

11.      Voyager LLC assigns a unique user_id to each user, and keeps records of user's account registration, including the time of registration and that the user manifested assent to the User Agreement. I have reviewed records reflecting Mr. Cassidy's unique user_id.

12.      Voyager's user registration records, maintained in the ordinary course of business, reflect that Mr. Cassidy registered for an account through the App on March 17, 2021 at 4:28 pm U.T.C.  An excerpt of that record appears in Voyager's internal database as follows:

| user_id | created_at | did_agree | agreement_text |
|---------|------------|-----------|----------------|
| [Mr. Cassidy's user_id redacted for privacy] | 2021-03-17 16:28:55.159006… | TRUE | By creating an account, you agree to our Terms |

The "did_agree" field in the database reflected in the above image is set to true when the user clicks "Continue" after having checked the box confirming that "By creating an account, you agree to our Terms."

13.      Voyager LLC's records also indicate that all of Mr. Cassidy's transactions on the App took place between March 18, 2021 and August 17, 2021.

14.     From March 18, 2021 to present, Voyager LLC has updated its User Agreement multiple times.  I have attached as exhibits to this declaration each version of the User Agreement in place during that time period.

15.     Attached as **Exhibit A** is a true and correct copy of the User Agreement as revised in January 2021, which remained in place until April 16, 2021.

16.     Attached as **Exhibit B** is a true and correct copy of the User Agreement as revised on April 16, 2021, which remained in place until August 20, 2021.

17.     Attached as **Exhibit C** is a true and correct copy of the User Agreement as revised on August 20, 2021, which remained in place until November 23, 2021.

18.     Attached as **Exhibit D** is a true and correct copy of the User Agreement as revised on November 23, 2021, which remained in place until January 7, 2022.

19.     Attached as **Exhibit E** is a true and correct copy of the current User Agreement as revised on January 7, 2022.

20.     The only update to the User Agreement that occurred during the time period in which Mr. Cassidy traded on the Voyager Platform was the April 16, 2021 update.

21.     Customers, including Mr. Cassidy, were notified of that update by email on April 18, 2021.  Attached as **Exhibit F** is a printout of a record maintained by Voyager LLC in the ordinary course of business, depicting the email sent on April 18, 2021 notifying customers of the update to the User Agreement, and recording the date, time and distribution list. Voyager LLC's records also reflect that Mr. Cassidy was included in the distribution list to which the update was sent.

4

22.    I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 17, 2022.

SHANNON CASEY



1



| | |
|---|---|
| **Date:** | Wednesday, December 1 2021 04:26 PM |
| **Subject:** | Re: Customer Agreement changes summary. |
| **From:** | Pam Kramer <pkramer@investvoyager.com> |
| **To:** | Julia Hyman <jhyman@investvoyager.com>; |

Great work, THX!

On Wed, Dec 1, 2021 at 1:23 PM Julia Hyman <jhyman@investvoyager.com> wrote:
Hi All,

Confirming this has been updated and is currently in deployment.

Thanks!

Julia

Senior Marketing Program Manager

On Wed, Dec 1, 2021 at 12:52 PM Brian Nistler <bnistler@investvoyager.com> wrote:
For convenience, I have also attached a clean word and PDF copy of the updated agreement.

Thanks,
Brian

On Wed, Dec 1, 2021 at 12:48 PM Pam Kramer <pkramer@investvoyager.com> wrote:
Thank you very much, this is very helpful. Will let you know when it has been updated.
Pam

On Wed, Dec 1, 2021 at 9:47 AM Brian Nistler <bnistler@investvoyager.com> wrote:
Attached Pam.

On Wed, Dec 1, 2021 at 12:08 PM Pam Kramer <pkramer@investvoyager.com> wrote:
Yes, if possible, thanks.
Pam

On Wed, Dec 1, 2021 at 9:04 AM Brian Nistler <bnistler@investvoyager.com> wrote:
Hi Pam,

Do you mean that you want a redline of the original agreement as compared to the updated version?

- Brian

On Wed, Dec 1, 2021 at 11:50 AM Pam Kramer <pkramer@investvoyager.com> wrote:
Hi Brian et al,
Thank you for the update.

Adding Dan and Julia to this thread because they are in charge of ensuring the updates to the Customer Agreement happen on the website. **Would be great to have a mark up of the currently posted agreement**


EXHIBIT
Plf's Exhibit 5a

so that Dan knows which pieces to update and Julia knows what to QA, etc.

Also, based on these specific updates--do you think this warrants an email to customers? This summary is very helpful in that regard.

Thanks,
Pam K

On Tue, Nov 30, 2021 at 2:47 PM Brian Nistler <bnistler@investvoyager.com> wrote:
**Privileged and Confidential**



--

Brian Nistler
Associate Counsel


investvoyager.com

--

Brian Nistler
Associate Counsel


investvoyager.com

--



Brian Nistler
Associate Counsel


investvoyager.com


--

Brian Nistler
Associate Counsel


investvoyager.com

CONFIDENTIAL

| | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | eventName | predictionId | email | catalogLookupCount | templateId | messageBusId | messageId | createdAt | catalogCollectionCount | campaignId | channelId | messageTypeId | transactionalData | productRecommendationCount | contentId |
| 802357 | | 000100000114222cdc06348-8132-4b6b-bed7-54d7c8ce779f | joebeutts@gmail.com | 0 | 3062892 | 01000178e5f15b01-9529dad1-8ce2-494f-801f-ec0daee11982-000000 | 109a17d8cb0740da855571432e434616 | 2021-04-18 17:05:03 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802358 | | 0001000001142206101056-f621-4150-a860-44ceda810ceb | nick.birnbaum@gmail.com | 0 | 3062892 | 01000178e5f15c04-09bd1df2-5897-46f4-a614-de5aba0db39b-000000 | 9a4bf7fc03c643ddba02194a71f57124 | 2021-04-18 17:05:03 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802359 | | 000100000114222d3d9dc82-62c9-462b-b4b8-5ac190f98fe6 | sdh.liberty@gmail.com | 0 | 3062892 | 01000178e5f15c34-d2daf69e-2a51-48ce-85e4-c16236bb7596-000000 | 4303736e4223400286cc8d1d49074f7f | 2021-04-18 17:05:03 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802360 | | 0001000001142227d17ac15-6cdf-408f-9d46-a655172494d8 | bgoldin22@yahoo.com | 0 | 3062892 | 01000178e5f15c84-653b8e9f-32af-46b1-a5dd-1b3d0b0fc36d-000000 | 1a0c799112184d91910c31c0fc369c5d | 2021-04-18 17:05:03 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802361 | | 0001000001142229bfe74f4-102c-4315-b62b-244f7747ce51 | optimus9696@gmail.com | 0 | 3062892 | 01000178e5f15e13-2a450593-a014-40c7-a766-a121ce0d74ae-000000 | ee1614c6eabc420da72262a37a66eff7 | 2021-04-18 17:05:04 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802362 | | 0001000001142229532fdf4-52aa-4ee6-9ed5-af1732f40c96 | sheltoncgraham@gmail.com | 0 | 3062892 | 01000178e5f15a3b-c7f14d63-6906-4e11-9a0c-2d3fa919d8d9-000000 | b10dfcf4b6d447908a8bb879777a00f6 | 2021-04-18 17:05:03 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802363 | | 0001000001142226d861d31-dc80-4cf5-b805-34d6c978ddcf | ryanlapietra@yahoo.com | 0 | 3062892 | 01000178e5f15bd5-4809ccdc-72da-4159-a88b-dfe2e2181bba-000000 | 23e8df0779c14d078dbc6edbb14054cf | 2021-04-18 17:05:03 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802364 | | 000100000114222d3d5a18d-78a2-4ec2-9609-eda1e68db83f | johnsouthall56@gmail.com | 0 | 3062892 | 01000178e5f15f96-f7a29c28-f8c4-4e5d-a308-b769ccb83563-000000 | a6f70461c2bf4511be6ec64b2e05649e | 2021-04-18 17:05:04 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802365 | | 0001000001142221540e819-9f87-4230-b734-8d010be888fc | steffiebrennan@aol.com | 0 | 3062892 | 01000178e5f15c8f-9f3e3e75-5063-4c64-813a-b25c34eda641-000000 | 10f973b253f24326b512924458cd8f4d | 2021-04-18 17:05:03 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802366 | | 0001000001142234725086-a988-404d-9c55-03a7a82cc2bf | johnjoe.braxton@yahoo.com | 0 | 3062892 | 01000178e5f15c0e-d74a760d-7d67-4afc-bcec-16f0690525e5-000000 | a3f9e69ba9f64f78bc331ebefa50cc7b | 2021-04-18 17:05:03 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802367 | | 000100000114222691f01bc-2877-4dcf-9c3b-554d13c63e39 | salpad62@gmail.com | 0 | 3062892 | 01000178e5f15c70-d9d6b576-75eb-40dc-86c9-1f74b7d1a3d5-000000 | ecabbd92ab9d47a0b7cc1332c3a463ce | 2021-04-18 17:05:03 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802368 | | 000100000114222fa222838-e897-4b1e-8400-3f42d780c143 | michosarkisian@icloud.com | 0 | 3062892 | 01000178e5f15be6-0de57e97-d232-4804-9f11-23debed3f03e-000000 | 7a57dfe8888844dca6eef5d4f47c3534 | 2021-04-18 17:05:03 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802369 | | 0001000001142221a7d4682-5c36-4fe2-adf2-373828916aee | markcassidy528@gmail.com | 0 | 3062892 | 01000178e5f1541a-cc877c4b-814d-4fc8-8df6-28c2282a236d-000000 | c170d90ad26749c8801a95665dbb1a00 | 2021-04-18 17:05:01 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802370 | | 00010000011422284df769a-1c87-46dc-8af6-3c79b2d7af91 | camcast51@yahoo.com | 0 | 3062892 | 01000178e5f15b6b-afb60c53-9529-4678-b5f8-808955ec7f86-000000 | 933f41969ffd4601bd5ac2d5d7faa8ab | 2021-04-18 17:05:03 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802371 | | 00010000011422012b6fb1-fa9f-49d7-852c-9a567dcf95bc | slawrence434@gmail.com | 0 | 3062892 | 01000178e5f15808-e3b4a872-95ba-4d74-8c39-a47ef677d9a9-000000 | 4a330045082645399a3c73a6bde61662 | 2021-04-18 17:05:02 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802372 | | 000100000114222e3143941-602e-43db-a107-3cf825d97fea | sparkie909shiloh3@gmail.com | 0 | 3062892 | 01000178e5f15bed-efe8c377-fa5d-4ba3-bac1-2a7dbb6756fd-000000 | 814a7dba67294bd592548a8005c57f74 | 2021-04-18 17:05:03 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802373 | | 000100000114222d042e3f4-621a-4c81-a7b7-58b1dfb28a43 | christam_office@yahoo.com | 0 | 3062892 | 01000178e5f1614e-911fc1f3-5515-40c4-961d-3fac1aebde55-000000 | 684d3908a04d45088ec4e061f92adfd7 | 2021-04-18 17:05:05 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802374 | | 0001000001142226a6c60c7-b3ac-4c82-8f47-4738d812621a | jliketheltr@gmail.com | 0 | 3062892 | 01000178e5f15eff-d5f389c3-bd9a-4647-8904-782c340ca822-000000 | 3b0f702e5d5d4d568f14894cba2107a3 | 2021-04-18 17:05:04 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802375 | | 00010000011422272ff65a-d77a-4a5e-b556-ba4a47eb6f96 | jaimeahluwalia@gmail.com | 0 | 3062892 | 01000178e5f15ed1-c4c2eec8-f5ae-4f86-87b6-836b50a101d3-000000 | 3a7c282740394822b9011d0ed6830fff | 2021-04-18 17:05:04 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802376 | | 000100000114222b51bf810-26c7-4fc2-902f-28cd15384f97 | garrettauby@gmail.com | 0 | 3062892 | 01000178e5f15f70-deb09ece-3bb6-4390-ad29-e87bb0c60635-000000 | 1d9dc88ea5f34d038224fadb1cee233f | 2021-04-18 17:05:04 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802377 | | 000100000114222a428bdda-e203-424d-8378-2c8ac00d1330 | briana.lark@comcast.net | 0 | 3062892 | 01000178e5f15f28-d1aae84b-2b0c-42d5-ae33-0f3c38e62aed-000000 | 3187e93dd68b49fba83e45d8180550b1 | 2021-04-18 17:05:04 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802378 | | 0001000001142223f871483-4348-4c8b-b93d-8341e80289ff | nsdoc78@gmail.com | 0 | 3062892 | 01000178e5f15e1d-1e37b7cf-bb20-4389-9af8-e65ab7813c0e-000000 | 23cfef83fcf245cc89bc67198edc8ea5 | 2021-04-18 17:05:04 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802379 | | 000100000114222eb1f213d-39cc-4381-bd17-e9a6e2ba3479 | guidoterry@gmail.com | 0 | 3062892 | 01000178e5f160a7-63af07e7-9d42-4d77-b9af-ce89e9d9064a-000000 | 1d99e50e6c2b453aa5d4a714542e871c | 2021-04-18 17:05:04 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802380 | | 0001000001142223e3316e8-a6cc-479c-b33d-1aa80000b244 | jgrado@okstate.edu | 0 | 3062892 | 01000178e5f15f4c-8d99ffa0-4c09-4da9-9f0d-6341e04a3f5f-000000 | 7838924a5a394ae6a370b8b135a5cc6e | 2021-04-18 17:05:04 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802381 | | 00010000011422478c5615-c7f1-4153-904b-344338eca32e | guillermo.llamas@ymail.com | 0 | 3062892 | 01000178e5f16103-251645a9-d5bd-49ae-ac0e-b1dfaf0dc199-000000 | fb028f4f3d164489bb1aa41b8b8d2cdd | 2021-04-18 17:05:04 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802382 | | 000100000114222d878d0e5-fcfc-44d5-a777-c81775333f7b | tom.catalanotto@gmail.com | 0 | 3062892 | 01000178e5f15f2e-abbdf9a7-c43e-470b-91ef-83a5b464bacf-000000 | 739c067d4c394e37aa8555df7af865f2 | 2021-04-18 17:05:04 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802383 | | 00010000011422233a60102-c099-4217-b208-dd7fe596d5fe | raycooljay12@gmail.com | 0 | 3062892 | 01000178e5f15e81-92ec8640-160c-469a-ad96-ccf2cc088494-000000 | 7ed34480c4ea458ba5015eaa9cabdb2c | 2021-04-18 17:05:04 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802384 | | 000100000114222db8c7581-1ac2-4ec0-9c05-2ae1ac4abff2 | hushmypretty@gmail.com | 0 | 3062892 | 01000178e5f15e4b-2b76cac2-36d8-4de7-8106-f5966e511bd6-000000 | 78ad762a427d412081fe04b0b2311068 | 2021-04-18 17:05:04 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802385 | | 000100000114222f1659fed-0b36-4b6d-b6fb-2ded44b1c4b2 | dlogsdon3@gmail.com | 0 | 3062892 | 01000178e5f160ba-f4915e4d-be90-4fd1-a3b9-00943bf10b89-000000 | 4311d8aa0ec54159922cf83e15c06cf6 | 2021-04-18 17:05:04 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802386 | | 0001000001142228792d411-a41d-4613-b3d1-606b215097a3 | john.j.farrell611@gmail.com | 0 | 3062892 | 01000178e5f161b3-1fc4fac7-d8cd-422f-becb-0eb8d1acc734-000000 | a7bb330a151c40f6813f38a496ff8e59 | 2021-04-18 17:05:05 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802387 | | 0001000001142241400566-502e-4b09-93bd-12e1029567a5 | derrick.fuqua@gmail.com | 0 | 3062892 | 01000178e5f16228-2687b0dd-f8b0-40a1-bb05-4cd5a0e22113-000000 | 51b24148f9b84a7088bca880a9c1aea8 | 2021-04-18 17:05:05 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802388 | | 00010000011422252 5ea59a-7368-4da2-b376-6af43fac976a | clightford1@gmail.com | 0 | 3062892 | 01000178e5f1623e-9d37f52c-a507-4080-ab85-f2fad8979d62-000000 | c5505369c7b5464cb97a9e16232b05da | 2021-04-18 17:05:05 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802389 | | 00010000011422261172f67-3c50-40fd-8078-1f6fb64ad789 | artwhkg@knology.net | 0 | 3062892 | 01000178e5f15f34-8ddcc783-94b7-4cc4-aae1-7fd4045e937a-000000 | b42dbe9ab631482eba2171306874f0fc | 2021-04-18 17:05:04 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802390 | | 0001000001142219cfce64-0347-4aba-a077-b0c0872433c7 | david.zhu5@gmail.com | 0 | 3062892 | 01000178e5f16178-bf912343-f58e-4104-aa28-2a42a5741de5-000000 | 511ad4227efb41109a2f25f53c9a2dba | 2021-04-18 17:05:04 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802391 | | 0001000001142224025d55a-fad2-4703-b77c-1f2d39a2cc64 | robinballengee1965@gmail.com | 0 | 3062892 | 01000178e5f161c4-dd404630-6dd8-4bcf-bfaa-6ca4f0918713-000000 | 892808ce184f4931a9cd76e7106dcb6f | 2021-04-18 17:05:05 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |

EXHIBIT
Plf's Exhibit 6



AMERICAN
ARBITRATION
ASSOCIATION

INTERNATIONAL CENTRE
FOR DISPUTE RESOLUTION

1101 Laurel Oak Road
Voorhees, NJ 08043

July 26, 2021

Voyager Digital LLC
185 Hudson Street, Suite 2500
Jersey City, NJ 07311
Via Mail

**Case Number: 01-21-0003-9886**

Daniel Schaefer
-vs-
Voyager Digital LLC

Dear Parties:

The claimant has filed with us a demand for arbitration. The American Arbitration Association ("AAA") has determined that this arbitration arises out of a consumer agreement and, as such, the Consumer Arbitration Rules ("Consumer Rules") apply to this dispute. The Consumer Rules may be found on our website at www.adr.org.

Under R-12 of the Consumer Rules, businesses that provide for AAA arbitration in a consumer contract are obligated to submit their current or proposed consumer agreements to the AAA for review and inclusion on the Consumer Clause Registry ("Registry"). The AAA reviews the agreement for material compliance with the due process standards of the Consumer Due Process Protocol ("Protocol") and the Consumer Rules. The AAA's review is administrative; it is not an opinion on whether the arbitration agreement, the contract, or any part of the contract is legally enforceable, nor is it a determination regarding the arbitrability of the dispute.

This business has not previously submitted its consumer arbitration clause for review. As such, the AAA will review the clause for this matter on an expedited basis. The additional fee for this expedited review is $250, payable by the business.

**The business is also directed to submit its current consumer arbitration clause for inclusion on the Registry at** https://www.adr.org/Consumer **at which time the business will also incur a $500 Registry fee.** Once the business' clause is registered, it will no longer be assessed the $250 additional expedited review fee on each consumer case filed.

For cases proceeding under the Consumer Rules, the AAA reviews the relevant arbitration agreement for material compliance with the due process standards of the Consumer Due Process Protocol ("Protocol") and the Consumer Rules. The AAA's review is administrative; it is not an opinion on whether the arbitration agreement, the contract, or any part of the contract is legally enforceable, nor is it a determination regarding the arbitrability of the dispute. **We note that the arbitration provision has a material or substantial deviation from the Consumer Rules and/or Protocol. Specifically, the provision states:**

> *THE ARBITRATION WILL OCCUR IN NEW JERSEY AND WILL BE CONDUCTED*
> *CONFIDENTIALLY BY A SINGLE, NEUTRAL ARBITRATOR*

**The above provision violates Principle 7: Reasonably Convenient Location.** If a party believes that there are additional conflicts with the Protocol and/or Consumer Rules, those issues may be brought before the arbitrator once one has been appointed.



**EXHIBIT**

Plf's Exhibit 7

However, so that we may commence administration of this matter, **we are requesting that the business waive the above provision(s) and agree to have this matter and any future consumer arbitrations filed under this agreement administered under the Consumer Rules and in compliance with the Protocol**. Please confirm your agreement to waive the above-quoted provision by signing and dating below and returning a copy of this letter. Absent receipt of the requested waiver, the AAA will decline to administer this dispute and possibly any future consumer arbitrations involving this business. Please note that pursuant to the R-1(d) of the Consumer Rules, should the AAA decline to administer an arbitration, either party may choose to submit its dispute to the appropriate court for resolution. In addition, Rule R-9 states either party may choose to take the claim to small claims court if the claim is within the jurisdiction of that court.

_____         _____
Business (authorized representative)                              Date

Pursuant to New Jersey Statutes § 2A:23B-1 et seq, consumers with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of arbitration fees and costs, exclusive of arbitrator fees. This law applies to all consumer agreements subject to the New Jersey Arbitration Act, and to all consumer arbitrations conducted in New Jersey. If you believe that you meet these requirements, you must submit a completed Affidavit for Waiver of Fees, available on our website.

Under the Consumer Rules, the consumer pays a filing fee of $200 and the business pays a filing fee of $300. We have received the consumer's $200 portion of the filing fee. So that the filing requirements are complete, **the business is requested to submit filing fees of $300, the expedited consumer clause review fee of $250 and its arbitrator's compensation deposit of $2,500, totaling $3,050**.

**Please note payment should be submitted by credit card or electronic check. Please confirm the email address AAA may send a secured paylink with instructions to submit payment via either method**. In the event that payment is being made by a third party, such as an insurance company, please request that payment be sent directly to the business' representative. The business' representative should then forward payment to the AAA in accordance with the foregoing instructions.

**The requested payment and waiver should be received no later than August 9, 2021** and the AAA may decline to administer this dispute if the business does not timely respond. It should be noted that the consumer's satisfaction of the filing requirements triggers the business' obligation to promptly pay its share of the filing fees under the rules and the business may owe all or a portion of the filing fees even if the matter is settled or withdrawn. The AAA will refund any overpayments received from the consumer with the filing.

No answering statement or counterclaim is due at this time and the parties will be notified of the applicable deadlines upon satisfaction of all the filing requirements.

Please note all communication for this matter will be in writing, if you have any questions please feel free to send us an e-mail.

Sincerely,
Consumer Filing
Email: ConsumerFiling@adr.org
Fax: (877)304-8457

cc:     Daniel Schaefer
        3578 232nd Court NW
        Saint Francis, MN 55070
        Via Email to: d11schae@gmail.com

VOYAGER_001952

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.: 21-24441-CIV-ALTONAGA/Torres**

MARK CASSIDY, on behalf of himself
and others similarly situated,

      Plaintiff,

v.

VOYAGER DIGITAL LTD, and
VOYAGER DIGITAL LLC

      Defendants.

_____/

**DECLARATION OF MARK CASSIDY IN SUPPORT OF PLAINTIFF'S RESPONSE IN
OPPOSITION TO DEFENDANTS' EXPEDITED MOTION TO STAY**

      I, Mark Cassidy, hereby declare as follows:

      1.    I have personal knowledge of the facts stated herein, and if called upon as a witness, I would and could testify competently to the matters set forth herein.

      2.    I am a citizen and resident of the State of Florida and am 30 years old.

      3.    I created my Voyager account on March 17, 2021.

      4.    I placed the trade orders identified in the complaint, *see* Compl. ¶ 58, and an additional purchase of bitcoin (BTC) on July 31, 2021.

      5.    On August 17, 2021, I sold all of my holdings in my Voyager account and transferred the funds out.

      6.    Since then, I have not conducted trades on the Voyager platform, but did not cancel my Voyager account.

      7.    I only have one email account associated with my Voyager account. Since opening my Voyager account through February 15, 2022, I have received the following emails from no-reply@investvoyager.com to that email account:

1



EXHIBIT

Plf's Exhibit 8

CASE NO.: 21-24441-CIV-ALTONAGA/Torres







8.      I reviewed the Declaration of Shannon Casey in support of Defendants' Motion to Compel Arbitration. I did not receive the April 18, 2021, email notifying of the April 16, 2021 update to the Customer Agreement. It was not marked as SPAM or delivered to a SPAM folder, nor was it in the trash folder.

9.      I did not receive any email, notification, or any other form of actual notice of any of the other versions of the Customer Agreement referenced in Shannon Casey's declaration. Further, I have never received any form of explanation regarding what revisions were made to the Customer Agreement at any time.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and accurate to the best of my knowledge and belief.

Executed February 23, 2022.

By: _Mark Cassidy_____
Mark Cassidy
*Plaintiff*

5

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.: 21-24441-CIV-ALTONAGA/Torres**

MARK CASSIDY, on behalf of himself
and others similarly situated,

      Plaintiff,

v.

VOYAGER DIGITAL LTD, and
VOYAGER DIGITAL LLC

      Defendants.

_____/

**DECLARATION OF MARK CASSIDY IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR ORDER TO SHOW CAUSE**

      I, Mark Cassidy, hereby declare as follows:

1.    I have personal knowledge of the facts stated herein, and if called upon as a witness, I would and could testify competently to the matters set forth herein.

2.    I am a citizen and resident of the State of Florida and am 30 years old.

3.    I created my Voyager account on March 17, 2021.

4.    I placed the trade orders identified in the complaint, *see* Compl. ¶ 58, and an additional purchase of bitcoin (BTC) on July 31, 2021.

5.    On August 17, 2021, I sold all of my holdings in my Voyager account and transferred the funds out.

6.    Since then, I have not conducted trades on the Voyager platform, but did not cancel my Voyager account.

1



EXHIBIT

Plf's Exhibit 5

7.     On January 31, 2022, I attempted to log in to the Voyager account to obtain information regarding my account activity for this lawsuit, but my account was inaccessible.

8.     I submitted a "forgot my password" request, received a link, and reset my password. Upon attempting to log in to my account with the new password, I received a notification that now my email was invalid and/or not associated with a Voyager account.

9.     I repeated the process a second time with a new password, and I received the same notification.

10.     Users apparently cannot contact Defendants by phone with questions about their account—the only available number I found is for "Investor Relations." I placed several calls and left at least one voicemail to the Investor Relations number to get an answer regarding the apparent deactivation of my account, but to date have received no response.

11.     My only other avenue to contact Voyager was through a written request submitted on a fillable form on Voyager's website provided by Zendesk. So, unable to reach anyone on the phone and unable to access my account through the App, at 10:29pm on January 31st, I submitted a request in writing through the investvoyager.com website and requested "Details of account including transactions and date of opening/closing."

12.     On February 1st at 8:04 AM, I received an email response from Zendesk giving me a link to a "tax/transaction report request form," but was given no explanation about the status of my account.

13.     As of the time of this declaration, I still have not accessed my account through the Voyager App, and I am waiting for a response to my phone calls and voicemail left on Defendants' Investor Relations line.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and accurate to the best of my knowledge and belief.

Executed February 9, 2022.


By: _____
        Mark Cassidy
        *Plaintiff*

| Date: | Monday, March 8 2021 02:04 PM |
|---|---|
| Subject: | FW: User Agreement Update |
| From: | <jbarrilleaux@investvoyager.com> |
| To: | <breynolds@investvoyager.com>; |
| Attachments: | Return Report Automation Logic as of Feb 2021.docx |

-----Original Message-----
From: jbarrilleaux@investvoyager.com <jbarrilleaux@investvoyager.com >
Sent: Friday, March 5, 2021 2:24 PM
To: 'David Brosgol' <dbrosgol@investvoyager.com >
Cc: ghanshe@investvoyager.com;  jbarrilleaux@investvoyager.com
Subject: RE: User Agreement Update

Here are some things we need to address:

1 - Hypothetical training complaints during spikes or tech outages - we
will not reimburse or entertain

2 - ACH Return Account Handling - we restrict accounts in many situations.
- attached.

3 - Account Restrictions for the above mentioned ACH transactions or for
Blockchain transaction investigations/issues

4 - PII mismatch on bank accounts vs account

5 - Additional verification requests may occur that might include bank
statements, SSN validation, Videos, Liveness check or "other" for purpose
of due diligence

6 - Firm standard of no longer going back and forth with individuals who
threaten legal action

7 - Missing or delayed deposits for blockchain that require investigation

8 - Blockchain deposits and withdrawals where client sent to wrong
address. Recovery request can be made but is rarely possible and even if
possible, the investigation, timing and recovery are at the firm's
discretion and are not guaranteed. We also charge a fee for the work and
attempt

9 - client locks themselves out for 2FA (changed number, switched or lost
device). We will work with the client to restore access but this will
take some time as we go through a due diligence process and process of
verification that is discretionary.

There is probably more but that's a good start.

-----Original Message-----
From: David Brosgol <dbrosgol@investvoyager.com >
Sent: Friday, March 5, 2021 8:15 AM
To: Janice Barrilleaux <jbarrilleaux@investvoyager.com >
Cc: ghanshe@investvoyager.com

VOYAGER_001893


EXHIBIT

Plf's Exhibit 14

Subject: Re: User Agreement Update

Got it. Yeah. would be great to get Gerard's input.

Idea: instead of filtering it all through me to Ethan, maybe it's most efficient to arrange a call with Ethan next week with the 3 of us to discuss it?

Which do you both prefer?

Dave


> On Mar 5, 2021, at 10:20 AM, <jbarrilleaux@investvoyager.com >
<jbarrilleaux@investvoyager.com > wrote:
>
> I am free at 4 pm your time today.
>
> I think Gerard would likely want to have some input as well.
>
> He doesn't read email, although I cc'd him here so maybe, but if you slack him he will let you know.
>
> If today doesn't work, my calendar is up to date for next week!
>
> Look forward to it.
>
> -----Original Message-----
> From: David Brosgol <dbrosgol@investvoyager.com >
> Sent: Friday, March 5, 2021 6:03 AM
> To: Janice Barrilleaux <jbarrilleaux@investvoyager.com >
> Subject: User Agreement Update
>
> Hi Janice,
>
> Thanks for sending me the current User Agreement and the redline for the January changes. I've reviewed and will be working with Lowenstein to update it. Having discussed it with Ethan, it seems that it might be best to do a significant overhaul. That said, I know you are the person with most knowledge of the Voyager specific issues that need to be considered and reflected so Ethan and I would love to get your input and help.
>
> I'd like to schedule some time to sync up and discuss issues/process. Today or early next week would work if you are amenable.
>
> Best,
>
> Dave
>
>
>

| | |
|---|---|
| **Date:** | Monday, March 15 2021 06:55 PM |
| **Subject:** | Re: [EXT] OSC Comment Letter (Feb 2021) - Draft Response v.3.0 |
| **From:** | Evan Psaropoulos <epsaropoulos@investvoyager.com > |
| **To:** | Bechold, Edward <Edward.Bechold@marcumllp.com >; |
| **CC:** | Steve Ehrlich <sehrlich@investvoyager.com >; Peltzman, Zachary <Zachary.Peltzman@marcumllp.com >; |

In response to your question - the OSC asked to point specifically to the User agreement. The sentence you highlighted is paragraph 2 of the User agreement and needs to be read together with the next sentence that the client bears sole responsibility for transaction losses and the Company reserves the right to pass on any fees charged by exchanges, market-makers, liquidity providers, or other types of cryptocurrency counterparties.

Here is the language from the user agreement:

> Voyager is not a broker-dealer and is not a member of the Financial Industry Regulatory Authority ("**FINRA**") or the Securities Investor Protection Corporation ("**SIPC**"). I understand that my Cryptocurrency investments are not protected by either FDIC or SIPC insurance.

> I understand that Voyager reserves the right to pass on any fees charged by any Cryptocurrency exchanges, market-makers, liquidity providers, or other types of Cryptocurrency counterparties (each such counterparty, a "**Counterparty**"), including in connection with the withdrawal of Cryptocurrencies to an external wallet or any fees related to any enhanced due diligence related to my Voyager Account.

On Mon, Mar 15, 2021 at 6:44 PM Bechold, Edward <Edward.Bechold@marcumllp.com > wrote:

One question

---

**CONFIDENTIALITY NOTICE:**

The information transmitted, including this message and any attachments, is intended only for the individual or entity to which it is addressed and may contain information that is privileged, confidential or exempt from disclosure under applicable law. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by individuals or entities other than the intended recipient is strictly prohibited, and all liability arising therefrom is disclaimed. If you have received this in error, please notify Marcum immediately by telephone at (631) 414-4000 or (212) 485-5500 and delete the information. Marcum LLP is a New York limited liability partnership. This communication may come from Marcum LLP or any of its subsidiaries.

**DISCLAIMER:**

This communication has been prepared for informational purposes only and is not intended to constitute advertising or solicitation and should not be used or interpreted as tax or professional advice, unless otherwise stated. The content of this communication is limited to the matters specifically addressed herein and is not intended to address other potential tax consequences or the potential application of tax penalties to this or any other matter. Those seeking tax or professional advice should contact a member of our firm. Transmission of this information is not intended to create, and receipt does not constitute, any client-firm relationship. Personal or confidential information should not be sent to Marcum without first communicating directly with a member of our firm about establishing a client relationship.

--

Evan Psaropoulos
Chief Financial Officer
917.455.8927

CONFIDENTIAL